## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MUZAFAR BABAKR,

          Plaintiff,

                                    Civil Action No. 2:20-cv-02037

v.

DR. HOLLY T. GOERDEL, DR. JACOB T. FOWLES,
DR. DOROTHY M. DALEY, DR. STEVEN W. MAYNARD-MOODY,
DR. CHARLES R. EPP, DR. HEATHER GETHA-TAYLOR,
DR. ROSEMARY O'LEARY, DR. REGINALD L. ROBINSON,
DR. CARL W. LEJUEZ, DR. KRISTINE LATTA, and
UNIVERSITY OF KANSAS, an agency of the State of Kansas,

          Defendants.

## FIRST AMENDED COMPLAINT AND JURY DEMAND

I, Muzafar Babakr, allege the following as my Complaint against defendants, Dr. Holly T. Goerdel, Dr. Jacob T. Fowles, Dr. Dorothy M. Daley, Dr. Steven W. Maynard-Moody, Dr. Charles R. Epp, Dr. Heather Getha-Taylor, Dr. Rosemary O'Leary, Dr. Reginald L. Robinson, Dr. Carl W. Lejuez, Dr. Kristine Latta, and the University of Kansas ("KU"):

## INTRODUCTION

1.      I faced national origin discrimination while at KU. The defendants did not treat me as other students, put me in unreasonable conditions, and retaliated against me. In particular, the program coordinator, Dr. Goerdel, did not treat me as other doctoral students because only in my case she chaired my specialization exam in violation of the policy leading to loss of interest of my advisor and hence ending the advising relationship. This was followed by a series of discriminatory actions against me as an international student.

2.      The doctoral committee ultimately dismissed me from the doctoral program after placing me on probation for allegedly not making progress. In reality, the doctoral committee

1

dismissed me in retaliation for saying that I would bring their discriminatory actions against me to the attention of a court.

3.      Some aspects of policy violations by the defendants constitute negligence because the doctoral committee owed me the duty of making sure that I had an advisor consistent with its own policy. When the advising relationship came to an end with my advisor, no one took me as his/her student and the doctoral committee prevented me from pursuing a new specialization for which an advisor would be available. I had to take a leave of absence to keep my J-1 status. I later could not enroll in classes due to the unavailability of an advisor. Hence, I fell out of legal J-1 status, could not finish the program, and could not request an extension for the program, thereby breaking the contract with my sponsor.

4.      Other aspects of policy violation involve civil conspiracy. The doctoral committee and Director Robinson conspired to have me discontinue the program when in actuality I was trying to take a leave of absence. The doctoral committee then conspired to dismiss me from the program.

5.      As I tried to resolve these issues, some of the defendants defamed me by providing misleading information to other units within KU and to my sponsor.

6.      At least one aspect of policy violations constitutes fraudulent misrepresentation because Director Robinson had me sign a letter indicating that I would stay with my advisor until completion of the program and that my advisor would accept me as her student again after our advising relationship came to an end twice. However, she was not performing in good faith and she was not at all interested in having me as her student.

7.      Other aspects of policy violations involve depriving me of property and liberty interest by the doctoral committee through dismissing me from the doctoral program in violation

2

of procedural and substantive due processes guaranteed by the Constitution of the United States of America.

8.      The defendants' conduct constitutes unjust enrichment as KU charged me tuition and fees while I received no service from KU.

9.      The defendants' wrongful conduct includes intentional infliction of emotional distress as I suffered immense emotional anguish and suffering.

10.     The defendants, thus, violated many school, college, and university policies many other times. These policy violations constituted breach of contract between KU and me as an international sponsored doctoral student.

11.     As a result of discrimination, retaliation, negligence, civil conspiracy, defamation, fraudulent misrepresentation, due process violations, unjust enrichment, intentional infliction of emotional distress, and breach of contract, I incurred immense financial, emotional, reputational, and legal injuries.

12.     I bring this action to vindicate my statutory right to equal educational opportunities, a right KU violated and will continue to violate absent relief from this Court.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343 because this litigation involves matters of federal law including claims made under Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. §2000 *et seq.* and 42 U.S.C. §1983.

14.     This Court has jurisdiction over this matter also because of complete diversity between the parties pursuant to 28 U.S.C. 1332(a) (2). I am a citizen of a foreign state and lawfully entered the United States on a student visa, and my claim for relief exceeds $75,000.

15.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. My state and federal claims are interrelated.

16.     All the defendants are located in Kansas and the relevant facts occurred in Kansas. Thus, venue in this Court is proper pursuant to 28 U.S.C. §1391(b).

## PARTIES

17.     I, Muzafar Babakr, am the plaintiff. I am a citizen of Iraqi Kurdistan. I lawfully entered the United States on a student visa and currently reside in the State of Kansas, Douglas County. At all times relevant to the misconduct by the defendants I was a student at KU.

18.     Defendant Dr. Holly T. Goerdel is the former program coordinator and former chair of the doctoral committee at KU School of Public Affairs and Administration. She is sued in her individual and official capacities.

19.     Defendant Dr. Charles R. Epp is the current program coordinator and the current chair of the doctoral committee at KU School of Public Affairs and Administration. He is sued in his individual and official capacities.

20.     Defendant Dr. Jacob T. Fowles is a member of the doctoral committee at KU School of Public Affairs and Administration. He is sued in his individual and official capacities.

21.     Defendant Dr. Dorothy M. Daley is a member of the doctoral committee at KU School of Public Affairs and Administration. She is sued in her individual and official capacities.

22.     Defendant Dr. Steven W. Maynard-Moody is a member of the doctoral committee at KU School of Public Affairs and Administration. He is also a former member of my committee. He is sued in his individual and official capacities.

4

23.     Defendant Dr. Rosemary O'Leary is a former member of the doctoral committee and a former school director at KU School of Public Affairs and Administration. She is also my former advisor. She is sued in her individual and official capacities.

24.     Defendant Dr. Heather Getha-Taylor is a former member of my committee at KU School of Public Affairs and Administration. She is sued in her individual and official capacities.

25.     Defendant Dr. Reginald L. Robinson is the former school director at KU School of Public Affairs and Administration. He is sued in his individual and official capacities.

26.     Defendant Dr. Carl W. Lejuez is the former Dean of KU College of Liberal Arts and Sciences. He is sued in his individual and official capacities.

27.     Defendant Dr. Kristine Latta is the Director at KU College Office of Graduate Affairs. She is sued in her individual and official capacities.

28.     Defendant KU is a state institution as defined by K.S.A. §75-6102(a) and is subject to liability under the Kansas Tort Claims Act.

29.     Under the doctrine of Respondeat Superior, defendant KU is responsible for the actions of its employees.

30.     Defendant KU is an agency of the State of Kansas and a public institution of higher education located in Lawrence, Kansas, and is a recipient of federal financial assistance within the meaning of 42 U.S.C. §2000(d).

## GENERAL ALLEGATIONS

Definitions

31.     Specialization: A specialization in the doctoral program at KU School of Public Affairs and Administration is the area of study in which a doctoral student specializes such as Organization Theory, Human Resources Management, or Public Finance. In consultation with

5

his/her advisor, a student takes three classes in their specialization. Chaired by the student's advisor, members of the student's committee conduct a comprehensive written examination in the student's area of specialization, known as the "specialization exam."

32.     <u>School of Public Affairs and Administration:</u> Although it is called a school, it is a unit (department) within the College of Liberal Arts and Sciences at KU. KU has several schools and a college. Each school and the college typically have several departments. Besides departments as the common subunit, the college has a number of schools. Thus, the School of Public Affairs and Administration ("school") is equivalent to what is commonly known as "department" and the College of Liberal Arts and Sciences ("college") is equivalent to what is commonly known as "school" under KU.

<u>School Doctoral Program Curriculum</u>

33.     *Foundations Classes:* These are the core classes. A student takes four foundation classes and then takes a comprehensive written examination in the foundations.

34.     *Methods Classes:* These classes are about research methods. A student takes two methods classes.

35.     *Specialization Classes:* These are classes taken in the area in which the student specializes. A student takes three specialization classes. A student also takes a comprehensive written examination in his/her specialization.

36.     *Cognate Classes:* These classes are taken in an area related to the student's area of specialization. A student takes three cognate classes.

37.     *Dissertation:* This is the student's *contribution to his/her specialization*. Chaired by the student's advisor, the student's committee conducts the comprehensive oral examination in the student's dissertation proposal and the final dissertation defense.

38.     As can be seen above, the foundations and the methods portions of the program are stand-alone portions in the program. In contrast, the specialization, cognate, and dissertation portions of the program are related to each other and hence come as one package.

**I.      The Only Student Whose Specialization Examination was Chaired by the Program Coordinator, Dr. Goerdel, and Not my Advisor**

39.     I was an international doctoral student at the school. I received funding through a scholarship from the Kurdistan Regional Government-Iraq.

40.     My overall grade point average ("GPA") in the doctoral program is 3.84. My foundations GPA is 3.85 and my specialization GPA is 4.0.

41.     I passed one written comprehensive exam.

42.     I spent at least three semesters working on my doctoral dissertation.

43.     A paper of mine was accepted for the Public Management Research Conference when I had not yet started working on my dissertation.

44.     A poster presentation from another paper that I wrote was selected for a university-level graduate research competition.

45.     Through a Fulbright scholarship, I previously earned a Master in Public Administration and have been inducted to the Pi Alpha Alpha Honor Society with a 3.97 GPA

46.     As an international doctoral student, I have observed that I was treated differently from other students since joining the school in the Spring Semester 2013. For example, I was not given any office space, while other students were given office space. When I inquired about this, I was told that I was not given office space because I was not working with KU.

47.     However, this was a pretext, as other students who were also not working for KU were given office space. This discriminatory treatment from the school became evident and more serious when it came to the matter of taking the comprehensive written examination.

48.     In my early years in the program, me and my advisor, Dr. O'Leary ("Dr. O'Leary), had an overall good advisor-student relationship. However, that relationship was not without issues. The principal manifestation of her loss of interest in having me as her student was her refusal to chair my specialization examination.

49.     In the Spring Semester 2015, Dr. O'Leary told me that the program coordinator, Dr. Holly Goerdel ("Coordinator Goerdel"), would chair my specialization examination. However, as I contacted other students, they all informed me that the student's advisor chairs the specialization examination.

50.     I checked the school policy and it states that the student's committee conducts the specialization examination. In this regard, the school policy states, "The drafters and graders of the specialization exam will consist of two or three faculty members within the School of Public Affairs and Administration who have expertise in the student's chosen subfield, and who will serve as member of the student's committee."

51.     Among the two to three faculty members that conduct the specialization examination, the student's advisor chairs the specialization examination because the advisor works closely with the student and prepares the student for the specialization examination. The school policy states, "Students should consult their advisor to plan a schedule of course work and seminar preparation in anticipation of the comprehensive written examinations in public administration foundations and specializations."

52.     I contacted Coordinator Goerdel and to avoid any negative reaction from her, I indirectly alluded to the fact that she should not conduct my specialization examination which was to be offered in the Fall Semester 2015 and that my committee, chaired by my advisor, should conduct it instead.

53.     Coordinator Goerdel told me that faculty members needed not sit on a student's committee to participate in conducting the specialization examination for the student. However, the school policy does require that only faculty members sitting on the student's committee will conduct the specialization examination. In response to my question, her email states in part:

> My understanding for the specialization exam is that the dissertation committee drafts and grades the exam. Is that correct? No. Per policy "The drafters and graders of the Foundation exam will be the members of the Ph.D. committee. ***The drafters and graders of the specialty exams will be those 2-3 members of the department with expertise in those subfields."*** The 2-3 members of the department  with expertise may also be part of your oral exam/dissertation committee, but they need not be.

54.     In the Fall Semester 2015, Coordinator Goerdel was on parental leave. Hence, she could not *chair* my specialization examination. She was back from her leave in the Spring Semester 2016 and chaired my specialization examination, again in violation of the school policy, leading to the loss of interest of Dr. O'Leary. This time, the advising relationship with Dr. O'Leary came to an end.

55.     Coordinator Goerdel thus violated the school policy and interfered in my program by chairing my specialization examination even though she has no degree in Public Administration, let alone a specialization in Organization Theory, the area of my specialization, nor does she have expertise in my area of research. Further, I was not her student and she did not even sit on my committee, and her relationship with me deteriorated as she violated school policy by chairing my specialization examination, resulting in the loss of interest by Dr. O'Leary.

56.     Under school policy, for a faculty member to chair a specialization examination for a doctoral student, he/she must have a PhD degree in Public Administration, be a specialist in the doctoral student's area of specialization, do research in the student's area of research because

the student enrolls in dissertation hours with his/her advisor, must have worked with the student

as the advisor, and must have a healthy relationship with the student.

57.     If any of these conditions are not met, the faculty member cannot chair the

specialization examination for the student. As a faculty member who meets none of these

conditions, Coordinator Goerdel not only participated in conducting my specialization

examination, but she also chaired it, resulting in the loss of interest by Dr. O'Leary in having me

as her student.

58.     From the very beginning of joining the doctoral program, Coordinator Goerdel

was very tough with me as an international student, but not with other students. Not surprisingly,

Dr. O'Leary lost interest in having me as her student when Coordinator Goerdel chaired my

examination. That is because through chairing my specialization examination, Coordinator

Goerdel essentially signaled Dr. O'Leary that I should not stay in the doctoral program and Dr.

O'Leary understood the signal. Faculty members understand the university organizational culture

and university norms.

59.     For all other students, the student's advisor chaired the specialization exam

consistent with the school policy. Thus, other than intentional discrimination based on my

nationality, there is no other legitimate explanation for why Coordinator Goerdel and not my

advisor chaired the specialization exam in my case.

60.     Faculty members know that discrimination is illegal. Therefore, they do it in a

subtle way to make their actions seem nondiscriminatory so they can avoid liability.

61.     In my case for example, instead of directly saying I should leave the program,

Coordinator Goerdel insisted that she would chair my examination. The message from

Coordinator Goerdel to me as an international student was the same as telling I had no place in the doctoral program by telling me she would chair my specialization examination.

62.    The reason that doctoral students work with an advisor is that advisors prepare a student for the specialization exam and become familiar with the student's work, research interest, coursework, areas of strength, and so on. Having closely worked with the student, the advisor chairs the specialization exam because only the advisor knows the student best and what the student is undertaking in the doctoral program. The student also becomes familiar with his/her advisor in terms of what they expect the student to accomplish to succeed in the program. Coordinator Goerdel was not my advisor and I did not work with her, yet she chaired my specialization exam.

63.    Failure is *guaranteed* when someone other than my advisor and especially someone like Coordinator Goerdel who has no academic credential in Public Administration, no prior working relationship with me, and is hostile to me chair my specialization examination. This explains why Dr. O'Leary lost interest in working with me when Coordinator Goerdel chaired my specialization exam because Dr. O'Leary understood the signal sent by Coordinator Goerdel.

64.    As an Iraqi Kurdish student, I was and continue to be ready to take my specialization exam. My specialization GPA is 4.0. For over two years, however, Coordinator Goerdel did not allow that to happen because she chaired my specialization exam in violation of the school policy resulting in the loss of interest of Dr. O'Leary to have me as her student. Therefore, the advising relationship came to an end with Dr. O'Leary. As no one was willing to take me on as his/her student, I could not finish the doctoral degree.

65.     While students from different protected classes were targeted for discrimination, international students were targeted the most as they faced national origin discrimination. Upon information and belief, since 2013, the school has not admitted a single international student. Further, the only two students that the school dismissed are international students. Another international student took a leave of absence many years ago and never came back.

66.     The two students who were dismissed and the other one who took a leave of absence and never came back were all from Asia; one from China, the other from South Korea, and me from Iraqi Kurdistan. Further, I was the only Iraqi Kurdish student at the school. Thus, the presence of Iraqi Kurdish students is zero at the school. Upon information and belief, the presence of any international student has become zero at the school after I was dismissed.

67.     I have heard students from different protected classes complaining of discrimination and unequal treatment by the school. When I first joined the doctoral program back in the Spring Semester 2013, I was asked more than once by school students and staff about my national cultural background. A student even removed me from her Facebook friend's list once she asked about my national cultural background. Another student was always trying to avoid me and I generally felt unwelcome. I believe that Coordinator Goerdel made comments about my national cultural background to others.

68.     KU clearly states on its website that discrimination is prohibited. Hence, no comment, hint, action, or behavior that has a discriminatory content should be observed at KU.

69.     Upon checking the websites of other universities across Kansas and across the nation, I have never seen a nondiscrimination statement as visible and as clearly articulated as the one stated on KU's website, so much so that the front/main page of KU website even lists the people to be reached out to across all KU campuses for discrimination.

12

70.     Not only that, the nondiscrimination statement from KU's website clarifies that retaliation is also prohibited, thereby encouraging faculty, students, and staff to not hesitate in reporting discrimination. However, reality is different. Upon information and belief, discrimination is widely practiced at KU and I am one victim.

71.     The school does have has a history of treating members of protected classes unfairly. Besides myself, only one other doctoral student was terminated from the doctoral program after failing her twice in the comprehensive written examination, and she was an international student.

72.     Another student who was a member of a protected class was failed once but was eventually allowed to finish his degree. Another doctoral student who was also a member of a protected class left the school as she saw there was no place for her in the school. She joined another school within KU. Even after transferring to the new school, she faced issues in her new school and eventually did not finish her PhD degree.

73.     Of the four doctoral students who were all members of protected classes and who faced problems in our school, three were students of my advisor, Dr. Rosemary O'Leary; myself, the student who was eventually allowed to finish his degree even though they failed him once, and the student who left for another school within KU.

74.     Upon information and belief, KU has a history of practicing discrimination against its international students. I know other international students at KU who were either made to or had to leave KU. Because the school is part of KU, whatever prevailing culture that exists at KU will exist in all its constituent units and departments.

75.     Doctoral students from protected classes were not treated the same by faculty members compared to other students. School policy was bent or violated to help other students and such students received all kinds of support to help them finish their PhD degree.

76.     The school culture is very flexible, cooperative, and supportive to other students. I spent five years in the doctoral program, and I knew how other students were treated. Upon information and belief, only students from protected classes were made to leave the school either by failing them or treating them in a way so they themselves left. Upon information and belief, no Caucasian student was ever made to leave the school.

77.     Discrimination in educational institutions including higher education institutions is well-established in academic research. There are widespread media reports in Kansas and across the nation about discrimination happening everywhere, especially in educational institutions. Policy makers know this phenomenon based on statistics about rates of discrimination in educational institutions.

78.     Discrimination was practiced throughout educational institutions and is still practiced despite there being laws in place that prohibit it, and institutions, especially public ones, should avoid discrimination.

79.     For a doctoral student, nothing is more important than having a committed and interested advisor. Because of Coordinator Goerdel's violation of the school policy by chairing my specialization examination and the resulting loss of interest of Dr. O'Leary, I lost my advisor.

## II.     Coordinator Goerdel Forced Me to Return to My Advisor

80.     According to school policy, "The student must choose a committee for the comprehensive oral examination". The student chooses his/her committee composed of an advisor/chair and members. Thus, the advisor/chair and the members cannot be forced on a student.

14

81.     When Coordinator Goerdel knew that my advising relationship came to an end with Dr. O'Leary, she *forced* me to return to Dr. O'Leary. Forcing me to go back to Dr. O'Leary placed me in an unreasonable condition, as one form of discrimination. Discrimination can take several forms. One form is to put someone in an unreasonable condition.

82.     Only in my case, Coordinator Goerdel chaired my specialization exam and I was thus not treated equally as other doctoral students. After the advising relationship came to an end with Dr. O'Leary, because of Coordinator Goerdel's interference in my program by chairing my specialization exam, Coordinator Goerdel placed me in an unreasonable condition. Coordinator Goerdel was forcing me not to ask other faculty members to serve as my advisor. Coordinator Goerdel thus violated school policy by forcing me to return to Dr. O'Leary.

83.     The reason behind forcing me to revert to Dr. O'Leary was that Coordinator Goerdel affected my advising relationship with Dr. O'Leary. In Coordinator Goerdel's viewpoint, that the advising relationship with Dr. O'Leary came to an end due to her being not interested in having me as her student affected the reputation of Dr. O'Leary. Therefore, Coordinator Goerdel felt an obligation to mend what she destroyed.

84.     In the hearing held for the grievance I filed with the college in the Spring Semester 2017, Coordinator Goerdel defended Dr. O'Leary, giving an impression that Dr. O'Leary is a competent advisor and that it was just my choice that our advising relationship came to an end. She was trying to argue that there was nothing wrong that might have led to ending the advising relationship with Dr. O'Leary.

85.     Coordinator Goerdel's interference in my program led to Dr. O'Leary's loss of interest in having me as her student. Hence, Coordinator Goerdel did everything she could to

make it the case that it was me who ended the advising relationship with Dr. O'Leary, while there was nothing wrong.

86.     Coordinator Goerdel also forced me to copy her on emails when I was looking for a new advisor and accused me of ending the advising relationship with Dr. O'Leary. Coordinator Goerdel also told me that my specialization examination committee would largely be the same no matter when I sit for it. This was a signal that even if I did find a new advisor, Coordinator Goerdel would still chair my specialization exam.

87.     The reason behind forcing me to copy her on my emails was that Coordinator Goerdel wanted to know who I was approaching, so she could tell them not to accept me as their student. For example, she was upset when she learned that I had approached a faculty member to serve as my advisor without her prior knowledge. In one of her emails, she told me:

> You did not communicate with me this afternoon that you had reached out to Professor Epp. As your interim advisor, it is advisable for you to keep open lines of communications so that I can offer supports and advising that are most helpful to you.

88.     If Coordinator Goerdel did not violate school policy by forcing me to go back to Dr. O'Leary and affecting the choice of other faculty members to not accept me as their student, I believe I could have found a new advisor who would work with me.

## III.     The Doctoral Committee Interfered in My Program

89.     Coordinator Goerdel continued her discriminatory practices against me. Under Coordinator Goerdel's leadership, the doctoral committee also put me in an unreasonable condition as one form of discrimination against me based on my national origin. A student works closely with his/her advisor to prepare for the specialization examination. While the only way to sit for the specialization examination was a case where Dr. O'Leary would chair my specialization examination as I worked with her, I asked other faculty members to see if they would be interested in taking me as their student.

16

90.     Thus, instead of changing my specialization, which is what I was supposed to do to be consistent with the school policy absent the advisor who worked with and prepared me for the specialization examination, I asked other faculty members to serve as my advisor in the Spring Semester 2016. As they said that they could not serve as my advisor, I stated that I would change my specialization to find an advisor.

91.     At our school, the program coordinator is also the chair of the doctoral committee. Coordinator Goerdel and the doctoral committee that she was chairing composed of Drs. Jacob Fowles, Dorothy Daley, Steven Maynard-Moody, and Rosemary O'Leary ("doctoral committee"), interfered in my program in violation of school policy. The doctoral committee came up with an *odd* decision that not only violated school policy but has also suffered from a logical fallacy and was impossible to be implemented.

92.     In a meeting held in March 2016, Coordinator Goerdel, accompanied by the school director, Dr. Reginald Robinson, ("Director Robinson") told me that the doctoral committee met and decided that I would not be allowed to change my specialization even though I did not have an advisor for my specialization.

93.     School policy says, "student's chosen subfield." Thus, a student chooses his/her specialization area. If an advisor is unavailable for a specialization, the student must turn to a different specialization to continue in the program.

94.     The doctoral committee prevented me from changing my specialization, in violation of school policy, and forced me to stay in my specialization even though they knew the reason I wanted to change my specialization was that I did not have an advisor in my specialization.

95.     Had I had an advisor, I would have never changed my specialization. I chose my specialization and was deeply interested in pursuing it. My GPA for my specialization classes is 4.0. However, because of Coordinator Goerdel's violation of school policy by chairing my specialization examination and the resulting loss of interest of Dr. O'Leary to have me as her student, I found myself in a situation where I had to seek a new advisor.

96.     As faculty members with expertise in my area of specialization could not serve as my advisor, I considered turning to a new specialization so I could continue in the program.

97.     In that same meeting held in March 2016, Coordinator Goerdel also told me that the doctoral committee had decided that the way forward for me was to accept a committee/group of advisors. A student's advisor is chosen by the student and cannot be forced upon on the student. So, the doctoral committee violated school policy by forcing a committee/group of advisors on me. Further, there is nothing called a "committee/group of advisors" in the school policy; instead, there is only mention of "an advisor".

98.     A student having an advisor is well known, but it is unheard of for a student to have a *committee/group* of advisors but no *single* advisor. The logical fallacy that the decision of the doctoral committee suffered from was that they stated that a committee/group of faculty members would serve as my advisors. If a group of faculty members would serve as my advisors, it logically follows that one faculty member was also willing to serve as my advisor. That is because a committee/group is larger than one in number. Yet, the doctoral committee informed me that a committee/group of advisors was available, but one advisor was not.

99.     One aspect of the impossibility of implementing the decision of the doctoral committee was that it is unheard of and impossible for a specialization examination committee to

compose of only advisors/chairs. The specialization examination has an advisor/chair and the other(s) are members of the committee.

100.     Another aspect of the impossibility of implementing the decision of the doctoral committee is that I have to enroll in dissertation hours with my advisor/chair when sitting for the specialization examination. It is impossible for a student to enroll with a group of advisors/chairs, as a student enrolls in dissertation hours with one advisor/chair and not a group of advisors/chairs.

101.     A student's committee typically has an advisor/chair and the others are members of the committee. It is unheard of in academia and is impossible for a doctoral student to have a committee composed of virtually only advisors/chairs. The advisor/chair of the student's committee shapes and guides the dissertation of the student.

102.     In case of group advisors/chairs, the advisors/chairs would end in conflict, because each advisor/chair would try to guide the research in the direction he/she wants.

103.     None of the faculty members that the doctoral committee could identify as a group of advisors agreed to serve as my advisor when I contacted them. I even contacted other faculty members, who were not even sitting on my committee, and hence had no prior working relationship with me but none could serve as my advisor.

104.     In that same meeting held in March 2016, realizing that the decision of the doctoral committee which stated that a committee/group of advisors was available but one advisor was unavailable made no sense, Coordinator Goerdel brought up the idea of reinstating the advising relationship with Dr. O'Leary.

105.     Coordinator Goerdel said that my explanation for stating that Dr. O'Leary was not interested in having me as her student was not acceptable and that Dr. O'Leary was still

interested in advising me. I said I would go to Dr. O'Leary and talk to her to see if she was interested in reinstating the advising relationship. Coordinator Goerdel did not allow me to contact Dr. O'Leary. Instead, she said that they would arrange for a meeting and that Dr. O'Leary and myself must meet in Coordinator Goerdel and Director Robinson's presence.

106.     Thus, a meeting was held on March 15, 2016. In that meeting, Coordinator Goerdel continued to force me to either return to Dr. O'Leary or leave the program. As the director of the school, Director Robinson also backed Coordinator Goerdel. Coordinator Goerdel asserted that she would chair my specialization examination. Dr. O'Leary said that she wanted to have me as her student but Coordinator Goerdel would chair my specialization examination.

107.     After a long meeting, I agreed to reinstate the advising relationship with Dr. O'Leary and registered for the specialization examination offered in the Fall Semester 2016. However, I realized that Dr. O'Leary was not interested in working with me. I had meetings with her and she did not seem engaged. Thus, the advising relationship came to an end again in May 2016.

108.     Coordinator Goerdel and Director Robinson met with me in June 2016. I told Coordinator Goerdel I needed to change my specialization as I already contacted faculty members having expertise in my area and they could not serve as my advisor. She reiterated that changing my specialization was not allowed. Later, I told Coordinator Goerdel that looking for a new advisor entailed changing my specialization.

109.     As the chair, Coordinator Goerdel had the doctoral committee meet and the doctoral committee made a decision that violated school policy, again, by forcing me to stay in my specialization even though I did not have an advisor for my specialization

110.    The decision of the doctoral committee said nothing about not having an advisor which was the only issue I had. Instead, it just stated that the doctoral committee and faculty members having expertise in my area of specialization were ready to conduct my specialization examination.

111.    If Coordinator Goerdel had not violated school policy by chairing my specialization examination resulting in the loss of interest of Dr. O'Leary, I could have taken the specialization examination in the Spring Semester 2016.

112.    On the other hand, If the doctoral committee did not violate school policy by forcing me to stay in my specialization even though they knew the reason I wanted to change my specialization was that I did not have an advisor for my specialization, I could have started a new specialization by the Summer Semester 2016 the latest, instead of remaining without an advisor and losing time and money completing nothing in the program.

## IV.    The Doctoral Committee and Director Robinson Took Adverse Actions Against Me

113.    Coordinator Goerdel sent me her email in July 2016, which forced me to stay in my specialization in violation of school policy which states that a student chooses his/her specialization, while she knew I had re-established the advising relationship with Dr. O'Leary in the Spring Semester 2016 after it came to an end in the same semester but it did not work.

114.    Coordinator Goerdel also knew I had asked other faculty members with expertise in my specialization to serve as my advisor, but they indicated they could not.

115.    As I exhausted the resources within my school, I was left with no option other than saying I would bring the issue to the attention of other parties outside the school.

116.    According to Article 6.1.3 of the University Senate Rules and Regulations, "No person shall be subjected to discharge, suspension, discipline, harassment, or any form of

discrimination for having utilized or having assisted others in the utilization of grievance procedures."

117.    The doctoral committee and Director Robinson retaliated against me simply because I said that I would bring the issue of Coordinator Goerdel's discriminatory treatment to the attention of other parties outside of the school. The doctoral committee boycotted me, and Director Robinson singled me out among other doctoral students, and pushed me to proceed in the program *without* an advisor.

118.    Forcing me to proceed in the program without an advisor essentially meant dismissing me from the program because a specialization cannot be pursued without an advisor, and there should first be an advisor for the student before the student can sit for the specialization examination. The letter that Director Robinson sent me looks like a dismissal letter in format and style.

119.    I experienced immense emotional distress resulting from being boycotted by the doctoral committee and being singled out by Director Robinson. I did not receive guidance about the doctoral program because Coordinator Goerdel, who answered programmatic questions, stopped communicating with me. Further, my education was impeded due to the lack of an advisor and not being allowed to change my specialization, even though I did not have an advisor for my specialization.

V.     **Director Robinson Singled Me Out Among Doctoral Students**

120.    School policy states that the program coordinator/director (also known as director of graduate studies) is to be contacted for questions about the doctoral program, as the program coordinator knows the school policy and knows how things work in the doctoral program.

121.    From July 2016, until a new program coordinator took office in July 2017, Director Robinson was the contact person and Coordinator Goerdel never communicated with

me. Director Robinson *singled me out* in retaliation for saying I would bring Coordinator Goerdel's discriminatory treatment to the attention of other parties outside the school.

122.    Until I said that, Coordinator Goerdel communicated with me as per school policy. Once I mentioned that I would bring the issue to the attention of others, Director Robinson singled me out for retaliation and Coordinator Goerdel and the doctoral committee boycotted me.

123.    Even after the new program coordinator, Dr. Charles Epp, took office, he copied the new school director, Dr. O'Leary, in all his communications with me.

124.    After I filed the grievance in January 2017, Coordinator Goerdel and Director Robinson stepped down. Dr. Charles Epp became the new program coordinator and Dr. O'Leary became the new school director.

125.    Thus, instead of directly singling me out, Dr. O'Leary chose to be copied in communications from the new program coordinator, Dr. Epp, with me. I believe she took this step because in the grievance I filed with KU, I stated that Director Robinson was singling me out among doctoral students. Therefore, to avoid appearing she had directly singled me out, she chose to be copied in all communications between Dr. Epp and me.

## VI.    The Only Student Whose Specialization Examination was Chaired by Coordinator Goerdel and Not my Advisor

126.    According to school policy, only two to three faculty members having expertise in the student's area of specialization and also sit on the student's committee will conduct the specialization examination. Coordinator Goerdel informed me in her email of July 2016 that the doctoral committee and faculty members having expertise in my specialization would conduct my specialization examination. Like Coordinator Goerdel, Director Robinson told me the same information in his letter.

127.    However, the doctoral committee and faculty members having expertise in the student's area of specialization do not conduct the specialization examination. Only two to three faculty members with expertise in the student's specialization and who also sit on the student's committee will conduct the specialization examination. Among the two to three faculty members of the student's committee, the student's advisor *chairs* the specialization examination committee because the advisor works closely with the student to prepare the student for the specialization examination.

128.    Coordinator Goerdel, thus, violated school policy again by chairing my specialization exam. Dr. O'Leary stated that Coordinator Goerdel formed my specialization examination committee as the chair of the specialization examination committee. Dr. O'Leary's email states in part:

> Here is the committee that Professor Goerdel put together the last time you were supposed to take the exam.  The same committee will be used when you take your exam next semester:   Heather Getha-Taylor, Steven Maynard-Moody, Marilu Goodyear, Rosemary O'Leary, Holly Goerdel.

129.    When my advising relationship came to an end with Dr. O'Leary in the Spring Semester 2016, Coordinator Goerdel forced me to return to her. Further, Coordinator Goerdel was forcing me to copy her in my emails when I was looking for a new advisor. The reason behind asking me to copy her in my emails was that she wanted to know who I was approaching so she could tell them not to accept me as their student.

130.    For example, Coordinator Goerdel was upset when she learned that I had approached a faculty member to serve as my advisor without her knowledge. As I continued looking for a new advisor without copying her in my emails, she sent me a provocative email and copied Director Robinson in which she stated that finding an advisor was difficult. She was also making things more complicated. I became upset because she was negatively affecting the choice

of faculty members to serve as my advisor, and she herself was telling me that finding an advisor was difficult.

131.    Further, in a meeting held in March 2016, Coordinator Goerdel insisted that she would chair my specialization examination. I did not agree to that because she violated school policy and interfered in my program by chairing my specialization examination even though she does not have the academic credentials to chair my specialization examination.

132.    Thus, Coordinator Goerdel and I had an intense argument. In that meeting, she threatened me by saying I should consider the consequences of refusing to let her chair my specialization examination. It reached a point where I had to print out the school policy and show it to her.

133.    Ever since I became upset after receiving her provocative email, and refusing to let her chair my specialization examination, she developed a very negative attitude towards me. Using her power and influence, she actively advocated for my dismissal from the program.

134.    Given she actively advocated for my dismissal from the program, there was no better chance for her to dismiss me from the program than chairing my specialization examination. Coordinator Goerdel's intent of not allowing me to continue in the program had already become evident when she chaired my specialization exam. As I opposed her discrimination against me, she became even more hostile. Thus, I was worried about the outcome of a specialization examination that was chaired by Coordinator Goerdel.

135.    Coordinator Goerdel, thus, continued to discriminate against me as I was the only student whose specialization exam was chaired by Coordinator Goerdel and not my advisor.

VII.    **Director Robinson Forced Me to Sit for the Specialization Examination without Registration**

136.    As part of the discriminatory practices against me which rooted in the first instance of discrimination against me by Coordinator Goerdel, Director Robinson put in an unreasonable condition by forcing me to sit for the specialization exam even though I was not registered for it. School policy states, "In order to be eligible to take the exams, the student must register by the specified deadline." In addition, "Students must ensure that their Ph.D. summary spreadsheet is complete and up-to-date prior to contacting the School to register for exams."

137.    Unless the student is ready and all the pre-specialization examination conditions are satisfied, the student will not register for the specialization examination. School policy also states, "Students should consult their advisor to plan a schedule of course work and seminar preparation in anticipation of the comprehensive written examinations in public administration foundations and specializations."

138.    It follows then that before sitting for the specialization examination the student should have an advisor because the advisor chairs the specialization examination as chair of the student's committee.

139.    Director Robinson insisted that I should sit for the specialization examination in the Fall Semester 2016, even though I canceled it because I did not have an advisor.

140.    His email about that, which he made public to the doctoral committee and the administrative officer, was humiliating and belittling. It is to be noted that I also canceled the specialization examination in the Spring Semester 2016 when I had no advisor, and Director Robinson said nothing about it.

141.    *Forcing* me to sit for the specialization examination, without having an advisor, violated school policy and was impossible to fulfill. When sitting for the specialization examination, I had to enroll in dissertation hours with my advisor.

142.     Absent an advisor, I could not enroll in dissertation hours and could not sit for the specialization examination.

143.     Thus, the doctoral committee and Director Robinson impeded my education by forcing me to do the impossible.

## VIII.     Director Robinson Forced Me to Enroll in Dissertation Hours with Coordinator Goerdel Although She Does Not Have the Academic Credentials to Serve as my Advisor

144.     Around the end of July 2016, I became worried that I could fall out of legal status as an international student because of non-enrollment for the Fall Semester 2016.

145.     School policy states that the student chooses their committee, which consists of an advisor/chair and members.

146.     School policy also states that only two to three faculty members, with expertise in the student's specialization, and who also sit on the student's committee, will conduct the specialization examination. Among these two or three faculty members of the student's committee, the student's advisor chairs the specialization examination committee because the advisor works closely with the student to prepare the student for the specialization examination.

147.     While sitting for the specialization examination, I had to enroll in dissertation hours with my chosen advisor/chair. Director Robinson *forced* me to enroll with Coordinator Goerdel in dissertation hours for the Fall Semester 2016 even though Coordinator Goerdel was not my advisor; I did not work with her, nor does she undertake research in my area of research. Director Robinson continued his discriminatory action against me by putting me into unreasonable conditions. One of the emails from Director Robinson states in part:

[Y]ou should, as I indicated in my message, enroll with Dr. Goerdel.

148.    Director Robinson prevented me from even contacting Coordinator Goerdel by sending me emails, marked as highly important, and then he himself sent me an email marked as highly important forcing me to enroll in dissertation hours with her. Ever since I said I would bring the matter to the attention of an appropriate party outside the school, Coordinator Goerdel has not spoken let alone advise me, assuming that she has the academic credential to serve as my advisor.

149.    And given she has a negative attitude towards me and actively advocated for my dismissal in the program using her power and influence, enrolling in dissertation hours with her as my advisor was not at all possible.

150.    In the hearing conducted in May 2017 for items J, K, and L of a grievance that I filed within KU, the college grievance committee that conducted the hearing described Coordinator Goerdel's relationship with me as one that is "enough tarnished".

151.    It is impossible to enroll in dissertation hours with a faculty member whose relationship with me is "enough tarnished". This has further impeded my education, because without having an advisor, I could do nothing in the program.

## IX.    Coordinator Goerdel and Director Robinson Ignored my Need for an Advisor and Created a Situation Which Led Me to Taking a Leave of Absence

152.    Coordinator Goerdel and Director Robinson were neglectful of my need for an advisor. I met with Director Robinson in August 2016, and he continued pressuring me to enroll in dissertation hours with Coordinator Goerdel, even though he prevented me from contacting her in his earlier emails.

153.    When I mentioned that Coordinator Goerdel suggested dismissing me from the program, and this was why I could not enroll in dissertation hours with her, Director Robinson became convinced there was no way for me to enroll with her.

154.    However, he still urged me to proceed in the program, asserting that a change of specialization is impossible. I suggested taking a leave of absence. The Graduate Studies Policy for Leave of Absence states, "A leave of absence may be granted in extraordinary circumstances."

155.    It was Coordinator Goerdel's final decision to not allow me to pursue a different specialization, even though she knew I did not have an advisor for my specialization that caused me to consider taking a leave of absence. I did not want to take the leave, but was left with *no option* other than requesting it in order not to fall out of legal J-1 status.

156.    This decision by Coordinator Goerdel violated school policy which states that students choose their own specializations.

157.    Typically, students choose a specialization area in which they are interested. If an advisor is unavailable for a specialization, the student must turn to a different specialization to be able to continue in the program.

158.    However, Coordinator Goerdel prevented me from changing my specialization in violation of the school policy and forced me to stay in my specialization even though she knew the reason I wanted to change my specialization was that I did not have an advisor for my specialization.

159.    She also knew I re-established the advisory relationship with Dr. O'Leary after it initially came to an end, but it did not work. If I had an advisor, I would never change my specialization. I chose my specialization and was deeply interested in pursuing that specialization. My GPA for my specialization classes is 4.0.

160.    Because of Coordinator Goerdel's violation of the school policy by chairing my specialization examination and the resulting loss of interest of Dr. O'Leary to have me as her

student, I found myself in a situation where I had to look for a new advisor. As faculty members having expertise in my area of specialization could not serve as my advisor, I considered turning to a new specialization so I could continue in the program.

161.    Taking a leave of absence brought my progress towards degree to a halt. This happened because I was left with no option other than taking a leave of absence. The government of the United States allowed me to stay in lawful status because KU made a commitment that I am their student and that I could study here.

162.    Thus, Coordinator Goerdel and Director Robinson had owed me a duty to make sure that I had an advisor. However, they breached this duty because I was in a state of having no advisor in my specialization and I was not allowed to pursue a new specialization. This has left me with no option other than taking a leave of absence.

X.      **Director Robinson Suggested I Enroll in Dissertation Hours with Him Although He Does Not Have the Academic Credentials to Serve as My Advisor**

163.    School policy states, "The drafters and graders of the specialization exam will consist of two or three faculty members within the School of Public Affairs and Administration who have expertise in the student's chosen subfield, and who will serve as member of the student's committee." Within his discriminatory actions against me by putting me in an unreasonable condition, Director Robinson suggested in August 2016 that I enroll in dissertation hours with him as my advisor. His email to me states in part:

> Would you be more willing to consider this option if I was to serve as the advisor with whom you would enroll in dissertation hours? I am not an OT [Organization Theory] specialist, but I certainly have your best interest at heart.

164.    Enrolling with Director Robinson in dissertation hours violates school policy. He has no degree in Public Administration, let alone a specialization in Organization Theory, my area of specialization, nor does he possess expertise in my area of research.

165.     Further, I was not his student and he did not even sit on my committee. A student-advisor relationship does not develop overnight for purposes of sitting for the specialization exam as the student's advisor chairs the specialization exam for the student. If a faculty member has not worked with the student before, it is impossible to become the student's advisor suddenly.

166.     This has impeded my education because without an advisor with expertise in my area of specialization, I could take no steps forward in the program.

**XI.      The Doctoral Committee and Director Robinson Plotted to Have Me Discontinue the Program**

167.     In August 2016, I received an email from Director Robinson telling me I should consider the implications of taking a leave of absence. Director Robinson told me:

> Regarding the leave of absence request that we discussed, we have been advised by Yuki Watanabe in the International Student Services Office, that you should, if you have not already done so, consult with an immigration officer in that office (Strong Hall, Room 2) regarding the implications of such a leave.

168.     When I went to the International Student Office, I realized that the doctoral committee and Director Robinson had a meeting of minds and were plotting to have me discontinue the program.

169.     A staff member from the International Student Office told me that my school does not understand why I am taking a leave of absence. The staff member then told me that the process for a leave of absence requires that I should leave for my home country before my school would fill out the *"voluntary discontinuance"* form.

170.     However, as the college policy on leave of absence states, the process of granting a leave of absence starts in the department before the student leaves. I did not want to discontinue the program. I only wanted to take a leave of absence.

171.    I then learned on my own that leaving the United States without taking a leave of absence first meant that I had abandoned the doctoral program. Hence, the school would be under no obligation to grant me a leave of absence once I left the United States.

172.    The overt act was the attempt to have me leave the United States without first taking a leave of absence. I thus did not take the unlawful step of trying to leave before securing an approved leave of absence.

173.    I would lose the program if I followed the deceptive directions given about the process for taking a leave of absence. Coordinator Goerdel or Director Robinson also gave a negative impression about me to the International Student Office, which might affect their view of me as the office responsible for the affairs of international students.

## XII.    The Doctoral Committee and Director Robinson Caused the Release of Misleading Information to the School of Business

174.    Upon information and belief, Dr. Getha-Taylor provided misleading information to the School of Business when I was trying to transfer to this school by making it the case that I was trying to transfer because I did not pass the specialization exam on the first trial. As I lost hope in my school, I thought of joining the School of Business as I have taken several classes in this school.

175.    Upon information and belief, Dr. Getha-Taylor disclosed my educational records to the School of Business. According to Article 4.5(b) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members must, "Respect the confidential relationship between the University and its students by preserving the privacy of all records relating to students and protecting student information from improper disclosure."

176.    Regardless of who disclosed my records to the Business School, I considered the option of joining the Business School because the doctoral committee and Director Robinson

made it impossible for me to pursue a different specialization. Thus, they *caused* this misleading information to be provided to the Business School.

177. The real reason behind transferring to the School of Business was that I did not have an advisor for my specialization and the doctoral committee and Director Robinson did not allow me to pursue a different specialization. Thus, disclosing my educational records negatively affected me because the School of Business did not consider accepting me. In this regard, an email from a faculty member of the Business Schools states in part:

> We would also need some letters from faculty in the School of Public Affairs and Administration doctoral program about why you are leaving that program.

178. My reputation was damaged and I forever lost the opportunity to join this school. When trying to transition to the Business School, Dr. Getha-Taylor did not say I did not have an advisor because that might have negatively affected the reputation of the school. Instead, she *made it the case* that I am transferring because I could not finish my degree at my school.

## XIII. Coordinator Goerdel or Director Robinson Caused the Release of Misleading Information to University Appropriate Parties

179. Coordinator Goerdel or Director Robinson provided misleading information about me when I was trying to contact other KU administrators about my situation by saying I had *several* options to continue my program. According to Article 4.5(e) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members must "Refrain from knowingly furnishing false information to the University."

180. Coordinator Goerdel or Director Robinson knowingly caused the release of false information to other university parties such as the college, the Office of Graduate Studies, and the Office of International Student Services about the availability of options for me in the program.

181.    For example, when I contacted the dean of Graduate Studies, Dr. Michael

Roberts, about falling out of legal status due to non-enrollment, he indicated that my school gave

me several options. My email to Dr. Roberts states in part:

> There is a very serious problem that cannot be solved even though I tried many avenues
> including talking to my school, talking to the Ombudsman office, and talking to the
> college office of graduate affairs. I am kindly asking that we meet tomorrow so I can
> discuss the issue with you. The meeting may not take more than 15 minutes or so. I am
> about to fall out of status due to not enrolling in classes. My school left me with no
> option other than a situation where I cannot enroll and hence jeopardize my legal status
> as an international student. I will tell you the whole story when we meet tomorrow.
> Please I need to meet you tomorrow if possible because it is very urgent. I am in a very
> difficult situation. I cannot sleep at nights. Thank you in advance for the opportunity to
> meet you tomorrow.

182.    Providing false information further delayed the resolution, because the other

university parties thought that there were options for me to continue in the doctoral program and

it was up to me whether to accept these options.

**XIV.    Director Robinson Had me Sign Under Duress**

183.    In August 2016, I contacted Director Robinson about the paperwork for the leave

of absence and the college finally approved my request for leave. I thus did not fall out of legal

status.

184.    Nevertheless, as I considered my situation, I thought of revoking the leave of

absence and re-establishing the advising relationship with Dr. O'Leary one more time. I

contacted her twice, but she did not reply.

185.    As part of his actions targeting me for discrimination, by putting me in

unreasonable conditions, Director Robinson informed me I would not be allowed to revoke my

leave of absence *unless* I signed a letter indicating that I would stay with Dr. O'Leary until

completion of the program, would not change my specialization, and would sit for the

specialization examination by November 18, 2016, although this date was later pushed to the

Spring Semester 2017. The letter I signed under duress states in part:

> As you seek to revoke your leave of absence request and continue active pursuit of your degree, we are willing to accept that option only if you are willing to commit to the steps that I have outlined in this letter.

186.    The Graduate Studies policy for Leave of Absence states, "A leave of absence

may be granted in extraordinary circumstances." Thus, a student is generally discouraged from

taking it unless there is a real necessity that is beyond the student's control.

187.    However, Director Robinson prevented me from revoking it unless I signed the

letter. As I had no other option, and in order not to lose the program, I signed the letter under

duress in September 2016.

188.    Article I of the Faculty Code of Rights, Responsibilities, and Conduct states,

"This code is based on the premise that both administrators and faculty share responsibility to

create a climate suitable for scholarship, research, effective teaching and learning."

189.    Director Robinson was harming a suitable climate for scholarship and research

and was preventing me from pursuing my doctoral program effectively, because a doctoral

student cannot work productively without a committed and interested advisor.

190.    An advisor-student relationship is based on mutual interest and commitment and

it is purely voluntary. In addition, a doctoral experience is about contributing to the existing body

of knowledge and so peace of mind is essential for success.

191.    School policy states that the student chooses the advisor/chair. Hence, having a

student sign under duress to stay with a certain advisor violates the school policy and is

detrimental to the scholarly and academic environment.

**XV.      Director Robinson Acted as a Party in My Advising Relationship with My Advisor**

192.    School policy states that the student chooses his/her advisor. Director Robinson acted like a *party* in the advisor-student relationship. He continued discriminating against me by putting in unreasonable conditions.

193.    He told me that in his opinion the advising relationship still existed between Dr. O'Leary and me, hence how I felt about it was irrelevant. In other words, I had no say in who I could work with. This violates school policy because the student chooses his/her advisor/chair.

194.    According to Section 3(b) of the Code of Student Rights and Responsibilities, "Students are free to pursue their educational goals; appropriate opportunities for learning in the classroom and on the campus shall be provided by the University." Furthermore, according to the Faculty Code of Rights, Responsibilities, and Conduct 4.5(f), faculty members shall "Respect the rights and academic freedom of students."

195.    The freedom to pursue my educational goals was taken away by Director Robinson because he pushed me to act against my will and did not allow me to choose my advisor. Other students were not coerced to work with any specific faculty member.

196.    After re-establishing the advising relationship with Dr. O'Leary in the Fall Semester 2016, I realized that the advising relationship was not working.

197.    Even though the advising relationship came to an end in late Fall Semester 2016, after realizing that she did not want to continue with me, Director Robinson asserted that she was still my advisor, ignoring my opinion about it. It is to be noted that Director Robinson himself agreed that the advisor-student relationship would not work that way, yet he still pushed me to proceed and accept it.

## XVI.    Director Robinson Misrepresented Facts

198.    While Dr. O'Leary was not present when I signed the letter under duress in September 2016, Director Robinson, speaking on her behalf, indicated that she agreed to serve as

my advisor. Thus, Drs. O'Leary and Robinson talked to each other and hence Director Robinson

knew that Dr. O'Leary was not interested in having me as her student.

199.    Director Robinson knew that the statement was false when he made it and he

made it to get me to act upon it in a way that was detrimental to me.

200.    Acting on Director Robinson's statement that Dr. O'Leary was willing to serve as

my advisor, I *signed* a letter indicating that I would stay with Dr. O'Leary until my completion

of the program. In reality, Dr. O'Leary was not interested. Director Robinson thus

misrepresented facts.

201.    On a personal level, Dr. O'Leary was not comfortable working with me as it

became apparent in our three meetings held after re-establishing the advising relationship in

September 2016. For example, she was trying to avoid meeting with me when our relationship

was re-established and then sent me a defamatory email in which she copied Coordinator

Goerdel and Director Robinson. Her email to me states in part:

> I expect you to treat me, Professor Robinson, Professor Goerdel, and all other professors
> with respect. Any deviation from professional, respectful, behavior will not be tolerated.

202.    In our first meeting after reinstating the advising relationship with her, Dr.

O'Leary harshly blamed me for speaking up when Coordinator Goerdel tried to chair my

specialization examination. In another meeting, she was about to physically attack me at her

office.

203.    On the business side of the matter, she refused to discuss my dissertation proposal

with me although I was enrolled in six dissertation hours with her the Fall Semester 2016 and

students are typically asked questions relating to their research in the specialization examination

so a connection could be made between the specialization examination and the oral examination.

204.    As school doctoral curriculum indicates, "Students entering the program should not think of their research as something that may be put off until the "dissertation stage." Students' research programs begin the moment they enter the program, and students should begin thinking about possible dissertation topics and ideas from the moment they begin their program." As the school doctoral curriculum also indicates, "As a matter of practicality and prudence, students should expect to have a well-developed dissertation idea and research plan *prior to sitting for the comprehensive written examinations.*"

205.    Dr. O'Leary also told me that my dissertation proposal was unrelated to my specialization, even though I had spent 18 dissertation hours by then on the dissertation proposal and the proposal is the student's contribution to his/her specialization.

206.    As for my specialization examination, Dr. O'Leary told me that Coordinator Goerdel would chair it. She later told me that Coordinator Goerdel would not be a grader of my specialization examination, but that my specialization examination would still be the one that was drafted by the committee chaired by Coordinator Goerdel and the same committee that Coordinator Goerdel formed would conduct my specialization examination.

207.    School policy states, "The drafters and graders of the specialization exam will consist of two or three faculty members within the School of Public Affairs and Administration who have expertise in the student's chosen subfield, and who will serve as member of the student's committee."

208.    It follows then that Coordinator Goerdel should not write my specialization examination or form the specialization examination committee because the student's advisor chairs the specialization examination. I was the only student whose specialization examination

was chaired by Coordinator Goerdel and her interference in my specialization examination caused Dr. O'Leary's loss of interest in having me as her student.

209.    Director Robinson told me that Dr. O'Leary agreed to serve as my advisor. Thus, I signed the agreement that I would stay with her until completion of the program. In reality, she did not agree to serve as my advisor in good faith. I lost the Fall Semester 2016 due to misrepresentation of facts.

210.    That Director Robinson had me sign the letter under duress to stay with Dr. O'Leary is evidence that Dr. O'Leary was not interested in having me as her student. If she was interested in good faith, there was no need to have me sign a letter under duress to stay with her until completion of the program.

## XVII.    Coordinator Goerdel and Director Robinson Forced Me to Sit for the Specialization Examination without Registration

211.    Coordinator Goerdel and Director Robinson continued discriminating against me as an international student by putting me in unreasonable conditions. School policy states, "In order to be eligible to take the exams, the student must register by the specified deadline." In addition, "Students must ensure that their Ph.D. summary spreadsheet is complete and up-to-date prior to contacting the School to register for exams." Unless the student is ready and all the pre-specialization examination conditions are satisfied, the student will not register for the specialization examination.

212.    School policy also states, "Students should consult their advisor to plan a schedule of course work and seminar preparation in anticipation of the comprehensive written examinations in public administration foundations and specializations." It follows then that before sitting for the specialization examination, the student should have an advisor because the advisor chairs the specialization examination as chair of the student's committee.

213.    There are pre-specialization examination conditions that must be met before the student can register for the specialization examination. The condition that was not present which prevented me from registering for the specialization examination was having an interested advisor. Without that, I could not register for the specialization examination and could take no step forward in the program.

214.    Yet, I received an email in December 2016 indicating that my specialization examination was scheduled for February 10, 2017, even though I was not registered for the specialization examination. Coordinator Goerdel and Director Robinson ignored this and forced me to sit for the specialization examination.

215.    School policy also states that the specialization examination is offered the third week of February and the third week of September. However, the email I received in December 2016 indicates that the specialization examination would be offered in February 10, 2017, and not the third week of February 2017.

**XVIII.    The Doctoral Committee and Director Robinson Ignored My Need for an Advisor and Created a Situation That Could Lead to Violating Federal Immigration Regulations for J-1 Visa Holders**

216.    The doctoral committee and Director Robinson breached their duty of making sure that I have an advisor. Federal immigration regulations require that international students continuously enroll in classes/dissertation hours so their *lawful status* can be maintained. Because I did not have an advisor, I could not enroll for the Spring Semester 2017.

217.    Without enrollment, I would break the law and I did not want to break the law. The doctoral committee and Director Robinson ignored that I must continuously be enrolled in order not to fallout of legal status as an international student.

218.    Eventually, I enrolled in dissertation hours with a faculty member as a place-holding mechanism. The faculty member did not accept to serve as my advisor, but she allowed

me to enroll in dissertation hours with her as a place holding mechanism while my grievance was pending resolution.

219.    Enrolling in dissertation hours with the above-mentioned faculty member as a place holding mechanism kept me from falling out of legal status, but it took me nowhere regarding progressing in the program.

220.    My education continued to be impeded due to the decision of the doctoral committee, which prevented me from working with another advisor in a different specialization although they knew no one within my specialization would accept me as their student, and Dr. O'Leary was not interested in having me as her student even though I reinstated the advising relationship with her twice hoping it would work.

## XIX.    The Doctoral Committee and Director Robinson Ignored My Need for an Advisor and Created a Situation That Could Lead to Breaking My Contract with My Sponsor

221.    The doctoral committee and Director Robinson breached their duty of making sure that I had an *advisor*, per school policy. As a sponsored student, I had five years to complete the program. The fact that the doctoral committee forced me to stay in my specialization, in violation of school policy, even though I did not have an advisor for my specialization, made it impossible for me to finish the program in five years as required by the contract with my sponsor.

222.    The doctoral committees' actions caused me to break my contract with my sponsor and that may have consequences, such as losing funding. It is also possible that my sponsor will cancel my scholarship and ask me to pay back all the money spent on me during the past because I was not living up to the terms of the contract which specifies that I am expected to finish my program within five years.

223.    As an international student, I might have also faced difficulties in extending my DS-2019 beyond the fifth year.

## XX.    The Only Student Whose Specialization Examination was Chaired by Coordinator Goerdel and Not My Advisor

224.    Coordinator Goerdel *continued* discriminating against me due to national origin by chairing my specialization exam resulting in the loss of interest of Dr. O'Leary. I filed a grievance against Coordinator Goerdel and Director Robinson with KU Judicial Board in January 2017. While the grievance was pending, I received an email from Director Robinson telling me they were arranging for me to sit for the specialization examination.

225.    I informed Director Robinson I could not sit for the specialization examination because I did not have an advisor and there was a pending grievance. Doctoral students cannot sit for the specialization examination and make progress in the program if they do not have an advisor. Director Robinson ignored my clarifications.

226.    I became worried that the school might dismiss me based on the letter I signed under duress in September 2016.

227.    I asked Director Robinson if they would take any action given that I was not sitting for the specialization examination. I also asked Director Robinson to send me something in writing to assure me they would not dismiss me. Director Robinson ignored this request. It reached a point where I said that I would raise the issue to the attention of KU Judicial Board if he did not send me something in writing stating that I would not be dismissed.

228.    Upon stating that, Director Robinson sent me an accusative email indicating that they would not dismiss me while there was a pending grievance. The email was accusative in the sense it depicted me as someone who is not a person of his own words.

229.     I could not sit for the specialization examination because I did not have an advisor. What I had was an advising relationship obtained under duress with Dr. O'Leary who lost interest in having me as her student and hence our advising relationship came to an end in late Fall Semester 2016. She was thus not sitting on my committee anymore and hence she should not have conducted my specialization examination.

230.     Having a doctoral student sign under duress to work with a specific advisor violates the school policy which states that a doctoral student chooses his/her advisor/chair. I cannot think of any explanation for losing Dr. O'Leary's interest in having me as her student other than Coordinator Goerdel's discrimination against me by chairing my specialization exam.

231.     Further, when there is a pending grievance, it is impossible to force a student to sit for the specialization examination. Filing a grievance would serve no purpose if I sat for the specialization examination back then. I filed the grievance because I wanted to change my specialization as no one agreed to serve as my advisor in my specialization. Sitting for the specialization examination would have meant that I had an advisor and hence did not want to change my specialization.

232.     If I had an advisor and did not want to change my specialization, there was no reason to file the grievance.

233.     If Coordinator Goerdel did not violate the school policy by chairing my specialization examination, resulting in the loss of interest of Dr. O'Leary, and in turn in ending the advising relationship with her, I could have taken the specialization examination in the Spring Semester 2017. I lost that opportunity because of Coordinator Goerdel's violation of the school policy regarding the specialization examination.

XXI.     **Coordinator Goerdel and Director Robinson Provided Misleading Information to University Appropriate Parties**

234.     Coordinator Goerdel and Director Robinson provided false information when I filed the grievance within KU by making it the case that I filed the grievance because I was worried about the outcome of the specialization exam. I filed a grievance against Coordinator Goerdel and Director Robinson with KU Judicial Board in January 2017. According to Article 4.5(e) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members should avoid knowingly falsely informing the university. Coordinator Goerdel and Director Robinson provided a false and misleading response to KU Judicial Board by stating in their response that, "Mr. Babakr's grievance appears to be based primarily on his disagreement with the School of Public Affairs and Administration requiring him to continue to progress in his academic program."

235.     I tried to make *progress*, but the school, namely Coordinator Goerdel and the doctoral committee she was chairing, impeded my education. As Coordinator Goerdel chaired my specialization examination in violation of the school policy, this resulted in the loss of interest by Dr. O'Leary.

236.     Then Coordinator Goerdel, and the doctoral committee she was chairing, interfered in my program in violation of the school policy and prevented me from changing my specialization, even though I did not have an advisor for my specialization. School policy says, "student's chosen subfield". If an advisor is unavailable for a specialization, the student must turn to a different specialization to be able to continue in the program.

237.     In their response about holding a hearing at KU Judicial Board level, Coordinator Goerdel and Director Robinson strongly challenged the power of KU Judicial Board to reverse any decision made by the school.

238.    Coordinator Goerdel and Director Robinson also quoted a message from the Dean of the college, Dr. Carl Lejuez ("Dean Lejuez"), in which Dean Lejuez stated that he would take the grievance. The message from Dean Lejuez to Coordinator Goerdel and Director Robinson explained:

> At this time I also would like to identify that Mr. Babakr indicates in his letter that I suggested that CLAS [College of Liberal Arts and Sciences] would prefer not to hear his grievance. In our very brief meeting I informed him that he should first try and resolve the grievance issue through the School of Public Affairs and Administration to the extent possible-it was not clear at the time that a resolution at the unit level wasn't possible. I did also indicate that CLAS would be a step in the chain if he wasn't able to get resolution at the unit level. It was never my suggestion or intention that this process go past CLAS and start at the judicial board, just that it would start at the unit level to the extent that was possible. In any case where a grievance is appropriate (as discussed below in our view or based on the opinion of the judicial board) CLAS is willing to take the grievance.

239.    KU Judicial Board thus did not hold a hearing for my grievance, indicating there were possible solutions at unit levels, namely the college level. I contacted Dean Lejuez about filing the grievance and thus filed the grievance with the college.

240.    However, Coordinator Goerdel or Director Robinson misled Dean Lejuez by making it the case that I filed the grievance because I was worried about the outcome of the specialization examination. This caused the college not to change anything.

241.    There is a lot of evidence indicating that Coordinator Goerdel or Director Robinson misled Dean Lejuez.

242.    To begin, the assessment of the different items of the grievance by the college was supportive towards Coordinator Goerdel and Director Robinson. The assessment of item J in the grievance asked Coordinator Goerdel and Director Robinson to provide a copy of the correspondence they sent to Dr. Michael Roberts, Dean of Graduate Studies, to assess the claim that they provided misleading information to university appropriate parties. The assessment of item J by the college seemed to investigate the issue.

45

243.     However, by providing a copy of this correspondence, Coordinator Goerdel or Director Robinson wanted to send the college the email I sent to Coordinator Goerdel in which I indirectly told Coordinator Goerdel that I was worried about the specialization examination outcome.

244.     Dean Lejuez stated in his answer to my appeal of his decision that some items in my grievance involved the violation of Faculty Code of Rights, Responsibilities, and Conduct and hence disciplinary actions could be taken about them and such items are not suitable for a grievance. In item J of the grievance, I cite violation of the Faculty Code of Rights, Responsibilities, and Conduct. If these items are not suitable for a grievance, as claimed by Dean Lejuez, he should not have allowed item J to be included in the hearing. However, he did this because through this item, Coordinator Goerdel or Director Robinson wanted to show Dean Lejuez the email I had sent to Coordinator Goerdel.

245.     Another evidence that Coordinator Goerdel or Director Robinson misled Dean Lejuez is that when I appealed the decision of Dean Lejuez for my grievance to the University Judicial Board, Dean Lejuez filed a response and stated in two separate places:

> However, the review must be limited to the original grievance and should not include the new information and additional arguments made by Mr. Babakr during his appeal.

> Mr. Babakr has now attempted to assert new information and make new arguments regarding these issues. However, new arguments and new information cannot be introduced on appeal.

246.     These statements about the new information are referring to my arguments in the appeal in which I further explained that I am worried about the outcome of a specialization examination chaired by Coordinator Goerdel. When I met with Dean Lejuez after filing the appeal, it became apparent that Coordinator Goerdel or Director Robinson misled him.

247.    In a meeting held in March 2016, Coordinator Goerdel and I had a heated discussion about who would chair my specialization examination.

248.    Coordinator Goerdel insisted that she would chair my specialization examination, while I said that Dr. O'Leary should chair my specialization examination consistent with school policy. More than anyone else, Coordinator Goerdel knew why the student's advisor chairs the specialization examination because she was the program coordinator and she knew of how things work in the doctoral program.

249.    Yet, Coordinator Goerdel asked me to explain why I said that Dr. O'Leary should chair my specialization examination. In response, I told her that the reason I stated that Dr. O'Leary should chair my specialization examination was that I worked with Dr. O'Leary as my advisor and Dr. O'Leary knew me. I also said that if Dr. O'Leary does not chair my specialization examination, anything could happen because others were not familiar with what I was doing in the program.

250.    Yet, Coordinator Goerdel or Director Robinson used the argument I provided for why Dr. O'Leary, and not someone else, should chair my specialization examination, against me. Coordinator Goerdel or Director Robinson pointed out to Dean Lejuez that the reason I filed the grievance was due to worry about the outcome of the specialization examination.

251.    Dean Lejuez was misled by Coordinator Goerdel or Director Robinson because he was not made aware of the reason I said that I was concerned about the outcome of the specialization examination.

252.    I was worried about the outcome of the specialization examination when chaired by Coordinator Goerdel, in violation of the school policy, as she has no degree in Public Administration, let alone a specialization in Organization Theory which is my area of

specialization, nor does she have expertise in my area of research. Further, I was not her student and she did not even sit on my committee, and her relationship with me deteriorated as she violated the school policy by chairing my specialization examination, resulting in the loss of interest of my advisor, Dr. O'Leary.

253.    In addition, ever since I opposed her chairing my specialization examination, Coordinator Goerdel developed a very negative attitude towards me. Using her power and influence, she actively advocated for my dismissal from the program. Given she actively advocated for my dismissal in the program, there was no better chance for her to dismiss me from the program than by chairing my specialization examination.

254.    Thus, I have reason to worry about a specialization examination chaired by Coordinator Goerdel who, besides not knowing me because I was not her student, also continuously advocated for my dismissal in the program.

255.    That I put it in writing is evidence that what I said in terms of being worried about the outcome of the specialization examination if chaired by someone other than Dr. O'Leary and especially when chaired by Coordinator Goerdel, is understandable when the context is considered. I said it orally and in writing. If that was wrong, I would not have put it in writing and denied it.

256.    If anyone other than the student's advisor chairs the specialization examination, the student will have a legitimate reason to be worried about the outcome of the specialization examination, because only the student's advisor knows the student best and the student's advisor guides the coursework and research interest of the student and prepares the student for the specialization examination.

257.    If I was worried about the outcome of the specialization examination, I would not have prepared for it in the Spring Semester 2016, which was the time to retake the specialization examination. Instead, I would have tried to change my specialization.

258.    If I was apprehensive about the outcome of the specialization examination, I would not have asked other faculty members to serve as my advisor. Coordinator Goerdel thanked me in one of her emails for quickly trying to find an advisor.

259.    If I was worried about the outcome of the specialization examination, I would not have re-established the advisory relationship with Dr. O'Leary twice. I reinstated the advisory relationship with her once in March 2016 and the second time in September 2016. The time in which I reinstated the advising relationship with her for the second time was after emailing to Coordinator Goerdel. I emailed Coordinator Goerdel in July 2016 and I reinstated the advisory relationship with Dr. O'Leary in September 2016. If I was anxious about the outcome of the specialization examination, I would not have reinstated the advising relationship with Dr. O'Leary after the email to Coordinator Goerdel.

260.    Coordinator Goerdel sent me the email about preventing me from changing my specialization and then I replied to her stating indirectly that I was worried about the outcome of the specialization examination. Thus, the sequence of events matter. Had I sent mine first, they could argue that after seeing my email they prevented me from changing my specialization.

261.    If I was worried about the outcome of the specialization examination, Director Robinson should not have contacted the college before I contacted the college when I mentioned that I would raise the issue to the attention of another party outside the school. When one reads Director Robinson's email, one sees he is sweet-talking the college. If I was worried about the

specialization examination, Director Robinson should not have cajoled the college to gain their attention.

262.    If I was apprehensive about the outcome of the specialization examination, I would not have twice asked Dr. O'Leary to reinstate the advising relationship, even after I filed the appeal. Both times, she orally told me that she was not interested in serving as my advisor, but she did not respond in writing either time.

263.    In fact, not being worried about the outcome of the specialization examination if someone other than your advisor chairs your specialization examination is abnormal. Working with an advisor who can work productively with the doctoral student, and with expertise in the doctoral student's specialization and research, would make no sense and will serve no purpose if the advisor does not chair the specialization examination.

264.    The reason a student works with an advisor is that the advisor prepares the student for the specialization examination. For that reason, it is crucially important that your advisor, and not someone else, chair the specialization examination.

265.    It is to be mentioned that even Dr. O'Leary, with whom I worked, does not have expertise in my area of research. I spent a lot of time reading about my dissertation proposal before sitting for the specialization examination. Doctoral students are typically asked questions related to their dissertation proposal in the specialization examination so a connection can be made between the specialization examination and the oral examination. Yet, I was not asked any question related to my dissertation.

266.    After the first attempt at the specialization examination, I met with Dr. O'Leary and she asked me to provide her with the name and article of the scholar who introduced the theory for my dissertation. In this regard, I told her:

Like I said today, the first article by Macneil which became the foundation for relational contracting is "whither contracts?" published in 1969. However, the article that clearly discusses relational contracting is "The many futures of contracts" published in 1974 which I have attached in this email. Another interesting article is "relational contract: what we do and do not know" published in 1985 which is also attached.

267.     It logically follows that when a faculty member is not familiar with a dissertation topic, he/she would not give questions about this topic, because they could not evaluate an answer if they are not familiar with the literature.

268.     Although Dr. O'Leary has no expertise in my research area, it was still crucially important that she would chair my specialization examination. That is because she holds a PhD degree in Public Administration, has knowledge in Organization Theory which is my area of specialization, I chose her and worked with her as my advisor, she guided my coursework, and she knows me and my areas of strength. I know how to draft answers acceptable to her. I am familiar with her style and what she looks for while evaluating doctoral student examinations.

269.     My GPA for the specialization classes is 4.0. This is clear evidence I was not worried about the outcome of the specialization exam. The response from Coordinator Goerdel and Director Robinson to the college also stated that the reason I tried to change my specialization was that no one would serve as my advisor in my specialization. Their response clearly stated:

Mr. Babakr was unsuccessful in his effort to engage a new advisor. As a result, he asked to change his area of specialization.

270.     Dr. Epp too told me that no one in my specialization would serve as my advisor. He told me:

[I]t is my understanding that they have committed to serve as a committee. I believe they are only unwilling to serve as a sole individual advisor.

271.     According to the College Grievance Procedure, a hearing should be conducted within 30 days following the submission of the grievance. I submitted the grievance to the

college on March 3, 2017. Because I originally submitted the grievance on January 19, 2017 to KU Judicial Board and the board sent a copy of the grievance to Dean Lejuez on January 27, 2017, a hearing could have been conducted right after I submitted the grievance to the college because Dean Lejuez already had a copy of the grievance.

272.     In all cases, a hearing should have been conducted by April 3, 2017. However, that did not happen. Instead of conducting the hearing in less than a month as the college received a copy of the grievance by January 27, 2017, or at least within a month, as stated in the College Grievance Procedure, the college conducted the hearing almost two and a half months from submission of the grievance.

273.     The reason that the college was not serious in conducting the hearing on time was their loss of interest in the grievance resulting from the misleading information provided by either Coordinator Goerdel or Director Robinson regarding the reason that I filed the grievance.

274.     The college held the hearing on May 15, 2017 and Dean Lejuez informed me of the result of the grievance on June 1, 2017. Had the college held the hearing on time, I would not have lost the Summer Semester 2017.

275.     If Coordinator Goerdel or Director Robinson had not misled Dean Lejuez, I would not have needed to write an appeal, because Dean Lejuez initially stated that he would take the grievance. Thus, I could have worked in a new specialization by the Summer Semester 2017, as faculty members having expertise in my specialization could not serve as my advisor. I lost time and money due to this delay in conducting the hearing, resulting from the misleading information provided by Coordinator Goerdel or Director Robinson to Dean Lejuez.

276.     As a sponsored student, I had limited time and funding to obtain my degree. Any delay in resolving this issue left me with less time and funding to finish my degree.

277.     The principles of impartiality and fairness require that the committee that considers the grievance should not be biased in favor or against any party and should be fair to both parties.

278.     The college grievance committee was neither impartial nor fair. According to the College Grievance Procedure, the chair shall dismiss a complaint if:

> "(a) the grievance or another grievance involving substantially the same underlying occurrence or events has already been, or is being, adjudicated by proper University procedures; (b) the grievance has not been filed in a timely fashion; (c) the Dean lacks jurisdiction over the subject matter or any of the parties; (d) the grievance fails to allege a violation of a University rule; (e) the party filing the grievance lacks standing because he or she has not suffered a distinct injury as a result of the challenged conduct and has not been empowered to bring the complaint on behalf of the University; or (f) the party filing the grievance has been denied the right to file grievances pursuant to USRR 6.5.4."

279.     The chair of the college grievance committee and the members of the committee were biased for Coordinator Goerdel and Director Robinson. This happened *due* to the misleading information provided by Coordinator Goerdel or Director Robinson to the college, which led to their loss of interest in resolving the issue, although Dean Lejuez was initially willing to accept the grievance. According to Article 4.5(e) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members should avoid knowingly providing false information to the university

280.     For all the items of the grievance, instead of just stating the reason he dismissed a particular item, the chair argued for Coordinator Goerdel and Director Robinson. The chair violated the College Grievance Procedure by arguing for Coordinator Goerdel and Director Robinson, as the chair should not have argued in favor or against the parties.

281.     On the hearing day, as I entered the room identified for the hearing, the chair of the college grievance committee was there and asked me to leave the room saying that the grievance committee had a meeting. That was unusual. A couple minutes before the start of the

hearing, I was called into the room. When I entered the room, Coordinator Goerdel and Director Robinson were already sitting there.

282.     Because Coordinator Goerdel and Director Robinson had access to the committee without my presence, they presented information to the committee without my knowledge and thus creating a bias against me. I also was not given an opportunity to know what they told the committee or to respond to it.

283.     As I started speaking, I observed that Coordinator Goerdel and Director Robinson and the grievance committee were looking at each other so it showed that they agreed with each other. This nonverbal communication between the committee and Coordinator Goerdel and Director Robinson destroyed my morale because I felt that the committee had decided to rule in favor of Coordinator Goerdel and Director Robinson.

284.     At the end of the hearing, Coordinator Goerdel was laughing and the chair of the committee looked at her with an assuring look. As the hearing ended, a committee member, Dr. Lamb, left the room and followed Coordinator Goerdel and Director Robinson.

285.     After I finished wiping up water that spilled on the table, I left the room and saw Dr. Lamb at the door of the room. I said goodbye to her, but she did not respond, thereby reinforcing my belief that the committee was biased for Coordinator Goerdel and Director Robinson. According to the College Grievance Procedure, "After the presentation of evidence and arguments, the committee will excuse the parties and deliberate."

286.     Thus, any nonverbal communication in favor or against any party violates the College Grievance Procedure. The grievance committee should have made no party feel that the committee was agreeing or disagreeing with either party. The committee can decide only after listening to all parties and only after all parties have left the room.

287.    Besides nonverbal displays of bias, the grievance committee was verbally biased throughout the hearing. The committee constantly argued for Coordinator Goerdel and Director Robinson while they were supposed to listen to each party objectively. I was uncomfortable, on the defensive, and unable to think clearly throughout this hearing due to the perceived prejudice of the grievance committee.

288.    I all alone argued with Coordinator Goerdel and Director Robinson and the grievance committee, which seemed to side with Coordinator Goerdel and Director Robinson instead of being objective. For example, when I mentioned that Coordinator Goerdel and Director Robinson did not provide me with a copy of their response, the committee said this would not matter.

289.    According to the College Grievance Procedure, "The respondent shall provide a complete copy of the response to the complaining party." Without the response, the other party cannot prepare for the hearing.

290.    While Coordinator Goerdel and Director Robinson were supposed to submit their response by April 3, 2017, I received a copy of their response on April 11, 2017 and only after requesting it from Dean Lejuez. According to the College Grievance Procedure, "Upon receipt of the complaint, the College Office shall contact the respondent to verify that the respondent has received a copy of the complaint and to provide the respondent with a copy of these procedures."

291.    Thus, the college was supposed to contact me to make sure that I have a copy of the response. The college did not do that. Instead, I had to follow up with the college to see if the response was available instead of being provided by it.

292.    When I said that I had contacted Coordinator Goerdel on a Sunday evening and she responded the same evening in the name of the doctoral committee stating that the decision

to reject my request to pursue a new specialization was final, the committee argued for Coordinator Goerdel and Director Robinson saying the doctoral committee would not need to meet to state that their decision was final.

293.   The grievance committee accused me of providing misleading information to the university appropriate parties. I could not see the logic in this argument by the grievance committee that I myself provided misleading information to university appropriate parties.

294.   The committee said that it is common for different units within the university to request information from each other. Then the committee said that I provided misleading information to these units. If different units request information from each other, any information transmitted will be through the university units and not me. It is obvious that I do not provide misleading information to different university units that there were several options for me in the program and then say there were no options for me in the program.

295.   In his letter for Coordinator Goerdel and Director Robinson about items J, K, and L of the grievance, the chair of the grievance committee asked Coordinator Goerdel and Director Robinson to narrate the past events that warranted the language used in the letter I signed in September 2016 under duress and warranted the three-person advising relationship.

296.   Accordingly, Coordinator Goerdel and Director Robinson spent two and a half pages of their response narrating those past events. As I was trying to respond to the claims that Coordinator Goerdel and Director Robinson made in this narration, Coordinator Goerdel angrily interrupted me, the chair did not allow me to speak and asked me to move on to the next item.

297.   According to the College Grievance Procedure, "The chair of the committee shall have the authority and responsibility to keep order, rule on questions of evidence and relevance, and shall possess other reasonable powers necessary for a fair and orderly hearing." The chair

decides who should speak or not speak. Coordinator Goerdel stopped me from speaking and the chair agreed with her.

298.    Preventing me from speaking violated the College Grievance Procedure and reinforced my belief that my fate had been decided before I entered the room. I lost the chance to respond to the narration of the events that Coordinator Goerdel and Director Robinson provided upon the request of the chair himself, and therefore, I was not given an opportunity to respond.

299.    Further, the grievance committee accused me of rejecting Dr. O'Leary saying she would advise me. Item VII of the grievance explains with clear evidence that Dr. O'Leary was not interested in having me as her student.

300.    Being misled by Coordinator Goerdel or Director Robinson, the grievance committee was neither partial nor fair and violated the College Grievance Procedure by erring on the side of considering the policy violations and evidence I presented during the hearing. As a result, I lost the grievance at the college level.

301.    According to the College Grievance Procedure, "Each party has the right to introduce all relevant testimony and documents if the documents have been provided with the complaint or response." In the hearing conducted by the college, the chair allowed Coordinator Goerdel and Director Robinson to read a statement from Dr. O'Leary even though the statement was not part of their initial response.

302.    The chair did not allow Coordinator Goerdel and Director Robinson to submit the statement before the hearing, but allowed them to introduce it in the hearing. Because I did not see the statement before the hearing, I could not respond to it, I could not ask Dr. O'Leary questions about it, and I could call no witnesses to rebut what was in the statement. Thus, I had no real opportunity to respond to the statement or the allegations against me.

303.    The chair *allowed* Coordinator Goerdel and Director Robinson to introduce this statement to the hearing because Coordinator Goerdel or Director Robinson misled the college resulting in their loss of interest in resolving the issue. As the college lost interest in resolving the issue, it was not serious in doing anything regarding the issue.

304.    I filed the grievance with the college in March 2017 and the college considered three items for the hearing. The college thus requested a response from Coordinator Goerdel and Director Robinson for those three items. Coordinator Goerdel and Director Robinson jointly submitted a response.

305.    According to Article 4.5(e) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members should avoid knowingly providing false information to the university. The response that Coordinator Goerdel and Director Robinson submitted to the college was misleading as follows:

306.    Coordinator Goerdel and Director Robinson stated that they wanted to tell the college about the nature of the situation implying that what I stated in my grievance was not illustrative of the situation. However, the way they described the situation is a misleading description of the situation.

307.    To begin, they state that the issues between Dr. O'Leary and me started in the Spring Semester 2016. The issues started in the Spring Semester 2015, but Coordinator Goerdel then took parental leave and, hence, could not chair my specialization examination. I expressed concern about Coordinator Goerdel's interference in my specialization examination from the beginning.

308.    In several places of their response, Coordinator Goerdel and Director Robinson mentioned that the doctoral program requires that doctoral students finish coursework to enter

what they call the "examination phase/process". Doctoral students need not finish all coursework to sit for the written examinations. The two written examinations are separate examinations. Once a student takes the foundations classes, he/she can sit the foundations examination. Similarly, once a student takes the specialization classes, he/she can sit the specialization examination. For example, I took the foundations examination when I was still taking coursework.

309.    Further, there is no point beyond which a student must stop coursework if the student has not yet graduated. There is limited required coursework, but if a student takes additional classes, it is entirely appropriate. For example, some students take the optional "PUAD 937 Qualitative Methods in Public Administration" class besides the required courses. In the view of the university, the student is a customer. As a customer, the more classes a student takes, the more money the university makes from that student. Thus, the university would benefit if a student takes more classes.

310.    In several places of their response, Coordinator Goerdel and Director Robinson mentioned that I did not pass the foundations examination in the first trial. It was a *failure* of the doctoral committee which conducts the foundations examination for doctoral students to conduct the foundations examination in the way it is conducted for other students that led to that situation. I was not given a single question related to my coursework. Almost all the questions for the foundations examination come from a class called "PUAD 932 Seminar in the Intellectual History of Public Administration". Dr. George Frederickson used to teach this class. When I joined the school in 2013, a change took place. Dr. O'Leary taught this class and I took this class with her. The questions given to me in the first trial were drawn from the class taught by Dr. George Frederickson. Dr. Fredrickson had a different syllabus than the one we covered in Dr.

O'Leary's class. Three students took the foundations exam in the Spring Semester 2015. The other two students depended on the syllabus used by Dr. Frederickson for exam preparation and I depended on the new syllabus used by Dr. O'Leary. Hence, I found myself in a situation of seeing exam questions not drawn from my coursework. Interestingly, after the first trial of the foundations examination, I met with the doctoral committee which conducted the foundations examination, and they did not seem to have any idea of the literature.

311.    One aspect of the feedback for the foundations examination was that what I wrote about Woodrow Wilson was not an accurate description of the literature. Woodrow Wilson can be regarded as the father of American Public Administration. Yet, when I asked the doctoral committee about Woodrow Wilson, they (except for Dr. Maynard-Moody) could say nothing about what Wilson says. Two of them, Drs. Fowles and Daley, were even offended as they could say nothing in response to that simple question. Afterwards, they were asking me what points I wanted to discuss when I was asking them to meet with me. They were asking me to tell them in advance what I wanted to discuss with them so they could read about whatever point I wanted to discuss with them so they could avoid the embarrassing situation of finding themselves in a situation where a student asks the simplest question and they fail to say anything in response. In this regard, one of the emails from Dr. Fowles to me states in part:

> And if you could please send me an agenda for what you would like to discuss in advance, I would appreciate it. It will help me be better prepared to help you.

312.    Similarly, Dr. Daley's email to me states in part:

> Can you provide a sense of what you want to discuss about your exam?

313.    Half of the faculty members of the doctoral committee that conducted the foundations examination which includes Drs. Goerdel (then the chair of the doctoral committee) and Daley (member of the doctoral committee) have no degree in Public Administration.

314.   Then Coordinator Goerdel and Director Robinson stated, "Having cleared that hurdle, he was then required to take his specialization examination at the next available opportunity." I took the second round of the foundations examinations and the specialization examination in the same semester. They are not clear in stating this. At the next available opportunity means the following semester, but it was not the next semester in which I took the specialization examination.

315.   Coordinator Goerdel and Director Robinson also mentioned in several places of their response that I did not pass the specialization examination in the first trial. It was the *failure* of the specialization examination committee to conduct the specialization examination in the way that it was done for other students that led to that situation.

316.   Peer students told me that when sitting for the specialization examination, a student would typically be asked questions related to his/her dissertation. I spent a huge amount of time reading literature related to my dissertation. Yet, I was not given a single question related to my dissertation.

317.   I later discovered that Dr. O'Leary as the chair of the examination does not have expertise in my area of dissertation. It logically follows then that when a faculty member is not familiar with a dissertation topic, he/she would not give questions about this topic because they could not evaluate an answer if they are not familiar with a literature. Further, in answering question 1 of the specialization examination, I mentioned seven conditions to be met for contracting to lead to efficiency. According to the exam instructions, my answer to the specialization exam should not have exceeded 15 pages and I had to answer two questions. A typical answer then would be writing about 7.5 pages for each question. Mentioning seven

conditions while having about 7.5 pages for the answer required that I write briefly about each condition due to the imposed length limitation.

318.    The main feedback for this question was that the answer was too broad. Instead of writing a page or so about each of the seven conditions, the specialization examination committee expected me to focus on 1-2 condition(s) and write more about them. So, it was a matter of breadth vs. depth of the answer and not a matter of not knowing the answer. For the second question, the main feedback was that the answer came from one class. This was so because the other two classes were unrelated to the question I answered. A doctoral student takes three classes for a specialization before sitting for the specialization examination. In short, if the examinations were conducted in the same way they were conducted for other students, I could pass them.

319.    Coordinator Goerdel and Director Robinson also stated that the school offers a high-quality program. I was also part of this quality-program. There is no single piece of evidence I am a weak student, an impression that Coordinator Goerdel and Director Robinson have tried to convey throughout their answer to the college. On the contrary, every piece of evidence shows I am a very good student. For example, my overall GPA in the doctoral program is 3.84 despite the emotional disturbances I went through due to discrimination by Coordinator Goerdel. My foundations GPA is 3.85 and my specialization GPA is 4.0. University departments typically set a threshold for GPA before a student can take a comprehensive examination. This shows that a high GPA indicates that the student can do well on the examination and vice versa. In our school, the required GPA is 3.00 to be eligible to sit for a written examination. By all standards, a 3.85 GPA for the foundations classes and a 4.0 GPA for the specialization classes are high in not just our doctoral program but in any given doctoral program.

320.    Further, a paper of mine was accepted for the Public Management Research Conference (PMRC) when I had not yet started working on my dissertation. Students typically may have papers approved for conferences after starting to work on their dissertations. The PMRC is the second most prestigious, if not the most prestigious conference in Public Administration. The paper was a single-authored one. As it is extremely difficult for a paper to be approved for the PMRC, paper presentations at the PMRC by students are very limited and in the entire history of the school, only a few students had a single-authored paper approved for the PMRC before or even after starting to write their dissertations.

321.    Further, a poster presentation from another paper I wrote was selected for a university-level graduate research competition and the feedback was all positive. If Coordinator Goerdel did not violate the school policy by chairing my specialization examination and destroying my relationship with Dr. O'Leary as my advisor, I could attain more accomplishments especially in my last years in the program. Doctoral students typically become more productive in their final years because students become acquainted enough with their field and their own area of research and develop a mature understanding of the field. I might have published the paper accepted for the PMRC and probably other scholarly papers as well if Coordinator Goerdel had not created that toxic environment to me.

322.    I have almost always been one of the top, if not the top students of my class throughout elementary, middle, high school, undergraduate, and graduate studies. Further, I am one of the only two Fulbright scholars in the school as far as I know. I had a Fulbright scholarship for my Master's program. Fulbright is a prestigious scholarship awarded only to very few people.

323.     Thus, I already had a Master's of Public Administration (MPA) from Central Michigan University before entering the doctoral program and was also inducted into the Pi Alpha Alpha Honor Society with a 3.97 GPA for my Master's degree. Many students did not have a Master's degree in Public Administration or any Master's degree when they entered the doctoral program at our school.

324.     Coordinator Goerdel and Director Robinson also mentioned that Dr. O'Leary was helpful. Coordinator Goerdel's interference in my program in violation of school policy negatively affected my advising relationship with Dr. O'Leary. Dr. O'Leary lost interest in having me as her student, the biggest manifestation of her loss of interest was her refusal to chair my specialization examination, and Coordinator Goerdel insisted that she would instead chair my specialization examination.

325.     As the advising relationship came to an end with Dr. O'Leary, Coordinator Goerdel strongly reacted to that, forcing me not to ask other faculty members to serve as my advisor and forcing me to go back to her. Coordinator Goerdel ultimately threatened to dismiss me from the program if I did not go back to Dr. O'Leary.

326.     Coordinator Goerdel and Director Robinson then stated, "Less than a week before the date of his scheduled retake, however, Mr. Babakr announced that he was "canceling" the exam for personal reasons. Sometime soon thereafter, he announced that he no longer wanted Dr. O'Leary to serve as his advisor. He also indicated that he wanted to change his area of specialization." In other words, they stated that I canceled the specialization examination for personal reasons less than a week before the date of the specialization examination, ended the relationship with Dr. O'Leary and then tried to change my specialization.

327.     This is not how things happened in actuality. First, I tried to meet with Dr. O'Leary around a month before February 19, 2016, which was the date of the specialization examination, and I sent her multiple requests to meet. As Dr. O'Leary was out of town, she could not meet with me until a few days before the specialization examination.

328.     I met with Dr. O'Leary on February 15, 2016. Seeing that Dr. O'Leary was not interested, I asked Dr. Maynard-Moody who was sitting on my committee to serve as my advisor and after that the relationship came to an end with Dr. O'Leary. As Dr. Maynard-Moody ultimately could not serve as my advisor, I canceled the specialization examination because only two days were left for the specialization examination by the time Dr. Maynard-Moody informed me he could not serve as my advisor.

329.     The specialization examination was scheduled for February 19, 2016, and Dr. Maynard-Moody responded to me on February 17, 2016. Being reasonably worried that I might not find an advisor within two days, I canceled the specialization examination so I could secure an advisor before sitting for the specialization examination.

330.     Further, I explained why I canceled the specialization examination when Coordinator Goerdel contacted me about this issue. I did not cancel the specialization examination for personal reasons. It was Coordinator Goerdel's attempt to chair my specialization examination in violation of school policy and the accompanying loss of interest by Dr. O'Leary that led to cancelling the specialization examination. I was ready to sit for the specialization examination, but Coordinator Goerdel interfered in my program which led to the loss of interest of my advisor in having me as her student. This has led to ending the advising relationship. Because I did not have an advisor, I had to cancel the exam. After cancelling the specialization examination, I continued asking other faculty members with expertise in my

specialization to serve as my advisor. Only after finding they could not serve as my advisor, I said that I would change my specialization because a specialization cannot be pursued without an advisor.

331.    Thus, the correct sequence of those events was that I tried to meet with Dr. O'Leary almost a month before the scheduled retake of the specialization examination and sent her multiple requests to meet. I then asked Dr. Maynard-Moody to serve as my advisor and then ended the relationship with Dr. O'Leary, as she was not interested. As Dr. Maynard-Moody could not serve as my advisor, I canceled the specialization examination having concern I might not find an advisor within two days from the day of the specialization examination. I then asked other faculty members with expertise in my area of specialization to serve as my advisor. As they could not serve as my advisor, I said that I would change my specialization.

332.    Coordinator Goerdel and Director Robinson then stated that at the core of my grievance was my desire to change my specialization. There is not a single piece of evidence to support this claim. However, every piece of evidence shows that because no one was willing to serve as my advisor, I wanted to change my specialization.

333.    Coordinator Goerdel and Director Robinson admit that it was because no one was willing to take me as his/her student I tried to change my specialization. I twice reinstated the advising relationship with Dr. O'Leary but this did not work.

334.    They also mentioned that I requested to change my specialization in several places in their misleading response to the college. I did not make a request to change my specialization. I need not make a request to change my specialization. The student solely chooses a specialization. When no advisor is available for a specialization, the student must turn to a new specialization to be able to continue in the program. The doctoral committee interfered in my

program and put me in the situation of making a request to change my specialization in the

Summer Semester 2016. In Spring Semester 2016, I did not make a request to change my

specialization. Instead, I said that I would change my specialization as faculty members having

expertise in my specialization could not serve as my advisor.

335.    They then twice stated that I failed to sit for the specialization examination retake

in February 2016. I did not fail to retake the specialization examination in February 2016.

Coordinator Goerdel's discrimination against me by chairing my specialization exam while she

has no academic credential neither a working relationship with me made it impossible for me to

sit for the specialization exam. Thus, I could not retake the specialization examination because I

did not have an advisor.

336.    A student cannot sit for the specialization examination if he/she does not have an

advisor because the student's advisor chairs the specialization examination and I had to enroll in

dissertation hours with my advisor while sitting for the specialization examination.

337.    They then mentioned that they tried to find a way for me to move forward and

that it took them a great deal of time. In reality, all that they did was to force me to go back to a

hostile working relationship with Dr. O'Leary.

338.    Then they stated that in the March 2016 meeting I agreed to go back to Dr.

O'Leary and then changed my mind after re-establishing the advising relationship with her. I did

not change my mind. It was Dr. O'Leary's loss of interest that led to ending the advising

relationship again. For example, while I was enrolled in six dissertation hours with her in Spring

Semester 2016, she was trying to avoid discussing my dissertation with me. She was also

complaining about meeting with me.

339.    They also stated that they suggested that I would contact other faculty members to see if one would be interested in taking me as his/her student. I had explored in Spring Semester 2016 if any other faculty member would be interested in taking me on as his/her student. This was not their suggestion. They make it to seem to be their suggestion, but it was not. They also stated that I failed to find an advisor. As a student, all I can do is request faculty members serve as my advisor. If they do not agree, that is not my failure.

340.    Coordinator Goerdel and Director Robinson then *admitted* that due to a lack of an advisor, I asked to change my specialization. This is the *real reason* I asked to change my specialization, a *lack of an advisor*.

341.    It is by no means a well-considered view by the doctoral committee to force a student to pursue a specialization without an advisor as claimed by Coordinator Goerdel and Director Robinson more than once.

342.    Coordinator Goerdel and Director Robinson then stated that the July 2016 decision of the doctoral committee is at the heart of the grievance. In actuality, it was the lack of an advisor for my specialization which was at the heart of the grievance. On the same page, they mentioned three reasons for wanting to change my specialization; a desire to change my specialization, having no advisor, and the decision of the doctoral committee preventing me from changing my specialization. These three reasons contradict each other. The actual one is the lack of availability of an advisor. If I had an advisor, I would not need to change my specialization.

343.    Coordinator Goerdel and Director Robinson then mentioned that Director Robinson contacted a college senior staff, Dr. Kristine Latta, ("Dr. Latta") for advice for how the school and I could work constructively. Director Robinson did not contact Dr. Latta for advice. He contacted her right after I said I would bring the issue to the attention of an appropriate party

outside the school to make sure that others would not listen to me by conveying a misleading picture of the actual story.

344.     The email Director Robinson sent to Dr. Latta is misleading. For example, he says I fired Dr. O'Leary before taking the specialization examination and then I wanted to change my specialization instead of sitting for the specialization examination. He did not say that Dr. O'Leary was not interested; he also did not say I asked other faculty members to serve as my advisor and they could not serve as my advisor. He also did not say I reinstated the advising relationship with Dr. O'Leary once before ending it again. I sent my email at 1:29 AM and Director Robinson contacted Dr. Latta later at 10:55 AM of the same day.

345.     If the doctoral committee did the right thing by forcing me to continue in the program without an advisor, Director Robinson would not have had a reason to contact Dr. Latta so quickly. They could have waited to see what I would do, but Director Robinson misled the college before I talked to them.

346.     Coordinator Goerdel and Director Robinson then mentioned more than once that I took a leave of absence as the best option. Leave of absence was not the best option, but I was left with no option other than taking a leave of absence to avoid falling out of legal status. This allegation from them denotes there were other options besides a leave of absence, but there was not any option.

347.     They also stated that Director Robinson just wanted to let me know the implications of taking a leave of absence. I also knew a leave of absence meant leaving the United States and I discussed that with Director Robinson in the meeting with him before he sent out his email to me about the implications of a leave of absence. So, I knew that a leave of absence meant leaving the United States for home. In addition, the email from Director Robinson

69

to me says that the International Student Office advised that I consider the implications of a leave of absence, but Coordinator Goerdel and Robinson stated in their response to the college that it was Director Robinson who advised that I consider the implications of a leave of absence.

348.    Director Robinson was supposed to tell me when I asked him what implication this would have if it were he who expressed concern about the implications of taking a leave of absence. If Director Robinson was concerned that taking a leave of absence would mean leaving the United States for home, he should have let me revoke the leave of absence when I tried to do so instead of having me sign a letter under duress as a condition of allowing me to revoke the leave of absence.

349.    Coordinator Goerdel or Director Robinson should not have spoken negatively about me to the International Student Office. The office of International Student Services told me that the school did not understand why I was asking for a leave of absence. The letter that I signed under duress states, "Given the relatively unsteady nature of the relationship between you and the School." This quote is evidence that Coordinator Goerdel and Director Robinson plotted to have me discontinue the program. Hence, the quote from the letter describes my relationship with the school as "unsteady".

350.    When trying to take the leave of absence, I was told by the office of International Student Services that doing so meant leaving the United States right after meeting with them. The idea of leaving the United States immediately was probably used to make me stay. Coordinator Goerdel or Director Robinson probably told the office of International Student Services to convince me to stay. Probably Coordinator Goerdel or Director Robinson also told the International Student Services Office that if I was determined to take the leave of absence, then the International Student Services Office should try to discontinue me from the program.

That is why Director Robinson communicated with the International Student Services Office to see what I was saying. Therefore, the issue was not expressed concern about the implications of a leave of absence. It was a plot to have me discontinue the program.

351.     Coordinator Goerdel and Director Robinson then mentioned in their misleading response to the college that they facilitated my request for a leave of absence. However, they did not facilitate the request; they plotted to have me discontinue the program. The first stream of emails of Exhibit B from their response to the college contains no communication between the school and other administrative departments about facilitating the leave of absence. The second stream of emails in the same Exhibit is about the revocation of the leave of absence and not facilitating the request. Therefore, even their Exhibit is misleading because the Exhibit does not match their narration regarding my attempt to take a leave of absence about which they state they facilitated my request for a leave of absence.

352.     Then they stated that I requested a leave of absence and changed my mind. I did not change my mind; it was mainly the plot of having me discontinue the program and not getting any new faculty member with expertise in my specialization that made me revoke the leave of absence. When I asked for a leave of absence, I said that I would take a leave of absence until we could get a new faculty member with expertise in my area. As I asked, I was told that the school is not hiring any new faculty members with expertise in my area of specialization within the next year. Thus, there was no point in taking the leave.

353.     Then they conveyed an embedded complaint I asked for and then revoked the leave of absence. In the second stream of emails in Exhibit B of their response to the college, they wanted to say they facilitated the revocation upon my request. Thus, they should not

complain that I revoked the leave. This is further evidence that they just plotted to have me discontinue the program and wanted me to never come back.

354.    They then stated more than once that they had me sign the letter under duress to have mutual commitments. Mutual commitments did not exist. I was committed but Dr. O'Leary was not. Dr. O'Leary has sent me an accusative email when I reinstated the advising relationship with her for the second time in the Fall Semester 2016. So, having me sign under duress was to force me to stay with her. The letter does not secure a productive pathway as they stated. Forcing a student to stay with an advisor who is not interested is not a productive pathway; it is counterproductive and violates the school policy which states that the student chooses his/her advisor.

355.    In their misleading response to the college, Coordinator Goerdel and Director Robinson then tried to tie the letter I signed under duress with past events and repeated this allegation more than once. This letter has nothing to do with what happened. The school just exploited the leave of absence to have me discontinue the program. As I revoked the leave, the school exploited this chance to force me to stay with Dr. O'Leary in violation of the graduate studies policy for leave of absence which states that a leave of absence is granted only in extraordinary situations. Hence, the school should create no obstacle if a student wants to revoke it.

356.    If Dr. O'Leary was interested in having me as her student, she was supposed to respond to my emails when I contacted her about reinstating the advising relationship. Director Robinson should not have had me sign the letter under duress to stay with her until completion of the program. Dr. O'Leary sent me a defamatory email when the advising relationship was reinstated. This is clear evidence that Dr. O'Leary was not interested in having me; hence,

Director Robinson had me sign a letter under duress to stay with her. Dr. O'Leary was also supposed to be present to also sign the letter as long as she was a party in the advising relationship. However, she was not present, because she was not interested in having me as her student.

357.    They then mentioned that they did not communicate with the dean of Graduate Studies, Dr. Michael Roberts. Even if Coordinator Goerdel and Director Robinson did not communicate with Dr. Roberts, it is information released from the school that eventually reached Dr. Roberts. If not, Dr. Roberts would not have known that the school offered several options to me.

358.    They also repeated more than once that they gave me several options. According to school policy, only the student can choose his/her advisor. Any advising option not made by the student violates school policy. Assuming that they offered advising options in violation of the school policy, here are the alleged options provided to me by the doctoral committee:

359.    Suggesting a continuing relationship with Dr. O'Leary: When the advising relationship came to an end for the second time in May 2016, they did not make the suggestion of going back to Dr. O'Leary. They made this suggestion only in Spring Semester 2016 and I reinstated the advising relationship with Dr. O'Leary, but it did not work. Besides, any option offered could not include a suggestion to work with Dr. O'Leary because working with her was already not working.

360.    When Coordinator Goerdel or Director Robinson told different university appropriate parties that I was offered several options, people concluded that after the advising relationship with Dr. O'Leary came to an end, these options were offered to me. Hence, mentioning a continuous relationship with Dr. O'Leary which was already reinstated once and

was not working could not be an option. While Coordinator Goerdel and Director Robinson described Dr. O'Leary as a faculty member who effectively advised countless students, I was the second student who left Dr. O'Leary in three years, 2013-2016.

361.    <u>Team approach:</u> There is no evidence for this option and it is impossible.

362.    <u>School's doctoral committee configures itself to meet my advising needs:</u> There is no evidence for this option and it is impossible.

363.    <u>Enrollment with Director Robinson as my advisor:</u> This is clear violation of the school policy and is impossible. Director Robinson does not have expertise in my area of specialization; he does not do research in my research area. Further, I did not choose him and did not work with him. Hence, there is no way for me to enroll in dissertation hours with him as my advisor because he can do nothing for me. Assuming I could enroll with him for one semester to sit for the specialization examination, there is no one with whom I could enroll in dissertation hours in the next semesters given that faculty members having expertise in my specialization already stated that they could not serve as my advisor.

364.    Coordinator Goerdel and Director Robinson also mentioned in their misleading response to the college that they wanted an effective way to move forward by having me sign the letter under duress to stay with Dr. O'Leary until completion of the program. Having a student sign under duress to stay with an advisor is not an effective way to move forward. Having anyone sign under duress violates the school policy which states that the student chooses his/her advisor and is against law. There is not logic and connection in the sequence of events that led to having me sign under duress.

365.    They then stated that Coordinator Goerdel, Director Robinson, and Dr. O'Leary tried to identify a path forward but they did nothing. There is no evidence they worked for

months with me. They mentioned that they showed flexibility, but they showed no flexibility. The only thing that Coordinator Goerdel and Director Robinson did was to prevent me from changing my specialization and forcing me to go back to Dr. O'Leary. Preventing me from changing my specialization violates the school policy because a specialization is chosen by the student. Forcing me to go back to Dr. O'Leary also violates the school policy because the student solely chooses his/her advisor.

366.    It was me who spent entire months with Dr. O'Leary hoping that the relationship would work, but it did not even though I spent the Spring and Fall Semesters 2016 hoping that it would work except for one month in the Spring Semester 2016 and one month in the Fall Semester 2016 as there was no advising relationship during those two months. Any time Coordinator Goerdel and Director Robinson spent on this issue, a total of five meetings, violated school policy.

367.    If an advisor is unavailable, the student must and can change his/her specialization because a specialization cannot be pursued without an advisor. Nobody should force a student to work with a specific faculty member as Coordinator Goerdel and Director Robinson did. Dr. O'Leary attended two meetings which focused on the advising relationship with her. Coordinator Goerdel attended another meeting for a total of three meetings.

368.    Other than these three meetings which Director Robinson also attended, all other meetings were attended by only Director Robinson. Director Robinson violated the school policy by interfering in my program because programmatic questions should be answered by the program coordinator per the school policy. Hence, any time spent on this issue by Director Robinson violates the school policy. Director Robinson could have avoided that if he had not singled me out among the doctoral students.

369.     Coordinator Goerdel and Director Robinson also mentioned in their misleading response to the college that I ignored advice consistently offered to me from a cross-section of the faculty members on how to move forward. I never ignored advice and no advice was offered to me. The only advice offered to me by the doctoral committee was that I continue in the program without an advisor.

370.     They also mentioned that my grievance results from a disappointment with the doctoral committee's decision. My grievance was not because of a disappointment with the doctoral committee's decision to prevent me from changing my specialization. I filed the grievance because a specialization could not be pursued without an advisor. The doctoral committee knew that nobody could serve as my advisor, but it still prevented me from changing my specialization. Based on the logic of the doctoral committee, I should continue in the program without an advisor and that is impossible.

371.     They also mentioned that the school assisted me in the program. The school did not assist me in the program. Instead, Coordinator Goerdel and Director Robinson discriminated against me.

372.     They mentioned that they wanted me to resume my progress. If my progress was impeded, the doctoral committee impeded it and not me.

373.     Besides their misleading answer, in the hearing conducted for the three items of the grievance by the college, Director Robinson read a statement from Dr. O'Leary which was also misleading as follows:

374.      Dr. O'Leary submitted, through Coordinator Goerdel and Director Robinson, a one-sided statement to the hearing. In addition to repeating some of the same false claims by Coordinator Goerdel and Director Robinson, Dr. O'Leary mentioned in the statement that her

experience with me was a case of first impression for her. I am not her only student who left her. Another student of hers also left and another student of her also faced difficulties. She then stated that her relationship with me was intensified in the Spring Semester 2015, but she met with me only four times. Advisors typically meet with their students four times in a semester.

375.    Contrary to what Dr. O'Leary said, she did not spend long hours analyzing what went wrong in the foundations examination. We had only one meeting about that and in that meeting, she just told me to talk to the foundations examination committee and get their feedback. Contrary to what she stated, it was me who mentioned that talking about the examination before it is done should be avoided. She did not ask me why I did not talk to the examination committee.

376.    Contrary to what Dr. O'Leary said, she did not tutor me the rest of Summer Semester 2015. She only did a practice examination. Even the practice examination was not her idea. I was enrolled in six dissertation hours for the Fall Semester 2015, Spring Semester 2016 and Fall Semester 2016 with her. That means she was expected to allocate at least roughly 288 hours of her time for me. During these three semesters, she spent only around two hours with me. That means less than 1% of the required time. Despite numerous requests from me for meetings, she rarely met with me. She was typically cancelling meetings, rescheduling them, or meeting late.

377.    She also mentioned that she tutored me for the foundations examination and after I took the foundations examination, she tutored me for the specialization examination. We had only 3-4 meetings for both examinations and all these meetings were held before sitting for the foundations and specialization examinations both of which I took in the Fall Semester 2015. She did not help me prepare for two separate examinations as she claimed.

378.    Dr. O'Leary also mentioned that I ended the advising relationship with her several times. It was she who was not helpful and not interested in having me as her student that led to ending the advising relationship. Dr. O'Leary refused to chair my specialization exam from the very beginning. When our advising relationship was reinstated under duress in the Fall Semester 2016, she sent me a defamatory email instead of showing interest in having her as her student. If she was helpful, our advising relationship would have continued. Even if she had been helpful and I had fired her, it would be still fine because per the school's policy, the student chooses his/her advisor. The impression she conveyed is that if your advisor is helpful, then the student should not end the advising relationship. As she was not helpful, my position remains valid.

379.    She then stated that I did not show up for the specialization examination. It was due to her failure to chair my specialization, while she and all other advisors chair the specialization examination for their students, that I could not show up for the specialization examination. I was in continuous preparations for the specialization examination. I was ready to sit for the specialization examination, but she was not ready to do her part, chairing my specialization examination.

380.    Contrary to what she stated, only after discovering faculty members having expertise in my specialization could not serve as my advisor, I tried to change my specialization.

381.    She also mentioned that I expressed anxiety throughout the process and that she attributed that to my fears of not passing the specialization examination. I never ever expressed anxiety about the exam. In a discussion we had after our advising relationship was reinstated in March 2016, she seemed very upset that I opposed Coordinator Goerdel's chairing of my specialization exam. In response to that, I made it very clear to her that I was worried about the outcome of a specialization exam chaired by someone other than her, namely Coordinator

Goerdel. I even once told Director Robinson that if Dr. O'Leary did not chair my specialization exam, anything could happen.

382.     I am the only student in this school whose advisor refused to chair his specialization examination and instead Coordinator Goerdel chaired my specialization examination. Further, I am the only student who faced stiff resistance from Coordinator Goerdel when the advising relationship came to an end with my advisor. Several students in my school switched from one advisor to another. In doing so, neither Coordinator Goerdel nor their advisors showed any negative reaction.

383.     As a result of the misleading information provided to Dean Lejuez by Coordinator Goerdel, Director Robinson, and Dr. O'Leary, Dean Lejuez changed nothing regarding my situation and I lost the grievance at the college level.

**XXII.     Dean Lejuez Provided Misleading Information to KU Judicial Board**

384.     Dean Lejuez provided false information when I filed the appeal with KU Judicial Board. As Dean Lejuez denied my grievance due to the misleading information provided to him by Coordinator Goerdel, Director Robinson, and Dr. O'Leary, I filed an appeal with KU Judicial Board in July 2017. Per the request of the University Judicial Board, Dean Lejuez submitted a response to my appeal.

385.     According to Article 4.5(e) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members should avoid knowingly providing false information to the university. In addition to repeating some of the same false claims by Coordinator Goerdel and Director Robinson, the response of Dean Lejuez to KU Judicial Board was false and misleading in the following ways:

386.     Contrary to what Dean Lejuez stated several times, there is no single piece of evidence that I did not want to make progress which is given as justification for the school's

actions. This is admittance that the school actions were not academic matters as his following sentence stated. However, Dean Lejuez stated that the school took these actions because he claimed I was not making progress.

387.    Contrary to what Dean Lejuez stated, none of the items in the grievance was an academic matter. All the items in the grievance involved clear and specific policy violations.

388.    Contrary to what Dean Lejuez stated about how the chair evaluated my grievance, the chair's assessment should conform to the College Grievance Procedure that outlines the basis for dismissing a grievance without a hearing. Anything beyond these reasons, such as arguing in favor or against any party of the grievance, is violation of the College Grievance Procedure.

389.    Contrary to what Dean Lejuez stated, I did not say that the basis for overturning his decision should be due to bias. I just said that bias violates the College Grievance Procedure.

390.    Contrary to what Dean Lejuez stated, I did point to actual bias in all the items in the appeal in which the chair argued for Coordinator Goerdel and Director Robinson. I said that the chair was biased when dismissing the items. Whether Dean Lejuez agreed or disagreed with the dismissals was not the point I was making. I just said that the chair was biased.

391.    Contrary to what Dean Lejuez stated more than once, I did not include new information and additional argument in the appeal. Even if I did, the University Senate Rules and Regulations allow new information and evidence to be included in the appeal in exceptional situations. Since Coordinator Goerdel or Director Robinson misled Dean Lejuez, thereby changing the outcome of the grievance, my appeal to KU Judicial Board could fall under the category of exceptional cases. Article 6.7.5.2 of the University Senate Rules and Regulations states, "In exceptional cases, if the appeals panel determines that information not contained in the

record is necessary for the resolution of the appeal, the panel may, with due notice to the parties,

obtain such information in the form of testimony or documentary evidence."

392.    Contrary to what Dean Lejuez stated, I pointed to specific policy violations in

each item and then injuries in items Q, R, and T of the grievance. In his letter requesting

information from Coordinator Goerdel and Director Robinson for the hearing, Dean Lejuez

stated that the school violated its policy, but he asked them to explain why they violated the

school policy.

393.    Contrary to what Dean Lejuez stated, I did not say injury automatically follows

policy violation. In my appeal, I said if there was no policy violation, the chair did not need to

ask what injury I suffered.

394.    Dean Lejuez then stated that they gave me deference implying that I did not give

them deference. When one reads the evaluation of the grievance items and listens to the hearing

audiotape, one can see that the grievance committee did not give me deference. For example, the

grievance committee accused me of providing misleading information. There was much bias and

accusations and I was humiliated in the hearing. The college grievance committee bullied me and

they were very adversarial with me during the hearing.

395.    The Dean should also have handled item I of the grievance as it is also a violation

of the Faculty Code of Rights, Responsibilities, and Conduct and not a violation of the Family

Educational Rights and Privacy Act as claimed by Dean Lejuez, but the chair referred it to the

Vice Provost for Student Affairs.

396.    Contrary to what Dean Lejuez stated, if violating the Faculty Code of Rights,

Responsibilities, and Conduct is a personnel matter, other items in violation of the Faculty Code

of Rights, Responsibilities, and Conduct were not determined to be personnel matters. Item J in

the grievance involved a violation of Faculty Code of Rights, Responsibilities, and Conduct, yet it was considered for the hearing. Part of item K which was also considered for a hearing involved a violation of Faculty Code of Rights, Responsibilities, and Conduct. The College Grievance Procedure says that violating the Faculty Code of Rights, Responsibilities, and Conduct is a ground for grievance and does not treat it as a personnel matter.

397.    Dean Lejuez was then not clear when saying that a student lacks standing regarding matters related to the Faculty Code of Rights, Responsibilities, and Conduct. Dean Lejuez stated a student could raise concerns about a faculty member's conduct. I did this. I did not say I would take action against faculty members; I just pointed out the way they treated me. Dean Lejuez implicitly admits that he did not take action when stating, "Not every allegation of wrongdoing is grievable".

398.    Besides, if these are personnel matters, the chair should have referred them to Dean Lejuez instead of dismissing them. Dismissing an item means nothing will happen about that item. The College Grievance Procedure says that grievances could be referred to appropriate bodies in the university. If Dean Lejuez is the appropriate person to take action, then the chair should have referred them to Dean Lejuez and not dismiss them.

399.    In item R of the grievance, I cite violation of the Code of Student Rights and Responsibilities and not the Faculty Code of Rights, Responsibilities, and Conduct as Dean Lejuez claimed. Item R was supposed not to be dismissed.

400.    Dean Lejuez did not address items J, K, and L of the grievance which were considered for the hearing; instead, he addresses procedural concerns. The only thing about items J, K, and L he said was that my disagreement does not make the college decision unreasonable. Contrary to what Dean Lejuez said about conducting the hearing, the initial assessment of

grievance was made in March 20, 2017. It does not take that much time to schedule six individuals in April. Personally, I was always ready for the hearing. Finals week is May 7 onward. The hearing should have been held by April 3, 2017, the latest.

401.    Dean Lejuez stated I could and should have progressed while the grievance was pending. The doctoral committee prevented me from making progress by preventing me from changing my specialization even though they fully knew no one was willing to serve as my advisor within my specialization and Dr. O'Leary had lost interest in having me as her student although I reinstated the advising relationship with her twice hoping that it would work out well.

402.    Contrary to what Dean Lejuez stated, there was no clear pathway towards degree completion I was refusing for more than a year.

403.    Contrary to what Dean Lejuez stated, there is no evidence that any delay in degree completion is my fault and under my control. The school and Dean Lejuez delayed my degree completion.

404.    Contrary to what Dean Lejuez stated, bias is not about considering or not considering information in the hearing, although there is evidence that the committee considered information that was not part of the grievance such as the statement from Dr. O'Leary. Bias is to argue for a party and make one party feel that the committee is siding with the other party.

405.    In the previous point, Dean Lejuez stated I did not identify information that was regarded in the hearing which was not part of the hearing. Then he points to information I say was introduced to the hearing, Dr. O'Leary's statement. This argument by Dean Lejuez counters his earlier one in which he said that the basis for bias should be information and not nonverbal looks and statements. Then when talking about Dr. O'Leary's statement in the hearing he said the chair has authority to decide what information to include in the hearing. The College

Grievance Procedure states that all evidence and documents should be submitted before the hearing. Without seeing the information and evidence provided by each party in advance, the parties cannot prepare for the hearing. Thus, the chair cannot arbitrarily include or exclude information in the hearing.

406.    Dean Lejuez then says that the statement read in the grievance hearing did not affect the grievance committee's decision. If it did not, it should not have been allowed to be read.

407.    Dean Lejuez described the statement read during the hearing as "hearsay" and he stated that it is admissible under the College Grievance Procedure. There is nothing about hearsay in the College Grievance Procedure implicitly or explicitly.

408.    Dean Lejuez stated that what I said in the appeal was a matter of personal disagreement. What I said in the appeal was not a matter of personal disagreement; it was a matter of erring in considering policy violations by the doctoral committee and also erring in considering evidence presented in the grievance.

409.    According to the University Senate Rules and Regulations, KU Judicial Board can reverse a decision made by lower level units. Article 6.7.1 of the University Senate Rules and Regulations states, "This section applies to any case in which an Appeals Panel of the Judicial Board reviews the decision of a unit level proceeding, Judicial Board hearing panel, or specialized tribunal." Dean Lejuez challenged the power of the Judicial Board to reverse a decision made by him. I lost confidence in the university grievance process when Dean Lejuez directly and openly challenged the power of KU Judicial Board as did the school.

410.     As a result of the misleading information provided by Dean Lejuez and the challenging statement from him that KU Judicial Board cannot reverse his decision, KU Judicial Board reversed no decision made by the college and I lost the grievance at the university level.

**XXIII.     The Doctoral Committee Invented the "Form Signer"**

411.     As part of their collective discriminatory actions against me, the doctoral committee put me in an unreasonable condition. After filing the grievance in January 2017, Coordinator Goerdel and Director Robinson stepped down. A new administration was formed in the school. Dr. Charles Epp became the new program coordinator ("Coordinator Epp") and Dr. O'Leary became the new school director ("Director O'Leary).

412.     In July 2017, I contacted Coordinator Epp as the new program coordinator about my situation and the problem of not having an advisor. In September 2017, I contacted him again about this issue. What the doctoral committee under the leadership of Coordinator Epp decided was just a reiteration of what was decided before under the leadership of Coordinator Goerdel, with the addition of the identification of one of the advisors as a forced *form signer*. In this regard, Coordinator Epp's email to me states in part:

> SPAA's [School of Public Affairs and Administration] proposal is for you to have a committee of advisors, with one of the committee designated to sign forms and authorize actions on behalf of the committee. I endorse and support this proposal. It is consistent with the University's and the School's rules. Having a single advisor, without an accompanying committee, is not an option at this point. School Director Rosemary O'Leary would serve in the role of form-signer on behalf of the committee

413.     Ironically, the faculty member identified as the forced form signer was Director O'Leary who became very hostile towards me after I filed the grievance and then the appeal. The idea of a committee of advisors was first introduced as a punishment to me by Coordinator Goerdel when she was the program coordinator. In a meeting held in March 2016, she was forcing me to go back to Dr. O'Leary. As I was saying that Dr. O'Leary was not interested in

having me, Coordinator Goerdel said that if I did not go back to her, I would face the consequences of working with a committee of advisors without ever being able to clarify how a committee of advisors could be possible.

414.    The doctoral committee thus interfered in my program again in violation of the school policy. The doctoral committee again made an unusual decision that not only violated the school policy but has also suffered from a logical fallacy and was impossible to implement.

415.    According to school policy, the student's advisor is chosen by the student and cannot be forced on the student. So, the doctoral committee violated the school policy by forcing a committee/group of advisors on me. There is also nothing called a "committee/group of advisors" in the school policy; instead, there is mention of "an advisor". A student having an advisor is known by everybody, but it is unheard of for a student to have a committee/group of advisors but have no single advisor.

416.    The logical fallacy that the decision of the doctoral committee suffered from was that they said that a committee/group of faculty members would serve as my advisors. If a group of faculty members were willing to serve as my advisors, it logically follows that one faculty member also should have been willing to serve as my advisor. That is because a committee/group is larger than one in number. Yet, the doctoral committee informed me that a committee/group of advisors was available, but one advisor was unavailable.

417.    One aspect of the impossibility of implementing the decision of the doctoral committee was that it is unheard of and it is impossible for a specialization examination committee to comprise only advisors/chairs. The specialization examination has an advisor/chair and the other(s) are members of the committee.

418.     Another aspect of the impossibility of implementing the decision of the doctoral committee is that I have to enroll in dissertation hours with my advisor/chair when sitting for the specialization examination. It is impossible for a student to enroll with a hostile forced form signer as the representative of a committee/group of advisors/chairs, as a student enrolls in dissertation hours with one advisor/chair.

419.     Further, a student's committee typically has an advisor/chair and the others are members of the committee. It is unheard of in academia and it is impossible for a doctoral student to have a committee composed of virtually only advisors/chairs. The advisor/chair of the student's committee shapes and guides the dissertation of the student. In the case of group advisors/chairs, the advisors/chairs would end up in a conflict because each advisor/chair would try to guide the research in the direction he/she wants.

420.     None of the faculty members that could be identified as group of advisors agreed to serve as my advisor when I contacted them. I even contacted other faculty members who were not even sitting on my committee and, hence, had no prior working relationship with me, but none could serve as my advisor.

421.     A "form signer" just does not exist in the school policy, but is also unheard of in academia. Director O'Leary developed a very negative attitude towards me and became very hostile towards me after I filed the grievance and then the appeal.

422.     In the hearing conducted in May 2017, Director Robinson read a statement from Dr. O'Leary, which showed that Dr. O'Leary was immensely affected by the fact that our advising relationship came to an end. Director Robinson read the statement in a very sad tone.

423.     Thus, in a meeting I had with Dr. O'Leary after the hearing was conducted for the grievance, I told her that the reason that our advising relationship came to an end was that she

was not interested in having me as her student. I also told her I would not mind reinstating the advising relationship with her if she was interested in having me as her student. However, she cried over the fact that our advising relationship came to an end. In that same meeting, she told me in a threatening voice that she would challenge even the University Chancellor/President that a committee of advisors should serve as my advisor.

424.   The reason that Dr. O'Leary agreed to become the director of the school after Director Robinson stepped down was to make sure that she could dismiss me from the program as she became the officer sitting at the top of the school hierarchy. She never served as school director/department chair before.

425.   However, she accepted this new challenge to make sure nobody could stand in her way. She had served as program coordinator before at another university. She was once the program coordinator at our school and it would be much easier for her to accept the position of program coordinator because she is familiar with the job and the position of program coordinator leaves time for the faculty member to do much more research and teaching than the position of school director does.

426.   The school director position leaves the position holder with very limited time (if any) for research and teaching as the director spends a huge amount of his/her time on administrative issues and not academic issues. It is only one level below the dean position and the dean position leaves virtually no time for research and teaching, as the position takes almost all the time of the position holder for administrative issues.

427.   However, Dr. O'Leary accepted the school director position. That is because if she accepted the position of program coordinator, the school director might have a different opinion than hers, but she wanted no one above her in the hierarchy to have a different opinion

than hers. The student's advisor chairs the specialization examination. Yet, she was sending out emails to me about the specialization exam and copied Coordinator Epp, thereby sending him a signal that it was her decision as director of the school that I should sit for the specialization exam even though I had no advisor, and that no one in the school could say something different from her.

428.    As for Dr. Maynard-Moody, he voted against me twice. Further, that I filed a grievance and then an appeal came as a challenge to the decision that Drs. O'Leary and Maynard-Moody made along with other members of the doctoral committee. In fact, I was not allowed to even communicate with Drs. O'Leary and Maynard-Moody since I said that I would file a grievance. Director Robinson informed me that I was not allowed to even communicate with Coordinator Goerdel or any member of her colleagues in the doctoral committee.

429.    As for Dr. Getha-Taylor, I believe she damaged my reputation when I tried to switch to the School of Business. Further, she was a student of Dr. O'Leary in her doctoral program and she feels strongly attached to Dr. O'Leary. For example, Dr. Getha-Taylor was happy and excited when I told her that my advising relationship was reinstated with Dr. O'Leary. Thus, I believe Dr. Getha-Taylor would agree with whatever decision Dr. O'Leary makes regarding the outcome of the specialization examination.

430.    Besides the fact that working with a committee/group of advisors with one of them identified as a form signer is unheard of in academia, due to the unhealthy relationship with me, these faculty members would see the specialization examination as a chance to dismiss me from the program.

XXIV.    **The Doctoral Committee, Dr. Getha-Taylor, Director O'Leary, Dean Lejuez, and Dr. Latta Took Adverse Actions Against Me**

431.     In a meeting held in September 2017, Coordinator Epp and I discussed my issue of not having an advisor and the need to pursue a new specialization as no one within my specialization would take me on as his/her student. It reached a point I said that I would bring the issues to the attention of a court.

432.     Upon saying this, Coordinator Epp aggressively ended the meeting and then sent me a retaliatory probation letter indicating that I was being placed on *probation* and that I had to sit for the specialization examination by December 1, 2017. Thus, the doctoral committee retaliated against me when I said that I would bring their discriminatory practices to the attention of a court. A student is typically placed on probation for having a low GPA. Thus, it was odd that the doctoral committee placed me on probation for a non-GPA-related issue.

433.     According to Article 6.1.3 of the University Senate Rules and Regulations, nobody should face retaliation for pursuing a complaint. Further, according to the University Whistleblower Policy, "No employee shall take retaliatory action against any individual for reporting, or causing to be reported, suspected wrongdoing, or for assisting in an authorized investigation of alleged wrongdoing." After mentioning that I would bring the issues of violating the university and school policies and immigration law by the doctoral committee to the attention of a court, the doctoral committee and the college retaliated against me by placing me on probation.

434.     The retaliatory probation letter indicates that Dean Lejuez, the college professional staff, and Director O'Leary approved the course of action outlined in the probation letter and uses a bullying language in stating, "These officials are in agreement that…"

435.     While the outlined course is not the path to success as they claim, it also violates the school policy. According to school policy, only faculty members sitting on the student's

committee will conduct the specialization examination. None of the faculty members identified as a forced group of advisors were sitting on my committee. These faculty members *used to sit* on my committee. However, as they started retaliating against me and their relationship with me deteriorated, they could no longer be on my committee. I specifically informed Coordinator Epp about how Director O'Leary felt about me after our advising relationship came to an end, but he ignored my clarifications. Further, the student's advisor chairs the specialization examination and he/she decides who will sit on the specialization examination committee. Thus, the doctoral committee, Director O'Leary, Dean Lejuez, and Dr. Latta violated the school policy because they cannot identify who would sit on the specialization examination committee for a student.

436.    The retaliatory probation letter says it addresses two issues; one is progress towards degree and the other is my request to be assigned an advisor. As for being assigned an advisor, I never requested to be assigned an advisor. One major point of my disagreement with the school back in Fall Semester 2016 was that a doctoral student could not be forced to work with a certain faculty member. Under school policy, an advisor is chosen by and not forced on the student.

437.    Further, the retaliatory probation letter does not identify an advisor. It is just a rephrasing of what was decided in September 2017 which is the odd, illogical, and illegitimate idea of committee/group of advisors. Dr. Maynard-Moody is thus still a member of a committee/group of advisors which was the original decision of the doctoral committee in violation of the school policy. The retaliatory probation letter says:

> Regarding an advisor, SPAA has assigned Steven Maynard-Moody as your advisor... In his role as advisor he will work with an advisory committee composed of Rosemary O'Leary and Heather Getha-Taylor.

438.    Thus, the retaliatory probation letter does not differ from the original decision of the doctoral committee. I see no change in Dr. Maynard's role as a form signer vs. his role as

advisor. I asked Coordinator Epp several times and he never explained what had changed in the role of Dr. Maynard-Moody as a "form signer" vs. his role as "advisor". The decision of the doctoral committee in September 2017 forced Director O'Leary on me as the form signer. In the retaliatory probation letter, Director O'Leary was replaced by Dr. Maynard-Moody as the forced form signer.

439.     Besides violating the school policy by forcing a group of advisors on me, there is a logical fallacy in the decision of the doctoral committee. If a group of faculty members will serve as my advisors as decided by the doctoral committee, one faculty member should also be willing to serve as my advisor. That is because a committee/group is larger than one. Yet, the doctoral committee informed me that a committee/group of advisors was available, but one advisor was unavailable.

440.     Assuming that Dr. Maynard-Moody is the advisor, the role of an advisor cannot be restricted and limited to one semester as described in my probation letter. While the retaliatory probation letter restricts the role of Dr. Maynard-Moody to only preparing me for the specialization examination, Dr. Maynard-Moody could not do that because he did not work with me.

441.     The student does not need that much time from his/her advisor while studying for the specialization examination because the student studies and prepares for the specialization examination. Other than possibly a couple of meetings with the advisor with whom the student worked, the student does not need the advisor for anything else. Dr. Maynard-Moody also confirmed this in one of his emails that preparation and studying for the specialization examination is the job of the student.

442.     The role of the advisor is vital while the student takes coursework to prepare for the specialization examination. I worked with a different advisor who prepared me for the specialization examination. A doctoral student's advisor is somebody who continuously works with the student until graduation and not for just one aspect. This one-semester one-task relationship is dubious.

443.     When a faculty member works with the doctoral student, the relationship is based on a continuous basis. Further, a doctoral student enrolls in dissertation hours with his/her advisor. A hostile forced one-semester form signer is unheard of in academia and violates the school policy which states that a student chooses his/her advisor. Besides not having expertise in my area of research, whatever Dr. Maynard-Moody could do (assuming that he could do something) cannot be forced on another faculty member in the coming semesters. That is because faculty members have their own expectations and requirements from doctoral students.

444.     What comes in the next semesters will be a continuation of what a student does in the semester in which a student is enrolled in dissertation hours. No semester, especially semesters in which doctoral students are enrolled in dissertation hours are stand-alone semesters. Every semester is related to what came before it and what comes after it. Taken together, the semesters form the student's program of study.

445.     Under school policy, when the student enters the doctoral program at the school, he/she chooses and works closely with their advisor in anticipation of the specialization examination. The student's advisor guides the student's coursework and research and becomes familiar with the doctoral student. Having worked with the student, the advisor chairs the specialization examination for his/her student.

446.     In the semester the student sits for the specialization examination, the student typically discusses his/her dissertation proposal which he/she typically starts working on before the semester he/she sits for the specialization examination. The specialization examination is offered in February and September of each year. Whether the student takes the specialization examination in February or September, the student typically continues to develop his/her dissertation proposal with his/her advisor following February until the end of the spring semester which is around May 15 if he/she takes the specialization examination in February. The doctoral student does the same thing if he/she takes the specialization examination in September until the end of the fall semester which is around December 15.

447.     Thus, the semester in which the doctoral student takes the specialization examination is not isolated from the previous semesters and is not isolated from the semesters that follow. It is related to the previous semesters in the sense that the student works with his/her advisor for coursework and shaping research interest. The past work becomes the basis for the specialization examination. It is also related to the next semesters in the sense that the dissertation proposal that the doctoral student typically develops in the semester taking the specialization examination will continue to be the doctoral student's dissertation proposal for the next semesters.

448.     Working with Dr. Maynard-Moody violates the school policy and is not even possible. Under the school's policy, the student chooses his/her advisor. I did not choose Dr. Maynard-Moody and did not work with him. He does not do research in my area of research. I never had him for any class. The doctoral committee forced me to enroll with Maynard-Moody in dissertation hours, but Dr. Maynard-Moody said that I should not discuss my proposal with him because he does not have expertise in my area of research. Dr. Maynard-Moody explained:

The dissertation is original research into a much narrower set of theoretical questions. Your dissertation committee should be chaired by someone who, ideally, has also published research in your focal area and has a deep understanding of your methods.

449.    While I was to enroll in dissertation hours in the Fall Semester 2017, Coordinator Epp described enrollment in dissertation hours as an "additional task". This shows a lack of interest on the side of the school regarding enrollment in dissertation hours. According to Dr. Maynard-Moody, my enrollment in dissertation hours was to be to prepare to the exam and not to work on my dissertation. In academia, there is nothing called enrollment in dissertation hours to prepare for a separate examination. Enrollment in dissertation hours means that the student works on his dissertation. This is further evidence that what was plotted in the Fall Semester 2017 was only an attempt to facilitate my dismissal from the program and nothing else.

450.    On an academic level, I must make progress towards the degree and one semester is half an academic year. I cannot tell my sponsor I did not make progress for a half year because the faculty member with whom I was enrolled in dissertation hours does not have expertise in my area of research and asks me not to discuss my dissertation with him. If I make this argument to my sponsor, my sponsor will say I had to enroll with someone with expertise in my research area so I can make continuous progress.

451.    On a personal level, Dr. Maynard-Moody cannot work productively with me and does not have a healthy relationship with me. As a member of the doctoral committee, he voted against me twice by interfering in my program in violation of the school policy and preventing me from changing my specialization even though he knew the reason I tried to change my specialization was that no one within my specialization would serve as my advisor. He also, along with other members of the doctoral committee, placed me on probation in violation of the school and college policy as retaliation for saying I would bring the issues to the attention of a

court. Therefore, he placed me on probation and then asked me to enroll in dissertation hours with him by forcing himself on me.

452.    A faculty member forcing himself on a student violates the school policy which states that a student chooses his/her advisor. Filing the grievance and then the appeal came as a challenge to a decision made by the doctoral committee of which he is a member. In fact, I may not even communicate with him since stating that I would file a grievance as Director Robinson told me that I may not communicate with Coordinator Goerdel or any member of the doctoral committee and Dr. Maynard-Moody is a member of the doctoral committee.

453.    Before our relationship deteriorated due to his violation of the school policy by interfering in my program and preventing me from changing my specialization, I asked Dr. Maynard-Moody twice to serve as my advisor but he declined. The first time he declined in writing and he declined orally the second time. When I first asked him to serve as my advisor back in the Spring Semester 2016, copying the program coordinator, he sent me a tough answer and marked his email as high importance in which he blamed me for not taking classes with him. In other words, because I took no class with him, I should never ask him to serve as my advisor.

454.    Of all the faculty members who I contacted to serve as my advisor, Dr. Maynard-Moody was the only one who not just declined to serve as my advisor, but has also harshly blamed me for asking him to serve as my advisor while I took no class with him and marked his email as "high importance". In response to my request for becoming my advisor, his email states in part:

> I am glad you find my advice helpful and supportive, but I do not accept your request to serve as your advisor/committee chair. For me this request comes several years too late. When I chair a dissertation I work with a PhD student to guide course choices and shape research interests. You have not taken a single course with me, even though I have offered PUAD doctoral seminars every year except 2014 while you have been at KU.

That year I taught two masters-level courses that may have been relevant to your studies. My own areas of interest and expertise don't overlap much with your own.

455.    When reading Dr. Maynard-Moody's response to my request to serve as my advisor, one can easily conclude that a faculty member who so strongly reacts when the student asks him to serve as his advisor back in the Spring Semester 2016 does not actually mean it when he says he is assigned as an "advisor" in the Fall Semester 2017. What he, along with other members of the doctoral committee in consultation with Dean Lejuez, Director O'Leary, and Dr. Latta came up with in the retaliatory probation letter was a plot to facilitate my dismissal in the program.

456.    Another violation of the school policy in the retaliatory probation letter is that it states that the school will determine the composition of my oral examination committee and dissertation committee. In the school policy, there is nothing called "oral examination committee" as distinct from the dissertation committee. The oral examination committee is the doctoral student's dissertation committee and this committee including its advisor/chair and the members are solely chosen by the student and not the school. That a doctoral student chooses his/her committee consisting of his/her advisor/chair and the members is the policy not only in our school or the university but also in any other university across the globe.

457.    As to progress towards degree, the doctoral committee placed me on probation because they claim I was not making progress. The retaliatory probation letter states in part:

> The SPAA [School of Public Affairs and Administration] PhD Program Committee has determined that failure to successfully complete the PhD Comprehensive Written Examination in your specialization area by the end of the 2016-17 academic year constituted failure to maintain satisfactory progress toward the degree.

458.    However, I have a progress report letter which indicates that I made progress during the semesters regarded by the doctoral committee as semesters in which I did not make

progress. So, the decision of the doctoral committee contradicts the progress report letter. The

progress letter to my sponsor states in pertinent part:

> This letter is to inform you that Muzafar Abdulla Babakr continued to make progress toward earning his Ph.D. in Public Administration at the University of Kansas School of Public Affairs and Administration during the 2016-17 Academic Year.

459.    It also contradicts with the annual self-assessment form that doctoral students fill

out each year so it can be determined whether the student is making progress. When I submitted

the annual self-assessment form, I was not told that I was not making progress.

460.    The doctoral committee interfered in my program in violation of the school policy

and impeded my education by not letting me change my specialization even though I do not have

an advisor for my specialization. Thus, the doctoral committee impeded progress and then it

placed me on probation for not making progress.

461.    Thus, there are two assumptions; I made progress or I did not make progress. If I

made progress as stated in the progress report letter and the annual self-evaluation form used to

determine whether a doctoral student is making progress, the basis for placing me on probation is

invalid. If I did not make progress, the doctoral committee is responsible for that because it

impeded my education by interfering in my program in violation of the school policy and

preventing me from changing my specialization even though I do not have an advisor for my

specialization. A doctoral student cannot make progress without an advisor. In either case, the

basis of placing me on probation is invalid.

462.    The retaliatory probation letter also says the specialization examination was

administered in the Spring Semester 2016, Fall Semester 2016, and Spring Semester 2017. All

three of these specialization examination administrations violate the school policy.

463.    Under school policy, 2-3 faculty members sitting on the student's committee

conduct the specialization examination. Among the 2-3 faculty members, the student's advisor

chairs the specialization examination. During none of these three times did Dr. O'Leary who worked with me as my chosen advisor agree to chair the specialization examination and this was at the heart of all the problems. Not only did she not agree; she also lost interest in working with me. Instead, Coordinator Goerdel discriminated against me by chairing my specialization exam.

464.    If Coordinator Goerdel did not violate the school policy by chairing my specialization examination resulting in the loss of interest of Dr. O'Leary, I could have taken the specialization examination in the Spring Semester 2016 instead of finding myself in a situation of canceling the exam because I did not have an advisor after the advising relationship came to an end with Dr. O'Leary when she lost interest in having me as her student.

465.    The retaliatory probation letter then states I was excused for not sitting for the specialization examination in Spring Semester 2016 for personal reasons. I did not mention personal reasons for not sitting or the specialization examination back then. I told Coordinator Goerdel who was the program coordinator back then that something urgent happened and I explained to her that what happened was that my advising relationship came to an end with Dr. O'Leary.

466.    As for Fall Semester 2016, I was on a leave of absence. When a student takes a leave of absence, his/ her program activities should come to a halt. A specialization examination cannot be administered while the doctoral student does not have to do anything in the program as per the policy for a leave of absence. If a student is involved in the program while he/she is on a leave of absence, it means that a student did not take a leave of absence and violates the leave of absence policy. Again, if Coordinator Goerdel had not violated the school policy by chairing my specialization examination resulting in the loss of interest of Dr. O'Leary in having me and in

turn resulting in ending my advising relationship with her, I could have taken the specialization examination in the Fall Semester 2016 instead of taking a leave of absence.

467.     Regarding Spring Semester 2017, Coordinator Goerdel violated the school policy again by chairing my specialization examination. If Coordinator Goerdel had not violated the school policy, I would have stayed with Dr. O'Leary and hence could have taken the specialization examination in the Spring Semester 2017 instead of filing the grievance. Absent an advisor, it is impossible to ask the student to do anything because a student can do nothing on his own, especially in semesters where the student needs to enroll in dissertation hours, as was my case because enrollment in dissertation hours can be done only when a student has an advisor.

468.     Further, when there is a pending grievance, it is impossible to force a student to sit for the specialization examination. Filing a grievance would serve no purpose if I sat for the specialization examination in the Spring Semester 2017. I filed the grievance back then because I wanted to change my specialization as no one agreed to serve as my advisor in my specialization. Sitting for the specialization examination back then would mean I had not wanted to change my specialization and I had an advisor. If I had an advisor and did not want to change my specialization, there was no reason to file the grievance.

469.     The retaliatory probation letter then states I had to sit for the specialization examination to return to good standing. It was the then-doctoral committee chair Dr. Goerdel that prevented me from sitting for the specialization examination for three semesters because she chaired my specialization examination in violation of the school policy resulting in the loss of interest of Dr. O'Leary in having me as her student.

470.     The retaliatory probation letter also states I was informed in May 2017 of the date of the specialization examination. In reality, I was not told about this date in May 2017 and the

date was not established in May 2017. While the retaliatory probation letter states that the doctoral committee would force me to take the specialization examination by the end of Fall Semester 2017, per the school policy, no one can force a doctoral student to sit for the specialization. The doctoral student decides when to take his/her specialization.

471.    Under school policy, when the student is ready to sit for the specialization examination, the student informs the school and registers for the specialization examination. Unless all the pre-specialization examination requirements are met, a student cannot register to sit for the specialization examination. No pre-specialization examination condition was present in the Fall Semester 2017. I did not have as advisor, I did not have a committee, I was not even registered for the specialization examination, and I did not have the approval of my sponsor for a program extension.

472.    In such a situation, it is a violation of the school policy and impossible that the doctoral committee placed immense and unbearable pressure on me to sit for the specialization examination while no pre-specialization examination condition was met. The retaliatory probation letter also shows a lack of trust when it states I must document any conflict in the December 1, 2017 specialization examination date, while it was members of the school faculty including Coordinator Epp who continuously provided misleading information about me.

473.    The retaliatory probation letter also asks me to discuss my probation with the committee of advisors. A student's committee comprises an advisor who chairs the committee and members of the committee. The committee that the doctoral committee forced on me had three advisors but no single advisor. In addition, it had no members because members of the committee cannot be advisors. Thus, a committee has an advisor/chair and everybody else is a member. This kind of a committee is unheard of in academia.

474.    When a student is placed on probation, the one who makes the decision would typically meet with the student to discuss that. The retaliatory probation letter states I needed to discuss my probation status with Coordinator Epp but makes it clear that I could not meet with him and that the only way to communicate with him was via email or phone. When I asked for a meeting with Coordinator Epp to discuss my status, he refused to meet with me because the probation was retaliatory.

475.    The doctoral committee and the college violated the school policy by forcing on me a committee composed of people who not only did not sit on my committee, but also have very deteriorated personal relationships with me. In the previous paragraphs, I explained how working with Dr. Maynard-Moody is a violation of the school policy and is impossible. As for Dr. O'Leary, she developed a very negative attitude towards me and became very hostile towards me after I filed the grievance and then the appeal. Dr. O'Leary voted against me two times.

476.    That I filed a grievance and then an appeal came as a challenge to a decision that Dr. O'Leary made along with other members of the doctoral committee. I am not allowed to even communicate with her since I mentioned that I would file a grievance. Director Robinson has told me I am not allowed to speak to Coordinator Goerdel or any member of the doctoral committee and Dr. O'Leary was on the doctoral committee. After mentioning that I would bring the issues to the attention of a court, I once saw her at school and she did not reply when I greeted her.

477.    Regarding Dr. Getha-Taylor, I believe she damaged my reputation when I tried to switch to the School of Business. Further, she was a student of Dr. O'Leary in her doctoral program and she feels strongly attached to Dr. O'Leary. For example, Dr. Getha-Taylor was happy and excited when I told her that my advising relationship was reinstated with Dr. O'Leary.

Thus, I believe that Dr. Getha-Taylor will agree with whatever decision Dr. O'Leary makes regarding the outcome of the specialization examination. She never wanted to be my advisor. Thus, she agreed to be on this committee of advisors only to facilitate my dismissal from KU When I asked her to serve as my advisor, she said:

> I have already agreed to work with several doctoral students this year and am unable to take on the important responsibility of serving as your dissertation advisor.

478.    Besides the fact that what was stated in the retaliatory probation letter violated several policies and is hence impossible, due to the unhealthy relationship with me, the three faculty members forced on me by the doctoral committee will see the specialization examination as a chance to retaliate against me. This is the reason I was not allowed to discuss my dissertation with anyone; what the doctoral committee plotted in consultation with Director O'Leary, Dean Lejuez, and Dr. Latta, was only an attempt to facilitate my dismissal from the program.

479.    Under school policy, faculty members sitting on the student's committee draft the student's specialization examination. Among these faculty members, those with whom the doctoral student has taken classes would participate in conducting the specialization examination because such faculty members know the student and can write questions related to the coursework of the doctoral student as they teach the classes. The 2-3 faculty members that conduct the specialization exam are those with whom the student has taken the specialization classes, because such faculty members give the student questions drawn from the classes the student has taken with them. The three advisors forced on me by the doctoral committee are not faculty members with whom I had any specialization classes. Ironically, the faculty member with whom I took a specialization class, Dr. Marilu Goodyear, was not on the specialization examination committee.

480.    Another indication that the probation letter is retaliatory is the style and language used to write my dismissal letters. The dismissal letters from both the school and the college show no regret in dismissing me from the program. Typically, dismissal letters are written in a language which shows that the school/department regrets having to dismiss the student as doctoral students spend a tremendous amount of time and money in their doctoral programs. Dismissal letters, therefore, typically give the student a chance for an appeal. According to Article 6.7.1 of the University Senate Rules and Regulations, a student can appeal decisions made by unit levels to the University Judicial Board. The dismissal letter from the college indicates that I am not allowed to even appeal the decision of the college.

481.    According to the College Probation and Dismissal Policy, "Academic dismissal should occur before a semester begins. If a student is dismissed during the semester, the dismissal is effective only at the end of the semester in which the department or program gives notification of dismissal." Thus, if a student is dismissed during the semester, the dismissal will go into effect at the end of the semester. My dismissal should have gone into effect by the end of the Spring Semester 2018. Yet, the school and the college dismissed me during the Spring Semester 2018 and told me that the dismissal was effective immediately.

482.    The action taken based on the retaliatory probation letter in violation of the policies as described above led to my dismissal in the program by the doctoral committee.

## XXV.    The Doctoral Committee Ignored My Need for an Advisor and Put Me in a Situation That Led to Violating Federal Immigration Regulations for J-1 Visa Holders

483.    The doctoral committee breached its duty of making sure that I have an *advisor* under the school policy. Federal immigration regulations require that international students constantly enroll in classes to maintain their legal status. The doctoral committee's illegal, illogical, and non-implementable decision to force me to work with a committee of hostile forced

advisors with Dr. Maynard-Moody identified as a hostile forced one-semester form signer left me with no option other than finding myself in a situation of violating federal immigration regulations for J-1 visa holders and falling out of legal status.

484.    To avoid violating my legal status, I should have enrolled either in classes for a new specialization which the doctoral committee prevented me from doing, or in dissertation hours with my advisor which was unavailable. As a result, I fell out of J-1 legal status.

485.    When I contacted Coordinator Epp about the danger of falling out of legal status, he carelessly responded that it is up to me whether I accept to enroll in dissertation hours for one semester with Dr. Maynard-Moody.

486.    When I went to the International Student Services Office to explain that no one is taking me as his/her student, they told me that someone by the name of Dr. Maynard-Moody called the office and informed them that he will allow me to enroll in dissertation hours with him. It is unheard of for a faculty member to call the International Student Services Office and tell them he will allow a student to enroll in dissertation hours with him/her. That is because students enroll with their advisor in dissertation hours without the need of the advisor to call this office. Dr. Maynard-Moody took this step so the International Student Services Office would not report to the federal government that I am in a situation of violating my J-1 visa status because no one would take me on as his/her student from the school.

487.    The decision that Dr. Maynard-Moody made along with the rest of the doctoral committee was that I had to continue in the program without an advisor. They knew no one would work with me as his/her student. Yet, they kept preventing me from working in a different specialization.

488.    Realizing the impossibility of this decision, Dr. Maynard-Moody called the International Student Services Office and showed his willingness to allow me to enroll in dissertation hours with him. Not being aware of what was going on in the school, the International Student Services Office came to take the words of Dr. Maynard-Moody for granted and reported to the federal government that it was my choice that I fell out of legal status and there was nothing that could prevent me from enrolling.

## XXVI.    The Doctoral Committee Ignored My Need for an Advisor and Put Me in a Situation That Led to Breaking My Contract with My Sponsor

489.    The doctoral committee's action was reckless and the committee breached its duty of making sure that I have an *advisor* consistent with the school policy. In September 2017, I informed Coordinator Epp I that needed to request a program extension because my current contract with my sponsor expired by the end of December 2017. Coordinator Epp first ignored that.

490.    Two weeks later, I raised the same issue to his attention. He urged me to talk to Dr. Maynard-Moody to plan for the next semesters. However, the retaliatory probation letter limited the relationship of Dr. Maynard-Moody to one semester and not the next semesters and limited his role to only exam preparation and enrollment in dissertation hours although he has no expertise in my area of research. Although I repeatedly wondered how Dr. Maynard-Moody could plan for the future semesters while his relationship with me was limited to one semester and one task, Coordinator Epp kept pushing me to ask Dr. Maynard-Moody to plan for the future semesters.

491.    While nothing with Dr. Maynard-Moody was possible, I still asked him to see what he says. When I asked Dr. Maynard-Moody as to how he could plan for the future

semesters while his relationship with me was limited to one semester, he said that he would just write a letter telling my sponsor that I needed to write a dissertation.

492.    He was just explaining/describing, but not planning the future steps. Explanation/description is not planning. It was obvious I needed to write my dissertation, but my sponsor wanted to know how much additional time I wanted and why, how much additional funding I wanted and why, what was the new graduation date, why I did not finish the degree in the period allowed in the contract, and so on. My sponsor then may ask additional questions before approving an extension.

493.    As Dr. Maynard-Moody sent me his email, I asked him again as to how he can develop a plan for the future semesters while he was not part of the future. This time, Coordinator Epp replied and said that faculty members can make no commitment beyond the Fall Semester 2017. This was a clear signal that a plan in their mind was just empty words. Planning is a commitment, but Coordinator Epp made it clear that they could make no commitment beyond the Fall Semester 2017. Speaking on behalf of Dr. Maynard-Moody, Coordinator Epp also vaguely said that Dr. Maynard-Moody could develop my future plan "to the extent necessary for your funding agency". When I asked Coordinator Epp what he meant by this sentence, he said that Dr. Maynard-Moody would describe the future steps to my sponsor.

494.    I explained to Coordinator Epp again that Dr. Maynard-Moody could not develop a future plan given that his relationship was limited to one semester and one task only. Coordinator Epp kept saying that Dr. Maynard-Moody could do it. I contacted Dr. Maynard-Moody again about planning for the future semesters.

495.    When I contacted him about planning for the future semesters, he made it clear that his relationship with me was limited to one task, exam preparation even though I was not his

student. He also made it clear that he did not have expertise in my area of research but could provide some ideas about my proposal. Assuming that Dr. Maynard-Moody had some ideas relevant to my proposal, it was by no means enough to plan for the future semesters.

496. Without a full proposal, a student does not know how much additional time and funding to request. Further, assuming that he can provide some ideas, his ideas cannot be forced on another faculty member who would work with me in the future semesters given that Dr. Maynard-Moody's relationship with me was limited to one semester.

497. I later raised the issue of planning for the future semesters to Coordinator Epp. This time he said nothing about how Dr. Maynard-Moody could plan for the future semesters.

498. I again raised the issue of planning for the future semesters to Coordinator Epp. He kept repeating that Dr. Maynard-Moody could plan for the future semesters but never explained how. I asked Coordinator Epp to explain the logic where someone is not part of the future and yet plans for what should happen in the future, but he could never explain that.

499. I contacted Coordinator Epp for the last time before falling out of legal status for the necessity of planning for the future semesters. Coordinator Epp told me that Dr. Maynard-Moody could plan for the future semesters. When I contacted Dr. Maynard-Moody, he did not address the issue of planning for the future semesters. Instead, he just said that he agreed with whatever Coordinator Epp said.

500. As I did not finish the program within five years allowed in my current contract, and as no one could develop a plan for the next semesters to ask for a program extension from my sponsor, I could not present the plan for my sponsor, hence violating my contract with my sponsor due to not finishing the program on time.

501.     This has resulted from the decision of the doctoral committee that impeded my progress and due to not requesting a program extension, as I did not have an advisor to make a request for a program extension from my sponsor. Without a program extension, I also could not extend my DS-2019 form which also expired at the end of December 2017.

## XXVII.     The Doctoral Committee Indirectly Announced the Specialization Examination Result in Advance

502.     Within their discriminatory actions, the doctoral committee kept putting me in an unreasonable condition. When I first asked Dr. Maynard-Moody as how he could plan for my future while his relationship with me was limited to one semester, Dr. Maynard-Moody did not respond. Instead, Coordinator Epp answered me and made it *clear* that the school or its faculty members could make no commitments beyond the Fall Semester 2017. Coordinator Epp made it clear that I would not be allowed to continue in the program beyond the Fall Semester 2017, hence planning for the future semesters would not be necessary. A future plan is a commitment, but Coordinator Epp made it clear that no one could make any future commitments to me.

503.     I asked Coordinator Epp several times as to who would serve as my advisor for the next semesters following the Fall Semester 2017, but he said that he did not know. The reality is that nobody would serve as my advisor as was once confirmed by Coordinator Epp himself. This is further evidence that what the doctoral committee in consultation with Director O'Leary, Dean Lejuez, and Dr. Latta plotted in the Fall Semester 2017 was only an attempt to facilitate my dismissal in the program. That is why Dr. Maynard-Moody's relationship to me was limited to only one semester and not the coming semesters.

504.     In the past, Dr. O'Leary was just a member of the doctoral committee and nobody accepted me as his/her student. Someone would not have agreed to serve as my advisor given she had become the director of the school and she was deeply affected when our advising

relationship came to an end. In a meeting I had with her after I filed the appeal with KU Judicial

Board, she cried because our advising relationship had came to an end and indirectly threatened

me that she would never ever allow me to get my PhD degree from this school.

505.    This is the reason that no one is identified by the doctoral committee as my

advisor. Dr. Maynard-Moody is identified as a hostile forced one-semester form signer only to

facilitate my dismissal in the program.

506.    It is to be noted that many times I was told, directly and indirectly, explicitly and

implicitly, orally and in writing, that the only way for me to stay in the doctoral program was to

continue to work with Dr. O'Leary and that I would not be allowed to stay in the program if our

advising relationship came to an end. When the advising relationship came to an end in the Fall

Semester 2016, Director Robinson said to me:

> I was disappointed to see your most recent email message to Dr. O'Leary. In light of
> that message, and given what I communicated to you via email yesterday, I am not sure
> what, if any, options remain for you to complete your degree in our program.

## XXVIII.    The Doctoral Committee Dismissed Me Without Any Legitimate Reason

507.    Because the doctoral committee placed me on probation as retaliation against me

for saying I would bring their discriminatory practices to the attention of a court, they dismissed

me without any legitimate reason. The dismissal was *retaliatory* as I was not even given a

chance for a fair hearing. The notice of probation was to make their actions look like they were

not violating due process by not giving me advanced notice.

508.    The doctoral committee could have dismissed me from the doctoral program right

after I mentioned that I would bring the discriminatory actions against me to the attention of a

court. However, after consulting with each other and with administrators from the college, they

reached a decision that a better way to dismiss me was to place me on probation, give me notice

of the probation, and plot to facilitate my dismissal in the program to give their actions an appearance of following the law.

509.     They had a meeting of minds to accomplish the goal of dismissing me through their overt acts as explained before. Even though I was given the notice, I was not given an opportunity for a fair hearing. Even the notice was not legitimate; it was a retaliatory notice because there was no basis for probation. There was no reasonable justification for my dismissal. It was retaliatory, arbitrary, capricious, and on a whim.

510.     When I contacted Coordinator Epp about the probation, he refused to even meet with me despite numerous requests. That is because the probation was retaliatory but they made it academic. Faculty members know that the best thing to do to avoid liability is to make their actions look like academic actions. Thus, faculty members label even retaliatory actions as academic actions.

511.     While my dismissal should have gone into effect by the end of the Spring Semester 2018 as per the college policy, the doctoral committee dismissed me after the Spring Semester 2018 began. The reason that the doctoral committee dismissed me was that I did not fulfill the requirements of the retaliatory probation letter. However, as explained before, the retaliatory probation was based on illegitimate and illegal bases.

512.     Thus, there was no legal and legitimate reason for terminating me. The doctoral committee violated several policies and rules by dismissing me while there was no basis for my dismissal. The doctoral committee and some other faculty members left no path for me to get my PhD degree and continuously violated several school, college, and university policies, and other state and federal laws as explained before. They violated the school policy by interfering in my program resulting in the loss of interest of Dr. O'Leary to have me as her student.

513.    Then they prevented me from changing my specialization in violation of the school policy even though I do not have an advisor for my specialization, damaged my reputation when I tried to transfer to another school, and plotted to have me discontinue from the doctoral program when I asked for a leave of absence. They also exploited the revocation of my leave of absence to have me sign under duress, treated me very harshly, impeded my education, placed me on probation as retaliation and plotted to dismiss me.

514.    I lost the opportunity to get my PhD degree. I believe it is a zero-sum game and that is why the doctoral committee was so careless in dismissing me. If a school invests in a student, they would not easily dismiss that student. Without the PhD degree, I will lose my future job, I will lose hundreds of thousands of dollars I spent while at school, I will lose 5 years I spent at the program, and I have lost the opportunity to study at a different department due to providing false information about me.

## XXIX.    Director O'Leary or Coordinator Epp Caused the Release of Misleading Information to My Sponsor

515.    According to Article 4.5(e) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members should avoid knowingly providing misleading information to the university. I received an email from my sponsor on January 22, 2019 telling me that KU told them that I had left school. I did not leave the school. The school *dismissed* me. As a result of this misleading information, my sponsor thinks that I myself chose to leave school and hence I am being held responsible by my sponsor to repay the money they invested in my education.

516.    Director O'Leary or Coordinator Epp caused the release of misleading information to my sponsor, as my sponsor thinks that I myself chose not to finish my PhD degree based on the misleading information they received from KU. Any information provided to my sponsor by KU came from Director O'Leary or Coordinator Epp.

XXX.    **Paying Tuition and Fees Without Receiving Any Service from KU**

517.    During the semesters these issues were happening, I received no service from the school, yet I was *charged* tuition and fees by KU. The faculty members know students have to continuously pay tuition and fees if they are in the program. Coordinator Goerdel's discrimination of me by interfering in my program in the Spring Semester 2016 led to ending the advising relationship with Dr. O'Leary, as she was no longer interested in having me as her student. Even though the advising relationship was reinstated later in the semester, she remained uninterested. Interest is lost but once. Thus, the advising relationship came to an end again by the end of the same semester. I thus got nothing from this semester.

518.    For the Fall Semester 2016, the advising relationship was reinstated but she showed no indication of interest in having me as her student. Hence, the advising relationship came to an end again. I have no explanation of why Dr. O'Leary lost interest in having me as her student other than Coordinator Goerdel's discrimination of me by interfering in my program and chairing my specialization exam. For the Spring Semester 2017 and Fall Semester 2017, I was enrolled with a faculty member with no advising relationship.

519.    She was kind enough to let me enroll with her as a place holding mechanism while my grievance within KU was pending in the Spring Semester 2017. For the Fall Semester 2017, I enrolled in some dissertation hours with her hoping that the doctoral committee would care if I fall out of legal status. However, the doctoral committee was reckless and did not care I fell out of legal status.

XXXI.    **Coordinator Goerdel, Director Robinson, Coordinator Epp, and Director O'Leary Caused Me Emotional Distress**

520.    Under Section I of the Code of Student Rights and Responsibilities, "The University of Kansas is committed to fostering a campus environment that is conducive to

academic inquiry, a productive campus life and thoughtful study and discourse." A conductive environment for learning did not exist for me.

521. In the Spring Semester 2016, Coordinator Goerdel caused my advising relationship with Dr. O'Leary to end as she chaired my specialization examination in violation of the school policy and discriminated against me based on my national origin.

522. Coordinator Goerdel strongly reacted when the advising relationship came to an end with Dr. O'Leary in the Spring Semester 2016. Her reaction was so strong that she brought the issue to the attention of Director Robinson and forced me to proceed and sit for the specialization examination without an advisor. However, school policy states there should first be an advisor before the student can sit for the specialization examination.

523. When I considered going back to Dr. O'Leary in Spring Semester 2016, Coordinator Goerdel did not let me contact her and said that she would arrange for contacting her and Dr. O'Leary and I should meet in her presence.

524. Coordinator Goerdel was excessively micromanaging me before July 2016. For example, she was forcing me to go back to Dr. O'Leary and I was not to ask other faculty members to serve as my advisor in Spring Semester 2016. She was also forcing me to copy her in my emails to faculty members when I was looking for a new advisor and was accusing me of ending the advising relationship with Dr. O'Leary. Further, she was mockingly telling me that finding a new advisor was difficult while it was she who was affecting the other faculty members not to accept me as their student.

525. Coordinator Goerdel was also fomenting dissert in others against me as was the case when she had the doctoral committee which she was chairing and Director Robinson

agreeing with her in declining my request to pursue a different specialization, even though I did not and still do not an advisor for my specialization.

526.    From July 2016 until she stepped down, Coordinator Goerdel never communicated with me. She had me removed from the PhD email listserv in July 2016 and then I was added again only after re-establishing the advising relationship with Dr. O'Leary in the Fall Semester 2016, thereby isolating me from the school, which made me feel alienated given she kept ignoring me and never responded to my emails.

527.    Coordinator Goerdel caused everything that was inflicted on me while I was in the school. She destroyed my chance of getting a PhD degree. She discriminated against me due to my national origin by chairing my specialization resulting in the loss of interest of Dr. O'Leary to have me as her student.

528.    Coordinator Goerdel created a situation of losing my specialization and trying to change my specialization as she led to loss of interest of Dr. O'Leary and she affected the view of other faculty members not to accept me as their student. For example, right after my advising relationship came to an end with Dr. O'Leary, Coordinator Goerdel saw me speaking with Coordinator Epp about my request to him to serve as my advisor. When she heard us talking, she looked at Coordinator Epp in a way that immediately changed the view of Coordinator Epp.

529.    It was Coordinator Goerdel, along with members of the doctoral committee she was chairing, that violated the school policy and interfered in my program by preventing me from pursuing a different specialization even though she knew I did not have an advisor for my specialization. It was also probably she who misled Dean Lejuez and other parties in the university resulting in the loss of the grievance at the university level.

530.     It was also Coordinator Goerdel who influenced Director Robinson to treat me harshly. Director Robinson did not have a history of conflict with me. Thus, other than Coordinator Goerdel's influence on him, I have no other explanation for why Director Robinson treated me severely while he was the director of the school.

531.     It was also Coordinator Goerdel who destroyed my relationship with Dr. O'Leary who became the director of the school; the former school director, Dr. Robinson, who became the university Vice Chancellor for Public Affairs; the former Dean, Dr. Lejuez, who became the Provost; the current program coordinator, Dr. Epp; and KU. She also destroyed my relationship with my own committee.

532.     Coordinator Goerdel also destroyed my relationship with the grievance committee formed by the college because I appealed the decision made by the college grievance committee and appealing the decision of this committee was a challenge to the validity of the decision that the committee made.

533.     Being probably misled by Coordinator Goerdel, the committee decided in favor of Coordinator Goerdel and Director Robinson although Dean Lejuez initially showed his willingness to take the grievance. The college grievance committee that Dean Lejuez formed was composed mainly of people who have power in their departments especially the department Chairs of Economics and Clinical Psychology.

534.     While Clinical Psychology and Molecular Biosciences are far from my field of study, Economics is close to the field of Public Administration. Because Dean Lejuez might have shown my appeal to the grievance committee, I believe I lost the opportunity to take any classes in the department of Economics because the appeal challenged their decision and pointed out the

shortcomings of how the grievance committee of which the department Chair of Economics was a member handled my grievance.

535. The misleading information that was probably conveyed by Coordinator Goerdel to Dean Lejuez made Dean Lejuez deny my grievance even though Dean Lejuez initially agreed to take the grievance. In his role as the Dean, Dr. Lejuez misled KU Judicial Board and challenged the power of the board to reverse any decision made by him.

536. After I wrote the appeal, I met with Dean Lejuez and he was very angry with me. He was about to physically attack me in his office.

537. The anger of Dean Lejuez is apparent in his response to the University Judicial Board. For example, he states in his response to my appeal, "[W]e gave deference to Mr. Babakr." He also states, "[I]t is not the role of the Judicial Board to substitute judgment for mine." Even though KU Judicial Board can reverse the decision of lower units, Dean Lejuez challenged the authority of the University Judicial Board.

538. Dean Lejuez who later became the Provost holds immense power. Because of the huge power and influence he has, an angry Provost can make it impossible for me to finish my degree. My relationship with Dean Lejuez was destroyed because I appealed his decision. I appealed his decision because he denied my grievance. He denied my grievance because of the misleading information conveyed to him probably by Coordinator Goerdel. Being probably misled by Coordinator Goerdel, Dean Lejuez denied my grievance although Dean Lejuez initially showed his willingness to take the grievance.

539. As my grievance was denied by the University Judicial Board, I filed a formal lawsuit. Filing a formal lawsuit destroyed my relationship with the university. The university does not want students to sue it. If a student does so, he/she must expect the university to lose

interest in having that student and create all sorts of obstacles to make it impossible for the student to finish his/her degree.

540.    Director Robinson was targeting me for verbal and nonverbal harassment, including yelling and screaming at me. In his meetings with me, he continually interrupted me, used accusatory language, ignored my viewpoint, and my need for an advisor. He often criticized me, singled me out among other students, and treated me differently. One of his emails state in part:

> I thought I was quite clear during our discussion about your wife's message to Dr. Goerdel that you should refrain from contacting Dr. Goerdel

Another email from him states in part:

> Again, I thought I was very clear about this, most recently in my message to you yesterday, that you should refrain from contacting Professor Goerdel. Do we need to discuss that further so that I can make it even more clear?

541.    Director Robinson intimidated and undermined me by continuously pushing me to proceed in the program without an advisor, which violates the school policy. By continuously threatening to dismiss me from the program in his emails to me, he targeted me for cyber-bullying. He also continuously pushed me to do things I did not want, such as forcing me to work with faculty members of his choosing and ignoring what the school policy says about choosing the advisor.

542.    The harshest treatment was from Coordinator Epp. It reached a point where he attacked my personality by saying I misrepresented other faculty members while I did not do that. In a meeting held in September 2017, Coordinator Epp brought the administrative officer, Miss Diana Koslowsky, to the meeting he had with me saying that because I misrepresented other people, he brought her to the room as a witness. He then made the email thread public for others to see.

543.     In another meeting, Coordinator Epp twice showed me the door. He also targeted me for cyber-bullying by continuously threatening to dismiss me from the program even though I did not have an advisor and a doctoral student can make no step without an advisor. In the retaliatory probation letter, he asked me to discuss my status in the program with him, but when I asked to meet with him about that, he declined to meet with me. In the dismissal letter, he asked me to ask him questions that I may have. When I asked for a meeting about that, he declined to meet with me.

544.     The role of the university is to build a student and not destroy a student. While the issues started before Coordinator Epp became the program coordinator, he turned out to be the most severe administrator with me. No one in my life, inside or outside the university, has ever treated me as humiliatingly and as severely as Coordinator Epp. After my dismissal from the school, I once saw him at the post office and he did not even greet me.

545.     Coordinator Epp also falsely told the International Student Office that I do not want a PhD. I have always wanted and still want to get my PhD. However, the doctoral committee did not allow me to get my degree by forcing me to stay in my specialization in violation of the school policy even though I do not have an advisor for my specialization.

546.     Director O'Leary also singled me out among the doctoral students. After Coordinator Epp took office, he copied Dr. O'Leary in his communications with me. Thus, instead of directly singling me out, Dr. O'Leary chose to be copied in communications from the program coordinator, Coordinator Epp, with me. I believe she took this step because in the grievance I filed in the university, I stated that Director Robinson was singling me out among the doctoral students. So, to avoid appearing she directly singled me out, she chose to be copied in all communications between Coordinator Epp and me.

547.     In a meeting I had with Director O'Leary after I filed the grievance, she cried because our advising relationship came to an end and threatened me in an indirect way that she will never allow me to obtain my PhD degree because our advising relationship came to an end.

548.     I suffered immense emotional distress as a result of this harsh treatment. Under Article 4.1(d) of the Faculty Code of Rights, Responsibilities, and Conduct, "A professor is expected to treat students with professional courtesy and to respect their rights, including, but not limited to, academic freedom and those rights as outlined in the Student Code of Rights and Responsibilities." Further, according to the Acceptable Use of Electronic Information Resources policy, "Electronic resources may not be used to engage in any illegal, threatening, harassing, or bullying conduct, including cyber-harassment or cyber-bullying, nor may they be used in a deliberately destructive manner." Moreover, according to the Faculty Code of Rights, Responsibilities, and Conduct 4.5(d), faculty members shall "Use technology in a responsible manner in accordance with guidelines and policies." Thus, technology is to be used for the business of KU and not as a means of causing emotional distress to students.

549.     I feel anxious, this has affected my productivity and morale, made me think of leaving the school, destroyed me from within, and shattered me psychologically.

## XXXII.     Continuous Violation of Various Policies by The Defendants

550.     Defendants violated many of the school, college and, university policies several times in different ways. As a student, I paid tuition and fees to KU and spent years in the doctoral program. What KU implicitly agreed to provide to me in return for paying tuition and fees, and spending years of my time working in the program, was to follow its own policies and grant me a PhD degree upon completion of my work.

551.     For that to happen, the defendants and I had an implicit agreement to follow the policies and rules in place. These policies and rules are in place to make sure that things are done

properly as per the normal guidelines. On my part as a doctoral student, I violated no policy. As explained before, the defendants violated many specific policies, some more than once. Some of these policies are school policies, and others are college or university-wide policies.

**XXXIII.       Considered Informal Means of Dispute Resolution Before Filing Lawsuit**

552.     According to Article 6.2.1 of the University Senate Rules and Regulations, "The collegial atmosphere of the University community is best served through informal compromise resolution of disputes. Thus, before pursuing formal grievance procedures, a grievant should ordinarily attempt to resolve the matter informally through direct or indirect consultation with the other party or through discussions with supervisory personnel." I tried direct and indirect consultation with the school to come up with a solution, but that did not work. I kept trying to resolve the issue within the university, but nothing worked.

553.     On November 20, 2019, I sent out my last email to the school asking to resolve the issues informally and internally within the university, but that did not work.

554.     According to Article 6.2.3.1 of the University Senate Rules and Regulations, "Informal mediation shall be available to resolve disputes within the University community... Unless either party to a dispute waives mediation, mediation shall occur prior to a hearing on the dispute." I tried mediation before suing but no one from the school or the university was responsive. I also sent KU General Counsel Office a demand letter before filing this lawsuit.

**COUNT I**
**Violation of Title VI 42 U.S.C. §2000(d)-National Origin Discrimination**
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, O'Leary, Maynard-Moody), Director O'Leary, Dr. Getha-Taylor, and Director Robinson in Their Individual and Official Capacities**

555.     I incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

556.    I faced intentional discrimination due to national origin. The defendants did not treat me equally as other doctoral students and they put me in unreasonable conditions.

557.    In particular, I was the only student whose specialization exam was chaired by Coordinator Goerdel and not my advisor, Dr. O'Leary. This was an indirect way to tell me that there is no place for me in the doctoral program. Upon information and belief, all students who were made to or had to leave the school were students from protected classes. International students were targeted the most, so much so that the presence of any international student has become zero at the school upon information and belief.

558.    As an international doctoral student, I have observed that I was treated differently from other students since joining the school in the Spring Semester 2013.

559.    I was asked more than once by school students and staff about my national cultural background. A student even removed me from her Facebook friend's list once she asked about my national cultural background. Another student was always trying to avoid me and I generally felt unwelcome. I believe that Coordinator Goerdel made comments about my national cultural background to others.

560.    In the Spring Semester 2015, Dr. O'Leary told me that Coordinator Goerdel would chair my specialization examination. However, as I contacted other students, they all informed me that the student's advisor chairs the specialization examination.

561.    As a faculty member who has no academic credential and is hostile to me, Coordinator Goerdel not only participated in conducting my specialization examination, but she also chaired it in clear violation of the school policy, resulting in the loss of interest by Dr. O'Leary in having me as her student.

562.     As an Iraqi Kurdish student, I was and continue to be ready to take my specialization exam. My GPA for my specialization classes is 4.0. However, for over two years, Coordinator Goerdel did not allow that to happen.

563.     While students from different protected classes were targeted for discrimination, international students were targeted the most as they faced national origin discrimination. Upon information and belief, since 2013, the school has not admitted a single international student. Further, the only two students that the school dismissed are international students. Another international student took a leave of absence many years ago and never came back.

564.     The two students who were dismissed and the other one who took a leave of absence and never came back were all from Asia. Upon information and belief, the presence of any international student has become zero at the school after I was dismissed.

565.     I have heard students from different protected classes complaining of discrimination and unequal treatment by the school.

566.     The school does have has a history of discriminating against students from protected classes especially international students.

567.     Of the four doctoral students who were members of protected classes and who faced problems in our school, three were students of my advisor, Dr. O'Leary.

568.     Upon information and belief, KU has a history of discriminating against its international students.

569.     Doctoral students from protected classes were not treated the same by faculty members compared to other students. Upon information and belief, no Caucasian student was ever made to leave the school.

570. The reason that doctoral students work with an advisor is that the advisor prepares the student for the specialization exam. Hence, it is crucially important that your advisor, and not somebody who does not know you, chair your specialization exam. Coordinator Goerdel's interference in my program led to the loss of interest of Dr. O'Leary to have me as her student. Realizing that she caused my advising relationship to end with Dr. O'Leary, Coordinator Goerdel started the second method of discrimination against me by putting me in unreasonable situations.

571. I faced a series of discriminatory practices against me based on national origin by putting me in impossible situations and treating me differently from other students. Such discriminatory actions included:

A. Coordinator Goerdel forced me to go back to Dr. O'Leary and asked me not to ask other faculty members to serve as my advisor.

B. Coordinator Goerdel was forcing me to copy her in my emails when looking for a new advisor because she was trying to tell whoever I was approaching not to accept me as his/her student as it became evident in her reaction when she saw Dr. Epp and me discussing my request for him to serve as my advisor.

C. Under Coordinator Goerdel's leadership, the doctoral committee interfered in my program and forced me to stay in my specialization even though I did not have an advisor for my specialization and came up with the strange decision of forcing me to work with a group of advisors.

D. Director Robinson forced me to sit for the specialization exam without registration.

E.  Director Robinson then forced me to enroll in dissertation hours with Coordinator Goerdel even though she does not have the academic credentials to serve as my advisor.

F.  Director Robinson then suggested that I enroll in dissertation hours with him even though he does not have the academic credentials to serve as my advisor.

G.  Director Robinson had me sign a letter under duress.

H.  Director Robinson acted like a party in my advising relationship with Dr. O'Leary.

I.  Coordinator Goerdel and Director Robinson forced me to sit for the specialization exam without registration.

J.  Coordinator Goerdel's interference in my program led to ending the advising relationship with Dr. O'Leary again.

K.  Under Coordinator Epp's leadership, the doctoral committee invented the "form signer" as one of their inexplicable decisions and asked me to enroll in dissertation hours with a form signer.

L.  The doctoral committee also forced a "committee of hostile advisors" on me composed of Director O'Leary, and Drs. Maynard-Moody and Getha-Taylor.

M. The doctoral committee appeared to announce the result of the specialization even before my taking it and dismissed me without any legitimate reason.

572.    As a result of this series of discriminatory practices, I have suffered damages, which resulted from the loss of my advisor. For a doctoral student, nothing is more important than an interested and supportive advisor, which ultimately led to my dismissal from KU and my immigration record becoming tainted for good. I have American kids in my family; two of my

kids were born in the United States. Any incidence of status violation would negatively affect me for the time being and for the future.

**COUNT II**
**Civil Rights Act of 1964 - Title VI Retaliation**
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, O'Leary, Maynard-Moody), Dr. Getha-Taylor, Director Robinson, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and Official Capacities**

573.    The doctoral committee under Coordinator Goerdel's leadership and Director Robinson retaliated against me simply because I indirectly said that I would file a grievance within KU due to the discrimination I was facing from Coordinator Goerdel. The doctoral committee boycotted me and Director Robinson singled me out among the doctoral students and subjected me to a series of impossible situations. I lost the grievance resulting from the misleading information provided to Dean Lejuez by Director Robinson, Coordinator Goerdel, and Dr. O'Leary. I also lost the appeal resulting from the misleading information provided to KU Judicial Board by Dean Lejuez.

574.    Hence, I was left with no option other than to say that I would bring the doctoral committee's discriminatory actions against me to the attention of a court. The doctoral committee in consultation with Director O'Leary, Dean Lejuez, and Dr. Latta placed me on probation because I mentioned that I would bring these discriminatory actions of the doctoral committee to the attention of a court. As an Iraqi Kurd student, I engaged in a protective activity by asserting my rights through resorting to the court when all doors were closed from KU.

575.    However, the defendants retaliated against me even though I had not sued them. People are typically retaliated against after they engage in protected activity by complaining about discrimination. In my case, merely saying that I would bring the issues to the attention of a court was enough for the defendants to retaliate against me, thereby signaling to all other students that whoever dares to think of complaining from discrimination would face retaliation.

126

576.     Both the probation and the subsequent dismissal were retaliatory as there was no basis for probation and hence no basis for termination.

577.     Because of said retaliation, the chance of obtaining my PhD degree dropped to zero and I was eventually terminated from KU.

**COUNT III**
**First Amendment Retaliation in Violation of 42 U.S.C. §1983**
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, O'Leary, Maynard-Moody), Dr. Getha-Taylor, Director Robinson, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and Official Capacities**

578.     The Retaliation from the doctoral committee under Coordinator Goerdel's leadership by boycotting me and Director Robinson by putting me in unreasonable and impossible situations and the retaliation from doctoral committee under Coordinator Epp's leadership were also in violation of my First Amendment right of free speech.

579.     Free speech is a fundamental right conferred on everybody by the Constitution of the United States. Saying that I would file a grievance within KU due to being discriminated against or saying that I would bring the discriminatory actions of the defendants to the attention of a court seeking justice is appropriate speech. I did not make any type of speech that is not covered by the First Amendment and I did not make a speech that is against the law. In fact, what I said is specifically protected speech as per the Constitution of the United States.

580.     Hence, the defendants should not have suppressed my free speech. However, not only did they not accept my free speech, they also retaliated against me. The retaliation became severe specifically after saying that I would bring their discriminatory practices to the attention of a court.

581.     The severity of the retaliation was that I was placed on probation and was then eventually dismissed from KU by the doctoral committee.

582.     Acting under the color of state law, the defendants deprived me of the right of free speech.

583.     As a result, I lost my chance to pursue a PhD degree for making a speech that is well protected under the First Amendment of the Constitution of the United States.

## COUNT IV
### Negligence
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, O'Leary, Maynard-Moody), Dr. Getha-Taylor, Director Robinson, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and Official Capacities**

584.     I incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

585.     A doctoral student can do nothing on his/her own without an advisor. The government of the United States allowed me to stay in the United States in lawful status because KU committed to the United States government that I was their student and hence could study at KU. The doctoral committee thus owed me a duty to follow its own policies to ensure that I always had an advisor as per the school policy to be able to continue in the doctoral program and not to fall out of legal status.

586.     The Doctoral committee and Director Robinson breached this duty by creating a situation where I had to take a leave of absence absent an advisor willing to work with me as his/her student. As I had no advisor, the doctoral committee and Director Robinson created a situation that could lead to violating federal immigration regulations for international students. They also created a situation that could lead to breaking the contract with my sponsor.

587.     In the last semester while at KU, the doctoral committee put me in a situation that has led to violating federal immigration regulations and breaking the contract with my sponsor, as I did not have an advisor.

588.     Without an advisor, I could not enroll in dissertation hours and hence fell out of

legal status. Further, I could not request a program extension from my sponsor. What the

doctoral committee identified for me in the last semester was a hostile forced one-semester form

signer, Dr. Maynard-Moody. It is obvious that nothing can be done with Dr. Maynard-Moody.

Progress can be made only with your advisor. All these problems could have been avoided if I

had an advisor.

589.     As a result, I suffered damages, including losing support from my sponsor. I also

incurred extreme emotional anguish due not finishing the degree and falling out of legal status.

## COUNT V
## Civil Conspiracy
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, O'Leary, Maynard-Moody), Dr. Getha-Taylor, Director Robinson, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and Official Capacities**

590.     I incorporate all preceding paragraphs into this Count by reference as though fully

restated herein.

591.     As I was trying to take a leave of absence, the doctoral committee and Director

Robinson had a meeting of minds to have me discontinue the program without justification. In

furtherance of their agreement, Director Robinson informed me that someone from the

International Student Services Office stated that I needed to consider the implications of taking a

leave of absence. I visited this office to see what they had to say.

592.     When I went the office, I was told that the school did not understand why I was

taking a leave of absence. However, I explained to Director Robinson why I asked for a leave of

absence before going to the International Student Services Office. Then a staff member from the

International Student Office told me I needed to leave the United States for home before the

school fills the "voluntary discontinuance" form.

593.     I then learned on my own that leaving the United States without taking a leave of absence first meant that I had abandoned the doctoral program. Hence, the school would be under no obligation to grant me a leave of absence once I left the United States.

594.     The defendants' overt act was the attempt to have me leave the United States without first taking a leave of absence. I thus did not take the unlawful step of trying to leave before securing an approved leave of absence. The leave of absence was eventually approved as I started questioning the process and the steps necessary to take a leave of absence. However, as I considered my situation, I revoked it due to among other factors fearing that even with an approved leave of absence the school may not allow me to resume my studies.

595.     This suspicion from the intention of the school became true when I tried to revoke the leave of absence. Director Robinson told me I would not be allowed to revoke the leave of absence until I signed a letter indicating that I would stay with Dr. O'Leary until my completion of the program. If it was a leave of absence, Director Robinson should not have prevented me from revoking it while students are discouraged to take a leave of absence except in extraordinary situations.

596.     When I mentioned that I would bring the discriminatory actions by the doctoral committee to the attention of a court, the doctoral committee, Director O'Leary, Dr. Getha-Taylor, Dean Lejuez, and Dr. Latta conspired to dismiss me from the program. They had a meeting of minds. To accomplish their goal of dismissing me from KU, they designed a pathway in which I had to enroll in dissertation hours with Dr. Maynard-Moody for only one semester and without discussing my dissertation with him. The doctoral committee placed me on probation, and then dismissed me which was the ultimate goal behind the conspiracy. Their overt act of having me enroll for only one semester with Dr. Maynard-Moody was to facilitate my dismissal.

The defendant's way of achieving their goal was illegal because the probation was retaliatory, and their dismissal of me was also illegal because the dismissal was also retaliatory.

597.    The result of civil conspiracy was the loss of the PhD degree. After signing the letter under duress as a condition of being allowed to revoke the leave of absence, the chance of finishing the degree became impossible. I was eventually placed on probation and then dismissed from KU. I also experienced severe emotional pain due to not being given the chance to finish my PhD degree.

**COUNT VI**
**Defamation**
**Against the Doctoral Committee (Drs. Goerdel, Fowles, Daley, O'Leary, Maynard-Moody), Director Robinson, Director O'Leary or Coordinator Epp in Their Individual and Official Capacities**

598.    I incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

599.    Although Dr. Getha-Taylor provided false and misleading information to the School of Business upon information and belief, but it was the doctoral committee and Director Robinson that caused the release of such misleading information to the Business School. That is because the doctoral committee and Director Robinson made me consider the option of transferring to the Business School.

600.    Upon information and belief, when I tried to transfer to the Business School, Dr. Getha-Taylor falsely stated that I was trying to transfer to this school because I did not pass the specialization exam in the first trial. In reality, the reason was that no one within my school would serve as my advisor in my specialization and the doctoral committee and Director Robinson prevented me from pursuing a new specialization for which an advisor would be available.

601.    Coordinator Goerdel or Robison provided false and misleading information to other university parties by making it the case I was provided with several options to finish my program and that was up to me to choose one of the options and continue in the doctoral program at the school. In reality, there was no option for me to continue in the doctoral program.

602.    Coordinator Goerdel or Director Robinson provided false and misleading information to the college by making it the case that I filed the grievance because I was worried about the outcome of the specialization exam. I was never worried about the outcome of the specialization exam. I was worried about a situation where somebody other than my advisor and especially someone like Coordinator Goerdel who besides being hostile towards me also has no academic credential to chair my specialization exam.

603.    Dean Lejuez provided false and misleading information to KU Judicial Board by making it the case that there was nothing that prevented me from finishing my degree. In reality, the doctoral committee and Director Robinson impeded my education and made it impossible for me to finish the degree.

604.    Director O'Leary or Coordinator Epp caused the release of false and misleading information to my sponsor. My sponsor now thinks that I myself chose not to finish the degree with KU. In reality, the doctoral committee left me with no option other than a situation where I could not pursue the degree due to the lack of an advisor.

605.    No reasonable person would believe that a student who left home, travelled thousands of miles, spent hundreds of thousands of dollars, spent five years at a program, got close to finishing the degree, and had a 4.0 GPA in his specialization would choose not to finish his degree and leave school.

606.    These false and misleading statements deprived me of the benefits of public

confidence among those who received the false and misleading statements and damaged my

reputation. I suffered other damages, including the loss of opportunity to join the School of

Business, losing the grievance at the college and KU Judicial Board levels, loss of opportunity to

obtain my degree, and having to repay my sponsor. In addition, thinking that the school did not

impede my education, other university administrators were not willing to listen to me when I

raised the issue of a lack of advisor to them.

**COUNT VII**
**Fraudulent Misrepresentation**
**Against Director Robinson in His Individual and Official Capacities**

607.    I incorporate all preceding paragraphs into this Count by reference as though fully

restated herein.

608.    In the Fall Semester 2016, I contacted Dr. O'Leary to see if she would be

interested in reinstating the advising relationship. Dr. O'Leary did not respond and Director

Robinson responded instead and inquired why I contacted Dr. O'Leary.

609.    I explained to Director Robinson that I wanted to reinstate the advising

relationship with Dr. O'Leary. Then Director Robinson visited with me and talked about the

letter. Thus, Director Robinson was aware how Dr. O'Leary felt about me and he knew that his

letter was a fraudulent misrepresentation of reality.

610.    Before I signed the letter under duress, one concern I raised was that Dr. O'Leary

was not interested in serving as my advisor in good faith. Director Robinson said Dr. O'Leary

had always been interested in having me as her student, but the problem is that I ended the

advising relationship with her.

611.    I relied on his misrepresentation when I signed the letter indicating that I would

stay with Dr. O'Leary until graduation. However, Dr. O'Leary was not interested in having me

133

as her student. When I first contacted her after signing the letter, she sent me a very harsh and

defamatory email. As we met three times in the Fall Semester 2016, she was very harsh with me,

name-called me, and blamed me for speaking up when Coordinator Goerdel chaired my

specialization exam. She also refused to discuss my dissertation with me while I was enrolled in

six dissertation hours with her.

612.    Director Robinson knew that the statement was false when he made it and he

made it to get me to act upon it in a way that was detrimental to me.

613.    I relied on Director Robinson's statement when I signed the letter and that was

detrimental to me.

614.    As a result of the fraudulent misrepresentation, I suffered damages including the

loss of the Fall Semester 2016.

**COUNT VIII**
**Procedural Due Process Violation Under 42 U.S.C. §1983**
**Depriving Me of Both Property and Liberty Interests**
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, Maynard-Moody), Dr.**
**Getha-Taylor, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and**
**Official Capacities**

615.    I incorporate all preceding paragraphs into this Count by reference as though fully

restated herein.

616.    I had a property interest in my continued education and enrollment. The Tenth

Circuit Court of Appeals states that education is a property for graduate students. I also had a

liberty interest in my good name, reputation, honor, and integrity.

617.    Of the three constitutionally-protected interests under the Fourteenth Amendment,

which are life, liberty, and property, the defendants took my property and liberty, meaning they

deprived me of two-thirds of my constitutionally-protected interests without any due process of

law.

618.     Acting under the color of state law, the doctoral committee dismissed me and deprived me of liberty interest and property interest in violation of 42 U.S.C. §1983 which holds liable any person who deprives another from life, liberty, and property without due process of law.

619.     The retaliatory dismissal destroyed my good name and reputation.

620.     The retaliatory dismissal also foreclosed any future prospects for my freedom to take advantage of academic and employment opportunities. My chance of an academic job in a university is down to zero.

621.     The defendants did not give me any chance for a fair hearing before dismissing me. Even the probation notice was retaliatory and, hence, did not satisfy the requirement of a true probation notice.

622.     When I mentioned that I would bring their discriminatory practices to the attention of a court, the doctoral committee retaliated against me, placed me on probation, and then dismissed me without any legitimate reason. This has violated the principle of procedural due process. Students in higher education have a constitutional protection and cannot be arbitrarily dismissed without care to their right for due process.

623.     The notice of probation does not satisfy the procedural due process requirement as there are several additional steps that should have been taken to ensure that they did not violate my due process rights. Such additional conditions, include but are not limited to, giving me a chance to call witnesses, cross-examine witnesses of defendants, and a fair hearing. In addition, the decision to dismiss me was not made by impartial people. It was in fact made by people who did everything in their power to dismiss me from KU. The moment I mentioned that I would bring their discriminatory actions to the attention of court, the defendants who made my

dismissal decision all became extremely hostile towards me. Thus, the probation was retaliatory and not academic even though the doctoral committee tried to make it look like an academic probation.

624.     Doctoral students are advanced students and are considered colleagues to faculty members and not students. Doctoral students co-publish with faculty members, teach classes as graduate teaching assistants, and conduct research as graduate research assistants. Doctoral students in my stage of the program can be on the job market and even be offered academic jobs.

625.     There is not that much difference in terms of status between senior doctoral students like me and faculty members. In my case, my academic status in Public Administration is higher than several of the defendants. Drs. Goerdel, Daley, Epp, and Robinson have no degree in Public Administration. I have a Master's degree in Public Administration on a Fulbright scholarship and could probably obtain my PhD degree if Coordinator Goerdel did not ruin my relationship with Dr. O'Leary.

626.     If a doctoral student is placed on real probation, the student will typically be first notified that the student will be placed on probation if he/she does not meet certain requirements. When placing the student on probation, the student will be given a chance for a fair and impartial hearing. None of that happened in my case because the probation was a tool to retaliate against me and not a thoughtful step. It is a violation of KU policy to place a student on academic probation with no basis for that probation.

627.     The fact that I was not dismissed immediately is evidence that the doctoral committee, Director O'Leary, Dean Lejuez and Dr. Latta had knowledge about the law.

628.     According to Article 4.5(a) of the Faculty Code of Rights, Responsibilities, and Conduct, faculty members shall, "Be aware of federal and state law, Board of Regents, and

University policies and regulations and comply with them." This means that the defendants were supposedly aware of what federal and state law says about a situation like mine. Hence, they were aware that they could be liable in their individual and official capacities.

629.    The defendants knew as state actors that they should not deprive any person of property or liberty interest while acting under the color of state law. In fact, KU has many lawyers in its General Counsel Office and these lawyers have supposedly informed faculty members and staff about their liability both in their official and individual capacities. In addition to their own lawyers, universities like KU also resort to legal advice from external lawyers to make sure that their policies and actions comply with the word and spirit of law and the Constitution.

630.    I am not the first one to sue representatives from KU. Therefore, I believe KU has learned from previous lawsuits what the responsibilities of faculty members are in both their individual and official capacities and has informed the faculty accordingly. Thus, faculty members are not ignorant about their liability both in their individual and official capacities.

631.    As a result of the violation of my due process rights, I suffered damages, including the loss of the opportunity to obtain my PhD degree and damage to my reputation.

### COUNT IX
**Violation of Substantive Due Process Under 42 U.S.C. §1983**
**Depriving Me of Both Property and Liberty Interests**
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, Maynard-Moody), Dr. Getha-Taylor, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and Official Capacities**

632.    The retaliatory probation letter and the subsequent retaliatory dismissal was a violation of my substantive due process rights.

633.    As a person, I had a property interest in continued education and enrollment.

634.    I also had a liberty interest in my good name, reputation, honor, and integrity.

635.    Acting under the color of state law, the doctoral committee dismissed me and deprived me of liberty interest and property interests in violation of 42 U.S.C. §1983 which holds liable any person who deprives another from life, liberty, and property without due process of law.

636.    While some students may be financially supported by their university, I used my own funding to study at KU. I have a scholarship from my sponsor. However, according to the terms of the scholarship, I have to pay back all the money that my sponsor invested in my education if I do not obtain the PhD degree.

637.    The dismissal from KU destroyed my good name and reputation and foreclosed any opportunity for an academic job, something for which I dedicated 5 years in the doctoral program.

638.    I used every single penny that my wife and I earned throughout our life to purchase a piece of land and put the land under the possession of my sponsor as a deed. If I do not obtain my PhD, my sponsor will take the deed and then ask me to pay back the difference. In addition, I have always been one of the top, if not the top student in my entire academic career and had developed a reputation for being recognized as a brilliant and extremely capable student.

639.    Thus, for me, substantive due process matters significantly more compared to a student who depended on KU for financial support or a student whose academic history is not as established.

640.    In my entire life, I have never failed a quiz let alone being unable to obtain a specific degree. I have successfully earned my bachelor's and Master's degrees and I was close to obtaining my PhD degree. I completed my Master's degree on a Fulbright scholarship, which is awarded only to select students worldwide.

641.    It is very damaging for my good name and reputation to be known among my peer students, family, friends, and the greater community as a person who could not obtain a PhD degree. For me, nothing matters more than depriving me of my liberty interest.

642.    Acting under the color of state law, the defendants arbitrarily dismissed me in violation of 42 U.S.C. §1983 and infringed on my constitutionally protected interest in both property and liberty.

643.    There was no reasonable justification for my dismissal. It was retaliatory, arbitrary, capricious, and on a whim. My dismissal does not serve any KU legitimate objective.

644.    The probation was not based on reason, rationality, and deliberation. It was sheer retaliation by the doctoral committee for asserting my civil rights as provided by law. When I asked Coordinator Epp for a meeting about the probation, he refused to even meet with me despite numerous requests from me to meet with him. Because he was so angry after I stated that I would go to court, he did not even want to see me face to face.

645.    The retaliatory probation letter indicates that I was placed on probation for not making progress towards my degree. However, I have a progress letter stating that I did make progress towards the degree. Further, when I submitted the self-evaluation form used to determine whether a doctoral student is making progress, I was not told that I was not making progress. Thus, the probation was just a pretext so they could dismiss me without complying with their policies.

646.    As a result of my arbitrary and capricious dismissal by the defendants, my reputation was damaged, I incurred extreme financial loss, and I lost the opportunity to obtain my PhD degree.

**COUNT X**
**Unjust Enrichment**

**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, O'Leary, Maynard-Moody), Dr. Getha-Taylor, Director Robinson, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and Official Capacities**

647.    I incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

648.    In the semesters these issues were happening, I received no service from the school, yet KU charged me normal tuition and fees. The faculty members of the school know that students have to keep paying tuition and fees as long as they have not graduated. International students are in the unique position at KU, unlike many other universities, of paying out-of-state tuition costs despite living in Lawrence during their years of study for the entirety of their program, which further adds to the cost.

649.    Coordinator Goerdel's discrimination of me by interfering in my program in Spring Semester 2016 led to ending the advising relationship with Dr. O'Leary, as she was no longer interested in keeping me as her student. Even though I reinstated the advising relationship with her later in the semester, she lost interest. Hence, our advising relationship came to an end again by May 2016 of the same semester. I thus got nothing from the Spring Semester 2016. For the Fall Semester 2016, the advising relationship was reinstated. However, she was not interested in having me, started name calling me, and was not ready to perform her duties as an advisor. Hence, the advising relationship came to an end again.

650.    For the Spring Semester 2017 and Fall Semester 2017, I was enrolled with a faculty member with whom I had no advising relationship. She allowed me to enroll in dissertation hours with her as a place holding mechanism while my grievance within KU was pending in the Spring Semester 2017.

651.    For Fall Semester 2017, I enrolled in some dissertation hours with the same faculty member hoping that the doctoral committee would not let me fall out of legal status. The

doctoral committee was reckless and did not care I fell out of legal status. For these four semesters and the additional two summer semesters forming 24 months, I also lost a tremendous amount of money to cover my living expenses of a family of four. All the money I spent in living expenses for these 24 months was spent in vain.

652.    KU's retention of the charged tuition and fees some of which is yet to be paid was unjust because the defendants violated their own policies and dismissed me from KU without justification.

653.    As a result, I suffered damages including, without limitation, the payment of tuition and fees and the costs incurred for my family's living expenses that would not have been spent if I had not been a student at KU. The total financial damage I incurred for being at KU for five years was about $275.000.

**COUNT XI**
**Intentional Infliction of Emotional Distress**
**Against Coordinator Goerdel, Director Robinson, Coordinator Epp, and Director O'Leary, in Their Individual and Official Capacities**

654.    I incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

655.    Defendants intentionally and recklessly caused me to suffer severe emotional distress. I often have trouble sleeping and develop headaches periodically. Being excessively micromanaged and then boycotted by Coordinator Goerdel and the harsh treatment by Director Robinson and Coordinator Epp, including violence such as yelling and screaming, continuously forcing me to proceed in the program without an advisor, and the danger of losing my legal status has caused me enormous emotional distress.

656.    The defendants' conduct was extreme and outrageous. In one meeting, Coordinator Epp twice showed me the door. Such harsh treatments gave me enormous emotional

distress. Memories of those incidents still give me pain every time I remember them, including the time involved in writing this petition. This harsh treatment will leave their marks on me forever. I always feel anxious, this has affected my productivity, and morale, made me think of leaving the school, destroyed me from within, and shattered me psychologically. As a minority doctoral student, unequal treatment has affected me much more strongly than other students because minority students have little support compared to other students. I was the subject of departmental gossip and faculty meetings.

657.    Coordinator Goerdel was fomenting dissent in others against me as was the case when she had the doctoral committee which she was chairing and the Director Robinson agreeing with her in declining my request to pursue a different specialization, even though I did not and still do not have an advisor for my specialization. Coordinator Goerdel also had me removed from the PhD email listserv in July 2016 and then I was added again only after re-establishing the advising relationship with Dr. O'Leary in the Fall Semester 2016, thereby isolating me from the school, which made me feel alienated given she kept ignoring me and never responded to my emails.

658.    Everything that was inflicted on me while I was in the school was caused by Coordinator Goerdel. It was she who influenced Director Robinson to treat me harshly. Director Robinson did not have a history of conflict with me. Thus, other than Coordinator Goerdel's influence on him, I have no other explanation for why Director Robinson treated me severely while he was the director of the school.

659.    It was also probably she who misled Dean Lejuez making him dismiss parts of my grievance and deny the remaining parts. After I wrote the appeal, I met with Dean Lejuez and he was very angry with me. He was about to physically attack me in his office.

660.     Director Robinson was targeting me for verbal and nonverbal harassment, including yelling and screaming at me. In his meetings with me, he continually interrupted me, used accusatory language, ignored my viewpoint, and my need for an advisor. He often criticized me, singled me out among other students, and treated me differently.

661.     Director Robinson also intimidated and undermined me by continuously pushing me to proceed in the program without an advisor, which violates the school policy. By continuously threatening to dismiss me from the program in his emails to me, he targeted me for cyber-bullying. He also continuously pushed me to do things I did not want, such as forcing me to work with faculty members of his choice and ignoring what the school policy says about choosing an advisor.

662.     The harshest treatment came from Coordinator Epp. It reached a point where he attacked me personally by saying that I misrepresented other faculty members while I did not do that. In a meeting held in September 2017, Coordinator Epp brought the administrative officer, Miss Koslowsky, to the meeting he had with me saying that because I misrepresented other people, he brought her to the room as a witness. He then made the email thread public for others to see.

663.     In another meeting, he twice showed me the door and yelled at me. He also targeted me for cyber bullying by continuously threatening to dismiss me from the program even though I did not have an advisor and a doctoral student can take no steps without an advisor.

664.     The role of the university is to build a student and not destroy a student. While the issues started before Dr. Epp became the program coordinator, he turned out to be the most severe administrator with me. No one in my life, inside or outside the university, has ever treated me as humiliatingly and as severely as Coordinator Epp. Human being has dignity and self-

worth. No one in my entire life has ever shown me the door. The defendants' conduct was so severe that no reasonable person could endure it.

665.    Director O'Leary also singled me out among the doctoral students. After Coordinator Epp took office, he copied Director O'Leary in his communications with me. Thus, instead of directly singling me out, Dr. O'Leary chose to be copied in communications from Coordinator Epp with me. After mentioning that I would bring the issues to the attention of a court, I once saw her at school and she did not reply when I greeted her.

666.    As a result of Defendants' conduct, I have suffered and continue to suffer extreme emotional distress.

## COUNT XII
### Breach of Contract
**Against the Doctoral Committee (Drs. Goerdel, Epp, Fowles, Daley, O'Leary, Maynard-Moody), Dr. Getha-Taylor, Director Robinson, Director O'Leary, Dean Lejuez, and Dr. Latta in Their Individual and Official Capacities**

667.    I incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

668.    The defendants violated many of the school, college and, university policies several times in different ways. The policies that are in place form an implicit contract between KU and me. The school had a duty of fair deal and good faith. However, the defendants breached this duty by violating many of the school, college and, university policies several times.

669.    These policy violations constitute a breach of contract. As a student, I paid tuition and fees to KU and spent years in the doctoral program with a purpose in mind. What KU implicitly agreed to provide to me in return for paying tuition and fees, and spending years of my time working hard day and night trying to meet any programmatic requirement, was to follow its own policies and grant me a PhD degree upon completion of my work.

670.    For that to happen, the defendants and I had to follow the policies and rules in place. These policies and rules are developed to make sure that things are done properly as per the normal guidelines, and they form a part of the contract between KU and me. As a student, I violated no policy but the defendants repeatedly violated specific policies.

671.    The breach of contract caused me damages, including, without limitation, the amount of money that I have to pay back my sponsor they spent while studying at KU, reputational, and legal damage in the sense that my immigration record is now not clean due to an incidence of falling out of legal status.

### PRAYER FOR RELIEF

**WHEREFORE,** I request this Court to award me:

A.    Compensatory damages and injunctive relief ordering the school to reinstate me and allow me to pursue a new specialization on Count I;

B.    Compensatory damages and injunctive relief ordering the defendants not to target me for further retaliation when I am re-admitted on Counts II and III;

C.    Punitive damages for $1000.000 on Count IV;

D.    Compensatory damages on Count V;

E.    Compensatory damages on Count VI;

F.    Compensatory damages on Count VII;

G.    Compensatory damages on Count VIII;

H.    Compensatory damages on Count IX;

I.    Compensatory damages on Count X;

J.    Compensatory damages on Count XI;

K.    Compensatory damages on Count XII;

L.      Injunctive relief ordering KU to get the approval of my sponsor to reinstate my scholarship and grant me the additional required time to finish the degree;

M.      Injunctive relief ordering KU to write a letter to the United States Citizenship and Immigration Services (USCIS) and the United States Department of State indicating that the reason I fell out of my J-1 visa status was beyond my control;

N.      Injunctive relief ordering the Defendants to follow their policies, including allowing my committee to be chaired by my advisor to conduct my specialization examination;

O.      Injunctive relief ordering the school to normalize the environment in terms of how faculty members, staff, and students treat me and to create a healthy environment in which I do not feel I am unwelcome or that I am the subject of departmental gossip or faculty meetings;

P.      Injunctive relief ordering the school to deduct the January 2014-December 2017 from the number of years required to gain the PhD degree at the school, as new classes should be taken in lieu of classes taken in those years. As for the semesters in which I was enrolled in dissertation hours, it was merely a place holding mechanism that took me nowhere;

Q.      Injunctive relief ordering the school to drop the incidence of probation in my records; and

R.      Such other and further relief just and appropriate under the circumstances.

## JURY DEMAND

 I demand trial by jury.

Respectfully submitted,

February 10, 2020

/s/ Muzafar A. Babakr
_____
Muzafar A. Babakr
1600 Haskell Avenue, Apt. #170
Lawrence, Kansas 66044
(785) 727-8768
muzaferi@gmail.com
**PRO SE PLAINTIFF**