IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MUZAFAR BABAKR,

        Plaintiff,

   v.                                      No. 20-2037-SAC-JPO

DR. HOLLY T. GOERDEL, et al.,

        Defendants.

MEMORANDUM AND ORDER

      The plaintiff Muzafar Babakr ("Babakr"), a former doctoral student at the University of Kansas ("KU") in the School of Public Affairs and Administration ("SPAA"), was notified in February of 2018 that he was dismissed from the doctoral program. Representing himself, Babakr brings this action alleging discrimination, constitutional violations, breach of contract and tortious injury from the manner in which his doctoral program was administered, mentored, supervised and reviewed, and from his eventual dismissal from the program. Less than a month after filing his complaint, Babakr filed a first amended complaint (FAC) totaling 671 paragraphs and 147 pages. The defendants file a joint motion to dismiss under Fed. R. Civ. P. 12(b)(6). ECF# 21. With the filing of the Babkr's response (ECF# 32) and the defendants' reply (ECF# 36), the matter is ripe.

**Rule 12(b)(6) Standards**

      "A pleading is required to contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting Fed. R. Civ. P. 8(a)(2)). All well-pleaded factual

1

allegations in the complaint are accepted as true and viewed in the light most favoring the plaintiff. *Farmer v. Kansas State University*, 918 F.3d 1094, 1102 (10th Cir. 2019). But, when the complaint alleges legal conclusions, those allegations are not subject to the same rule of being accepted as true. *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017)

      "A complaint cannot survive a motion to dismiss unless it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Doe v. School District No. 1, Denver, Colorado*, 970 F.3d 1300, 1309 (10th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). To be plausible on its face, the complaint's "factual allegations [must] allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "In determining the plausibility of a claim, we look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard [does not] require a plaintiff to 'set forth a prima facie case for each element.'" *George v. Urban Settlement Services*, 833 F.3d 1242, 1247 (10th Cir. 2016) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1192–93 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). But "mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to

support each claim." *Id.* at 1214 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When a plaintiff proceeds pro se, the court liberally construes his pleadings, but it will not act as his advocate. *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013). Nor will the court excuse him from adhering to the same procedural rules as other litigants. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

**ALLEGATIONS OF FACT**

The sheer length and repetitious allegations in the FAC defy the letter and spirit of Rule 8's requirement for a short and plain statement of the claims showing entitlement to relief. The FAC is also replete with allegations that are inconsistent, conclusory, and speculative. For the sake of simplicity and clarity, the court will lay out the central alleged events in the best chronological order inferred from the FAC.

<u>Parties</u>

The plaintiff Babkr is a citizen of Iraqi Kurdistan and entered the United States on a student visa. He currently lives in Douglas County, Kansas, and attended KU's SPAA's doctoral program. He sues the following individual defendants in their individual and official capacities.

The defendant Dr. Holly Goerdel ("Goerdel") served as the Coordinator of SPAA's doctoral program and as the chair of the SPAA's doctoral committee. She was succeeded in both positions by the defendant Dr. Charles Epp in July of 2017. She will be referred to as Coordinator Goerdel.

The defendants, Dr. Jacob T. Fowles, Dr. Dorothy M. Daley and Dr. Steven W. Maynard-Moody are members of the SPAA's doctoral committee. The defendant Dr. Heather Getha-Taylor is a former member of SPAA's doctoral committee.

The defendant Reggie Robinson was director of the SPAA until succeeded by the defendant Dr. Rosemary O'Leary in July of 2017. He will be referred to as Director Robinson. Dr. O'Leary also was Babakr's former advisor and served on the SPAA's doctoral committee.

The defendant Dr. Carl W. Lejuez is the former Dean of the College of the Liberal Arts and Sciences. The defendant Dr. Kristine Latta is the Director of the College Office of Graduate Affairs.

The plaintiff also names KU as a defendant under the Kansas Tort Claims Act, as an employer responsible and liable for its employees, and as an agency of the State of Kansas and a recipient of federal financial assistance within the meaning of 42 U.S.C. § 2000d.

<u>Explanation of Doctoral Program</u>

Doctoral students in SPAA specialize in an area of study. The doctoral curriculum requires them, in part, to complete four foundation classes and take a comprehensive written examination on the foundations, to complete two methods classes, and to complete three classes in their specialization and to take a written examination conducted by the student's committee in the area of the specialization. A doctoral student also completes three cognate classes in the specialization area and then prepares a dissertation in the specialization area over which the student's

4

committee orally examines the student. Babakr groups the foundations and methods classes as one part of the doctoral program, and the specialization, cognate and dissertation as the other part of the program.

Babakr alleges that the specialization examinations are offered twice each year, in February and September, and that a student's dissertation proposal typically develops following the specialization examination. Babakr repeatedly alleges the student's committee is chaired by the student's advisor.

Babakr's blames his failure to pass his first specialization examination on the committee's failure to conduct the examination in the same way done for other students. ECF# 3, ¶ 315. He was not asked questions about his dissertation. *Id.* at ¶ 316. He alleges his advisor Professor O'Leary chaired the committee but lacked expertise in the area of his dissertation. *Id.* at ¶ 317. He also disputes the grading of his answers. *Id.* at ¶¶ 317-318. Babakr does not allege when he failed his first attempt at the specialization examination, but presumably it occurred before Babakr was told that Dr. Goerdel would then be chairing his next specialization examination.

<u>Allegations of National Origin Discrimination</u>

Babakr alleges that from the outset KU's SPAA doctoral program treated him differently because he was an international student. He was denied office space which the other doctoral students enjoyed. ¶¶ 46-47. He alleges on information and belief that the SPAA doctoral program has not admitted an international student since 2013, that the only two students dismissed from the program were international students, and that another international student did not return after taking a leave of absence. ¶ 65. Babakr alleges he was the only Iraqi Kurdish student at the school. ¶

5

66. When he entered the school in 2013, Babakr was asked about his national cultural background by other students and staff. ¶ 67. He "generally felt unwelcome." *Id*.

Chronological Outline of Central Events

After earning a master's degree in public administration at another university, Babakr became an international doctoral student at KU's SPAA beginning in the 2013 spring semester. *Id*. at ¶ 46. When he inquired about not receiving office space like that given other doctoral students, he was told that he was not working for KU. *Id*. Babkr's adviser was Dr. O'Leary. ECF# 3, ¶ 48.

During the 2015 spring semester, Babakr learned from Dr. O'Leary that Dr. Goerdel would chair his specialization examination. *Id*. at ¶ 49. Babakr spoke with Coordinator Goerdel telling her that he was against her chairing his specialization examination presently scheduled for the 2015 Fall Semester and that his examination committee should be chaired by his advisor. *Id*. at ¶ 52. Coordinator Goerdel declined Babakr's request. *Id*. at ¶ 53. But, Goerdel went on leave during the 2015 Fall Semester, so the specialization examination did not occur and had to be scheduled for the Spring Semester of 2016 when she would return. *Id*. at ¶ 54. Babakr alleges that Dr. O'Leary then lost interest in him due to Coordinator Goerdel's signaling and interference. *Id*. at ¶ 54

A month before the specialization examination scheduled for February 19, 2016, Babakr alleges he tried contacting Dr. O'Leary but was unable to meet with her until February 15, 2016. "Seeing that Dr. O'Leary was not interested, I asked Dr. Maynard-Moody who was sitting on my committee to serve as my advisor and after that the relationship came to an end with Dr. O'Leary." *Id*. at ¶ 328. When Dr.

6

Maynard-Moody declined to serve as his advisor, Babakr canceled the specialization examination for February 19, 2016. ¶¶ 328-329. Babakr alleges his reasons for canceling were his advisor Dr. O'Leary's loss of interest in him and Coordinator Goerdel's attempt to chair his specialization examination "in violation of school policy." ¶ 330. Babakr began asking other faculty members with expertise in his specialization to serve as his advisor. Finding no one, Babakr requested a change his specialization as he needed an advisor. ¶ 330.

In a March 2016 meeting with Coordinator Goerdel and Director Reggie Robinson, Babakr learned that the doctoral committee had met and decided against allowing him to change his specialization. ¶ 92. Goerdel also told Babakr the doctoral committee had decided that while a single faculty member was unavailable to be his adviser, Babakr should accept several faculty members who would serve him as an advisory group. ¶¶ 97-98. Babakr alleges that in the March 2016 meeting with Coordinator Goerdel he had "a heated discussion about who would chair [his] . . . specialization committee." ¶ 247. Goerdel during the meeting raised the possibility of Dr. O'Leary returning as Babakr's advisor. ¶ 105. Goerdel told Babakr that she would arrange for a meeting between Dr. O'Leary and Babakr and that Goerdel and Director Robinson also would attend it. ¶ 105. This meeting occurred on March 15th at which Coordinator Goerdel and Director Robinson informed Babakr he needed to work with Dr. O'Leary or leave the program. ¶ 106. Goerdel insisted she would chair the specialization examination. Dr. O'Leary said she would advise Babakr and Goerdel would serve as chair. ¶ 106. Babakr agreed to this and registered for the 2016 fall semester specialization examination. ¶ 107. Babakr, however, alleges that when he

subsequently met with Dr. O'Leary he learned she was not interested in working with him, so he ended the advisory relationship again in May of 2016. ¶ 107.

Babakr met with Coordinator Goerdel and Director Robinson again in June 2016, requesting a change in his specialization because none of the faculty in his specialization area would serve as his advisor. ¶ 108. Goerdel again said that Babakr could not change his specialization. The doctoral committee did not allow this change. Babakr told them he had no option but that he would bring this "issue to the attention of other parties outside the school." ¶ 115. Babakr alleges that in retaliation for saying he "would bring the issue of Coordinator Goerdel's discriminatory treatment to the attention of other parties outside of the school," the doctoral committee boycotted his progress and Director Robinson pushed him to proceed without an advisor. ¶ 117. Babakr alleges that from July 2016 until July 2017, Director Robinson was his only contact person in the program and Coordinator Goerdel never communicated with him. ¶ 121

In an August 2016 meeting, Director Robinson pressed Babakr to enroll in dissertation hours with Dr. Goerdel, but Babakr said he could not because Goerdel had mentioned the possibility of his dismissal from the program. ¶¶ 152-153.  Babakr then suggested requesting a leave of absence from the program to preserve his legal status in the country. ¶ 154. Director Robinson subsequently emailed Babakr advising him to consult with an immigration officer in the International Student Services Office about this option. ¶ 167. Later in August of 2016, Babakr learned from Director Robinson that his request for a leave of absence had been approved. ¶ 183. Babakr, however, had second thoughts about taking the leave. ¶ 184. When Babakr disclosed this to

Director Robinson, he was told that a revocation of the leave of absence would be conditioned upon him signing a letter that he would keep Dr. O'Leary as his advisor until the program was completed, that he would not change his specialization, and that he would sit for his specialization examination on November 18, 2016. ¶ 185. Babakr alleges he signed this letter under duress in September of 2016. ¶ 187.

After starting again his advisory relationship with Dr. O'Leary in the 2016 fall semester, Babakr ended the relationship that same semester because he perceived that Dr. O'Leary did not want to advise him. ¶¶ 196-197. Babakr alleges that he met three times with Dr. O'Leary and that she sent a defamatory email to him, copying both Coordinator Goerdel and Director Robinson which said: "I expect you to treat me, Professor Robinson, Professor Goerdel, and all other professors with respect. Any deviation from professional, respectful, behavior will not be tolerated." ¶ 201. Babakr also alleges that Dr. O'Leary refused to discuss his dissertation proposal but also told him that his dissertation proposal was not related to his specialization. ¶¶ 203, 205. Dr. O'Leary explained that Coordinator Goerdel would chair the committee that would prepare the specialization examination but that she would not be involved in grading it. ¶ 206. Babakr denies Dr. O'Leary's good faith in wanting to be his advisor. ¶ 209. Babakr later cancelled the 2016 fall semester specialization examination for the lack of an advisor. ¶ 139.

While Robinson was still the Director of SPAA, Babakr tried transferring to the School of Business. ¶¶ 174-177. He alleges on information and belief that Dr. Getha-Taylor disclosed his educational records and provided to the School of Business misleading information that he was seeking a transfer because he did not pass his first

specialization exam and was unable to finish his current program. ¶¶ 174, 178. Babakr also alleges that Coordinator Goerdel and Director Robinson also provided false information to other KU administrators that he still had options within the SPAA program. ¶¶ 179-181.

In December of 2016, Babakr received an email notice that his specialization examination was scheduled for February 10, 2017. ¶ 214. In January of 2017, Babakr filed a grievance against Coordinator Goerdel and Director Robinson. ¶ 224. Babakr told Director Robinson that he could not take the specialization examination while the grievance was pending and that he wanted a written statement that he would not be dismissed for this. ¶ 225, 227. Director Robinson eventually sent an email stating that he would not be dismissed while a grievance was pending. ¶ 228.

Babakr characterizes the heart of his 2017 grievance to be the lack of an advisor for his specialization. ¶ 342. The hearing on his grievance was held on May 15, 2017, and Dean Lejuez informed Babakr of the hearing's negative result on June 1, 2017. ¶ 274. Babakr alleges that Dr. Goerdel and Director Robinson provided misleading information to Dean Lejuez about the reasons for Babakr's filing the grievance. ¶¶ 234, 240.

Babakr appealed to the KU Judicial Board in July of 2017, and Dean Lejuez submitted a response as requested by the Board. ¶ 384. The Board ruled against Babakr. ¶ 410. Babakr alleges Dean Lejuez misled the Board with information that nothing kept him from completing his degree. ¶¶ 401-403.

Sometime after January of 2017, Dr. Epp succeeded Dr. Goerdel as Coordinator of the doctoral program, and Dr. O'Leary succeeded Robinson as Director

of the school. ¶ 124. In July of 2017, Babakr went to Coordinator Epp asking for an advisor. ¶ 412. In September of 2017, he again visited Epp asking to pursue a new specialization due to the lack of an advisor, and indicating he "would bring the issues to the attention of a court." ¶¶ 412, 431. Also in September, Babakr told Dr. Epp he needed a program extension because the contract with his sponsor expired in December of 2017. ¶ 489. Babakr alleges that in retaliation for the meeting, Coordinator Epp sent him a probation letter that required him to sit for a specialization examination by December 1, 2017. ECF# 432. As to the contents of this probation letter, the FAC alleges:

> Regarding an advisor, SPAA has assigned Steven Maynard-Moody as your advisor . . . In his role as advisor he will work with an advisory committee composed of Rosemary O'Leary and Heather Getha-Taylor. [¶ 437]
> The SPAA [School of Public Affairs and Administration] PhD Program Committee has determined that failure to successfully complete the PHD Comprehensive Written Examination in your specialization area by the end of the 2016-17 academic year constituted failure to maintain satisfactory progress toward the degree. [¶ 457]

ECF# 3. Because the FAC quotes this letter in significant part, the defendants attach it as an exhibit to their motion and note other parts of this letter which gave Babakr until the end of the Fall 2017 semester to complete his written specialization examination and further warned that his failure to do so would result in his "dismissal" from the doctoral program. ECF# 22-1.

In the Spring 2018 Semester, Babakr received dismissal letters from the School and the College. ¶¶ 480-481. The defendants attach copies of those letters to their motion. ECF## 22-2 and 22-3. The School's letter dated January 20, 2018, recommended Babakr's dismissal effective the start of the spring 2018 term for his failure to satisfy academic probation. The College's letter dated February 9, 2018,

informed Babakr he was dismissed effective immediately. *Id.* This letter further explained that it also constituted notice of final agency action by KU and that future service of any subsequent petition for judicial review should be upon the Chancellor. *Id.*

**TWELVE CLAIMS FOR RELIEF**

The plaintiff's FAC seeks both compensatory damages and injunctive relief on his twelve claims against KU and against ten KU officials in their individual and official capacities. Two claims are brought under Title VI (Counts I and II), three claims are brought under 42 U.S.C. § 1983 (Counts III, VIII, and IX), and the remaining seven claims are brought under state law (Counts IV, V, VI, VII, X, XI, and XII). The plaintiff seeks both compensatory damages and injunctive relief.

Count I—Title VI National Origin Discrimination

The plaintiff asserts national origin discrimination under Title VI against the doctoral committee, Director O'Leary, Dr. Getha-Taylor, and Director Robinson. The plaintiff alleges the following to be discriminatory acts. First, his specialization examination committee was chaired by Director Goerdel instead of his advisor in the Spring Semesters of 2015 and 2016 when other doctoral students had their advisors chair their committees. ¶¶ 557 and 560. Second, Babakr alleges that he was treated differently because he was an "international doctoral student" and that students and staff asked about his "national cultural background" when he joined the program in 2013. ¶¶ 558-559. Third, Coordinator Goerdel's insistence on participating on his specialization examination committee and her interference with Babakr's doctoral program caused him to lose his advisor Dr. O'Leary. ¶¶ 561 and 570. Fourth, Babakr

12

suffered various discriminatory actions: a) before July of 2016, Coordinator Goerdel forced him to accept Dr. O'Leary as his advisor, requested him not to ask other faculty members to serve as his advisor, and required him to copy her on emails to other faculty; b) in July of 2016, the doctoral committee and Coordinator Goerdel forced him to stay in his specialization; c) in the Fall 2016 semester, Director Robinson tried to force him to sit for a specialization examination without registration; d) in the Fall 2016 semester, Director Robinson forced him to enroll in dissertation hours with Coordinator Goerdel and further suggested that he enroll in dissertation hours with Robinson; e) in September of 2016, Director Robinson forced him to sign a letter under duress; f) in the Fall 2016 semester, Director Robinson "acted like a party in my advising relationship with Dr. O'Leary; g) Coordinator Goerdel and Director Robinson tried to force Babakr to sit for the specialization exam in February of 2017; h) Coordinator Epp and the doctoral committee in March of 2017 tried to force an advisory committee on him and tried again in the Fall 2017 semester with a form-signer; and i) the doctoral committee appeared to announce the results of his 2017 Fall semester specialization examination before he took it and then dismissed him in 2018 Spring Semester.

## Count II—Title VI Retaliation

The plaintiff claims the doctoral committee and Director Robinson retaliated when he said in June 2016 that he would file a grievance for Dr. Goerdel's discrimination. He filed the grievance in June of 2017. He alleges retaliation from having said in July and/or September of 2017 that he would take his issues to the

courts. He alleges the doctoral committee's placement of him on academic probation in September of 2017 and dismissal in Spring of 2018 was in retaliation.

<u>Count III—42 U.S.C. § 1983 First Amendment Retaliation</u>

The plaintiff alleges his protected statements were that he would file a grievance and that he would file an action in court for the discriminatory treatment of him. The plaintiff asserts retaliation in that his speech was suppressed, not accepted, and resulted in retaliation that included being placed on academic probation and dismissed by the doctoral committee.

<u>Count IV—Common Law Negligence</u>

The plaintiff alleges the doctoral committee and Director Robinson breached their duty of following their own policies and giving him an advisor so he could continue and complete his doctoral program. The plaintiff alleges that Dr. Maynard-Moody was not an advisor but only a "form-signer" for the Fall 2017 Semester.

<u>Count V—Civil Conspiracy</u>

Babakr alleges two conspiracies. The first alleged conspiracy is that Director Robinson and the doctoral committee conspired to mislead him into leaving the United States without first securing KU's leave of absence. This would have allowed the school to interpret his departure as an abandonment of the program and then to deny his leave request. Babakr, however, did obtain a leave of absence but later had it revoked at his request. The second alleged conspiracy is that the doctoral committee conspired to dismiss him from the program by requiring him to take

dissertation hours with Dr. Maynard-Moody, by placing him on academic probation, and then by dismissing him.

Count VI--Defamation

The plaintiff alleges Dr. Getha-Taylor communicated false and misleading information about Babakr to the School of Business. She was given this information from the doctoral committee and Director Robinson. The information was that Babakr was seeking to transfer to a different school because he had failed his first attempt at the specialization examination. The plaintiff also alleges Coordinator Goerdel and Director Robinson provided false and misleading information to the college and university parties that he had options for the completing the doctoral program and that he had filed the grievance because he was worried about passing his specialization examination. He also alleges that Dean Lejuez provided false and misleading information to the KU Judicial Board about his ability to finish his doctoral program. Finally, he alleges Director O'Leary and Coordinator Epp falsely informed Babakr's sponsor that he chose not to finish his degree at KU.

Count VII—Fraudulent Misrepresentation

Babakr alleges Director Robinson induced him to sign the letter agreement in the Fall of 2016 by misrepresenting that Dr. O'Leary was interested in serving as his advisor. He alleges learning that Dr. O'Leary was not interested based on her treatment of him during the Fall of 2016.

Count VIII—42 U.S.C. § 1983 Procedural Due Process

The plaintiff alleges a property interest in his continued education and enrollment and a liberty interest in his good name, reputation, honor and integrity.

15

He alleges his due process rights were violated when he was placed on academic probation without adequate notice, when he was not afforded a fair hearing before dismissal, and when he was dismissed without a legitimate reason. Babakr specifically alleges the academic probation notice was inadequate because it was not conditioned upon having the chance to call witnesses, to cross-examine witnesses, and a fair hearing. He also alleges the decision to dismiss him "was not made by impartial people." ¶ 623.

### Count IX—42 U.S.C. § 1983 Substantive Due Process

The plaintiff alleges the probation letter in September of 2017 and his dismissal in the Spring of 2018 were violations of his substantive due process rights. He argues his dismissal from the doctoral program was arbitrary, capricious, and without reasonable justification. Instead, his dismissal was purely retaliatory for asserting his civil rights.

### Count X—Unjust Enrichment

Babakr alleges he was charged tuition and fees during six semesters (fall, spring and summer for 2016 and 2017) without receiving the necessary services of an advisor.

### Count XI—Intentional Infliction of Emotional Distress

Babakr alleges he was "excessively micromanaged," yelled and screamed at, harshly treated, and forced to proceed in the program without an advisor. More specifically, he alleges that Coordinator Epp twice showed him the door, that Coordinator Goerdel fomented dissent against him, that he was denied a different specialization, and that he was removed from an email listserv in 2016 until his

16

advisory relationship with Dr. O'Leary was resumed. He also alleges that Dean Lejeuz became "very angry" with him and was "about to physically attack" him. ¶ 659. He alleges that Director Robinson intimidated, harassed, yelled, screamed, continually interrupted, used accusatory language, ignored his viewpoint, and threatened in emails to dismiss him from the program. ¶¶ 660-661. Babakr alleges "harshest treatment came from Coordinator Epp" who "personally attacked" him saying he had "misrepresented other faculty members" and who had an administrative officer present during their meeting to serve as a witness. ¶ 662. Babakr alleges against Director O'Leary that she chose to receive emails from Coordinator Epp and did not reply to his greeting.

Count XII—Breach of Contract

The plaintiff alleges he had an implied contract with KU that its staff would follow KU's policies exercising good faith and fair dealing. He alleges this contract was breached by all the policy violations and by not allowing him to complete his doctoral program.

**ELEVENTH AMENDMENT IMMUNITY**

The defendants argue the plaintiff's § 1983 and state law claims are subject to dismissal as barred by Eleventh Amendment immunity. The plaintiff concedes this argument as to KU. Thus, the defendant KU is entitled to dismissal from Counts III through XII. The plaintiff also concedes that the individual KU officials sued in their official capacity for damages under § 1983 and for damages and injunctive relief under state law claims are entitled to dismissal. The only contested point under

this issue is whether the plaintiff in the FAC has alleged an ongoing violation of § 1983 for which he seeks prospective relief in Counts III, VIII, and IX.

It is well established that official capacity "claims for back pay, monetary damages, and retroactive declaratory relief are barred by the Eleventh Amendment." *Meiners v. University of Kansas*, 359 F.3d 1222, 1232 (10th Cir. 2004). At the same time, "[i]n *Ex parte Young*, [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ], the Court held that the Eleventh Amendment generally will not operate to bar suits so long as they (i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself." *Hill v. Kemp*, 478 F.3d 1236, 1255–56 (10th Cir. 2007), *cert. denied*, 552 U.S. 1096 (2008). Thus, "the Eleventh Amendment does not bar suit against the [university] officials for the injunctive relief of reinstatement into the doctoral program." *Kashani v. Purdue University*, 813 F.2d 843, 844, 848 (7th Cir.), *cert. denied*, 484 U.S. 846 (1987); *see Meiners*, 359 F.3d at 1232 ("Reinstatement of employment is a form of prospective equitable relief.").

The plaintiff argues the § 1983 claims in his FAC seek reinstatement to KU's doctoral program and to enjoin retaliatory conduct upon his reinstatement. The defendants reply that the plaintiff's FAC does not link his request for reinstatement to his § 1983 claims. Any such pleading deficiency could be easily cured by amendment. Even if curable, the defendants contend this official capacity claim is limited to those officials who have the power or authority to provide the prospective relief. The well-established rule is:

> The continuing violation exception to Eleventh Amendment immunity is not without limitations. In *Ex Parte Young*, the Supreme Court noted that the state official must have the power to perform the act required in order to overcome the jurisdictional bar of the Eleventh Amendment. *Ex Parte Young*, 209 U.S. at 157, 28 S.Ct. at 452-53.

*Moore v. U. of Kansas*, 118 F. Supp. 3d 1242, 1250 (D. Kan. 2015) (quoting *Klein v. University of Kansas Medical Center*, 975 F. Supp. 1408, 1417 (D. Kan. 1997)). For any of these claims to remain in the plaintiff's suit, he will need to allege the prospective relief sought under § 1983 and to allege which KU officials have the power to perform that prospective relief. As for the allegation of prospective relief to enjoin retaliation, the plaintiff is no longer a student in the doctoral program and has not alleged ongoing retaliation in violation of federal law. *See Rounds v. Clements*, 495 Fed. Appx. 938, 941 (10th Cir. Aug. 31, 2012) (unpub.) ("[T]he *Young* doctrine seeks to give force to the Supremacy Clause by stopping ongoing violations of federal law. *See Green v. Mansour*, 474 U.S. 64, 68 (1985)."). The court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" in assessing whether the Eleventh Amendment bar is overcome. *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002).

**TITLE VI CLAIMS**

Title VI of the 1964 Civil Rights Act provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Supreme Court has said it is "beyond dispute . . . that § 601 [Title VI] prohibits only

intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). The plaintiff concedes that KU officials should be dismissed from Title VI claims as they are not liable in their individual capacities, and the official capacity claims duplicate the claims against KU. The FAC names KU as a defendant under Title IV and alleges its liability for the actions of its agents. ECF# 3, ¶¶ 29-30.

<u>Timeliness</u>

The defendants first ask the court to find that some of the plaintiff's claims are time-barred. A two-year statute of limitations is applied to claims brought under Title VI in this court. *Baker v. Board of Regents of State of Kan.*, 991 F.2d 628, 632 (10th Cir. 1993); *Warren v. Univ. of Illinois-Champaign/Urbana*, 19-4094-SAC-ADM, 2020 WL 1043637, at *3 (D. Kan. Mar. 4, 2020). The accrual of such claims is determined under federal law. *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998). Thus, the claims accrue when the plaintiff knows or should know that his or her rights have been violated. *Id.* "In particular, a civil rights action accrues when facts that would support a cause of action are or should be apparent." *Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004)(internal quotation marks and citation omitted), *cert. denied*, 544 U.S. 1044 (2005). This determination properly focuses on when the alleged discriminatory act occurs and not on the point in time when the consequences of the act may have been felt. *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981). KU argues that the plaintiff alleges numerous acts of discrimination and retaliation under Title VI, and all are time-barred except for his dismissal which occurred in the 2018 Spring Semester.

Babakr looks to bring his Title VI claims under the doctrine of continuing violation. He argues that Coordinator Goerdel working with the doctoral committee and others discriminated against him continuously beginning in the 2015 Spring Semester. He describes his discrimination/retaliation claims as being akin to a hostile work environment claim in that the alleged unlawful acts were so severe and pervasive as to alter the conditions of his educational environment. He goes so far as to say that the FAC's alleged discrimination before his dismissal was "not distinguishable acts of discrimination and could arguably not have been independently raised in a lawsuit." ECF# 32, p. 19.

The defendants deny that the plaintiff's Title VI claims are based on repeated conduct which cannot be said to have occurred at particular points in time. The defendants say there is no precedent in this circuit for extending the continuing violation doctrine to Title VI claims. The FAC does not allege a hostile environment claim under the Title VI counts. Instead, it alleges specific circumstances and contexts surrounding the plaintiff's particular requests and decisions which resulted in the following discrete discriminatory acts:  changes to his advisor and his relationships with them, denials of his request for a new area of specialization, demands for him to sit for specialization examinations administered by committees which were not properly constituted, demands for him to enroll in dissertation hours, calls for him to have a committee of advisors instead of just one advisor, his placement on probation, and his dismissal. The defendants argue these alleged discriminatory acts accrued when they occurred and certainly had accrued no later than his September 2017 probation under any theory. The defendants insist the continuing violation doctrine

does not save the plaintiff's claims based on the discriminatory acts occurring more than two years from the filing date of Babakr's complaint in this case.

The court recognizes that, "'it is questionable whether the [continuing violation] doctrine applies to claims brought under Title VI,'" *Ghareeb v. Board of Trustees at University of Northern Colorado*, No. 19-cv-228-STV, 2020 WL 136647 at *5 n.4 (D. Colo. Jan. 13, 2020) (quoting *Martin v. State Univ. of N.Y.*, 704 F.Supp.2d 202, 234 (E.D.N.Y. 2010)). Assuming without deciding whether the doctrine has some application to Title VI claims, the court finds that the doctrine as limited by Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), is inapplicable here:

> In *Morgan*, the Supreme Court held that a continuing violation theory of discrimination is not permitted for claims against discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or a refusal to hire. 536 U.S. at 114, 122 S.Ct. 2061. The Court concluded that "[t]here is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing." *Id*. at 111, 122 S.Ct. 2061. Instead, the Court held that a discrete retaliatory or discriminatory act "occurred" on the day that it "happened." Id. at 110, 122 S.Ct. 2061. Thus, a claimant must file a charge of discrimination within the appropriate limitations period as to each such discrete act of discrimination that occurred. Id. The Court further emphasized that "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113, 122 S.Ct. 2061.
> . . . .
> We must conclude from *Morgan*'s holdings that when a plaintiff pursues several disparate treatment claims based on discrete discriminatory acts, the limitations period will begin to run for each individual act from the date on which the underlying act occurs.

*Davidson v. America Online, Inc.*, 337 F.3d 1179, 1184–85 (10th Cir. 2003). "Because 'discrete acts are easily identifiable and individually actionable,' the Supreme Court reasoned that such acts occurring 'outside of the limitations period, even though related to those occurring within the period, are not actionable.'" *Ghareeb*, 2020 WL

136647 at *5 n.4 (quoting *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1202 (10th Cir. 2002).

Liberally and reasonably construed, the FAC alleges principally discrete acts of Title VI discrimination and retaliation that are not only easily identified but are also separately and extensively described in detail by the persons involved and the dates and circumstances. The discrete acts, summarized above, include all the different changes in Babakr's advisors, the denials of his requests for a new area of specialization, the demands for him to take specialization examinations which he declined, the demands for him to enroll in dissertation hours which he declined, the requests for him to have a committee of advisors which he refused, his placement on probation, and his eventual dismissal. Of these different alleged acts that may constitute adverse actions, they are discrete and akin to those identified in *Morgan*, 536 U.S. at 114. In each instance, Babakr was put on notice of the adverse action and he responded to it. As alleged in the FAC, Babakr's responses included him confronting the defendants and telling them he was contemplating steps to pursue administrative and judicial relief from their actions. The plaintiff does not explain his opinion for why these adverse actions would not be discrete and individually actionable claims of intentional disparate treatment discrimination. As far as alleging that Coordinator Goerdel and others repeatedly engaged in related discriminatory treatment at least through September of 2017, the FAC certainly can be read in this way. But it does not allege that these circumstances are or could be actionable national origin harassment as to be an actionable claim for hostile educational environment theory under Title VI. *Cf. Bryant v. Independent School Dist. No. I-38,*

334 F.3d 928 (10th Cir. 2003); *Silva v. St. Anne Catholic School*, 595 F.Supp.2d 1171

(D. Kan. 2009); *Rubio v. Turner Unified Sch. Dist. No. 202*,  523 F.Supp.2d 1242 (D.

Kan. 2007). Most importantly, even assuming the adverse actions could be treated as

a continuing violation, the claim accrued no later than September 2017 when Babakr

was placed on probation for not passing the specialization exam in September of 2015

and for not taking it again during the next two years. Thus, the court finds that any

Title VI claims based on discriminatory and/or retaliatory acts occurring more than

two years prior to the filing date of the plaintiff's complaint are time-barred and

dismissed for that reason.

<u>Sufficiency of Allegations in Count I—Title VI Discrimination</u>

Rule 12(b)(6) does not create a prima facie case pleading requirement,

but the court may look to those elements in determining plausibility. *Khalik v. United*

*Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). The Tenth Circuit recently

summarized what suffices for pleading a discrimination claim:

> A complaint raising a claim of discrimination does not need to conclusively
> establish a prima facie case of discrimination, but it must contain more than
> "'[t]hreadbare recitals of the elements of a cause of action, supported by mere
> conclusory statements.'" *Khalik*, 671 F.3d at 1193 (quoting *Ashcroft v. Iqbal*,
> 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "While we do not
> mandate the pleading of any specific facts in particular," a plaintiff must
> include enough context and detail to link the allegedly adverse employment
> action to a discriminatory or retaliatory motive with something besides "sheer
> speculation." *Id*. at 1194. "[A] plaintiff should have"—and must plead—"at least
> some relevant information to make the claims plausible on their face." *Id*. at
> 1193. Thus, it is insufficient for a plaintiff to allege, for instance, that she did
> not receive an employment benefit that "similarly situated" employees
> received. *Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1164 (10th Cir. 2014). A
> plaintiff's assertion that she is "similarly situated" to other employees is "just a
> legal conclusion—and a legal conclusion is never enough." *Id*. Rather, a plaintiff
> must allege "some set of facts"—not just legal conclusions—"that taken
> together plausibly suggest differential treatment of similarly situated
> employees." *Id*. "Pleadings that do not allow for at least a reasonable

> inference of the legally relevant facts are insufficient." *Burnett v. Mortg. Elec.*
> *Registration Sys., Inc.*, 706 F.3d 1231, 1236 (10th Cir. 2013) (internal quotation
> marks omitted).

*Bekkem v. Wilkie*, 915 F.3d 1258, 1274–75 (10th Cir. 2019). For Title VI cases, courts

borrow Title VII analysis and require the plaintiff to show for a prima face case of

disparate treatment discrimination that he is a member of a protected class, has

suffered an adverse action, and was treated less favorably than those similarly

situated. *See Silva v. St. Anne Catholic School*, 595 F.Supp.2d at 1182.

   The defendants argue that Babakr offers no more than conclusory

allegations that he was targeted due to his national origin of Iraqi Kurdistan. While

alleging he was the victim of numerous school policy violations and unfair treatment

by the KU officials, he does not provide specific facts linking these violations and

treatment to a discriminatory motive. ECF# 3, ¶¶ 59-73. Instead, he speculates the

motive must be his national origin based on the few international students admitted

to the program and based on the experiences of four international students who

"faced problems" in the school's doctoral program. One student failed an

examination but eventually finished his degree, another student left the school and

transferred to another KU school, another took a leave of absence and did not return,

and another was dismissed for not passing the comprehensive written examination

after two attempts. The plaintiff speculates on "information and belief" that the

school has only dismissed international students from its program and that

Coordinator Goerdel made comments about his "national cultural background to

others." ECF# 3, ¶ 65, 67. The allegations that students and faculty asked about his

nationality when he joined the program and that other students made him feel

"unwelcomed" are not evidence of discriminatory motive by the KU officials. As for

treatment of other doctoral students, the FAC offers these conclusory allegations:

> 75.  Doctoral students from protected classes were not treated the same by
> faculty members compared to other students. School policy was bent or
> violated to help other students and such students received all kinds of support
> to help them finish their PhD degree.
> 76. The school culture is very flexible, cooperative, and supportive to other
> students. I spent five years in the doctoral program, and I knew how other
> students were treated. Upon information and belief, only students from
> protected classes were made to leave the school either by failing them or
> treating them in a way so they themselves left. Upon information and belief,
> no Caucasian student was ever made to leave the school.

ECF# 3, p. 14. The defendants argue this is insufficient in alleging that "similarly

situated students (*i.e.*, SPAA graduate students who failed the terms of their

academic probation), were treated differently (*i.e.*, were not dismissed)." ECF# 22,

p. 22. In short, the defendants dispute that Babakr has plausibly alleged he was

treated less favorably than similarly situated students for the claims in count one.

In response, Babakr argues the third element is satisfied by his allegation

that he was the only SPAA student to have Coordinator Goerdel chair his

specialization examination committee when all "other students" had their advisors

chair their examinations. ECF# 3, ¶ 49. Babakr extrapolates any number of

consequences from this single event, including the loss of an advisory relationship

with Dr. O'Leary and the inability to secure another willing advisor. Babakr speculates

that Coordinator Goerdel must have been motivated to discriminate against him,

because she resisted his repeated resistance to having her chair his examination

committee and because chairing an examination is administrative work that faculty

members generally do not find desirable but distracting work. Babakr also attacks the

qualifications of Coordinator Goerdel to serve as the chair of his examination

committee when she was not his advisor and did not specialize in Babakr's area of study. Babakr further argues that his allegations of how other international students were treated is pattern or practice evidence or circumstantial evidence of discriminatory animus.

In reply, KU reiterates that the plaintiff's conclusory allegations fail to connect any adverse actions to discrimination based on national origin. KU points to the lack of allegations that any similarly situated students not within his protected claim were treated differently. To be similarly situated, the other students, as KU emphasizes, must be under the same KU official supervision and under the same or similar standards and circumstances for which they are being evaluated, promoted, and disciplined.

The 12(b)(6) standard of plausibility looks at whether the facts alleged in the complaint are so general or so innocent that the plaintiffs "'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678 (2009). To determine whether a plausible claim has been stated, the court performs "a context-specific task" drawing on its "judicial experience and common sense." *Id.* a 679 (citation omitted). And, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The plaintiff does not allege any disparaging comments by Coordinator Goerdel or any another KU official about Iraqi Kurdistan or "its people, customs, culture, religious practices, or traditions." *See Rashdan v. Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014). The FAC does not allege anything connecting the plaintiff's national origin to Coordinator Goerdel's decision to serve as the chair of his examination committee. What the plaintiff regards as circumstantial evidence alleged in the FAC fails to state a plausible and reasonable inference of intentional national origin discrimination.

As disclosed in the FAC, Babakr failed both his first foundations examination and his first specialization examination. That specialization examination committee was chaired not by Coordinator Goerdel but by his advisor, Dr. O'Leary. ECF# 3, ¶¶ 310-318. In the FAC, the plaintiff blames both failed examinations on the faculty's errors in conducting the examinations and grading his answers, but he alleges nothing connecting those errors to any discriminatory intent. *Id.* There is no allegation that Coordinator Goerdel personally did something that caused or contributed to the plaintiff's failing these earlier examinations. The simple circumstance then of Babakr allegedly becoming the only doctoral student to have Coordinator Goerdel chair his specialization committee does not plausibly create an inference of discrimination. There is nothing about her assumption of this role under Babakr's academic circumstances that gives rise to an inference of discriminatory intent. As the FAC alleges, Dr. O'Leary explained to Babakr that Dr. Goerdel would chair the committee preparing the specialization examination but would not be involved in grading it. *Id.* at ¶ 206. The plaintiff's speculative allegations about the

28

intent behind Dr. Goerdel's decision to chair his specialization examination committee do not rise to the level of a plausible claim of an adverse action taken against him that was not imposed against similarly situated students.

The FAC's allegations of different treatment for similarly situated non-international students are also conclusory failing to create a plausible claim of discrimination. The FAC does not come forward with the details, circumstances and context essential for creating a reasonable inference that other SPAA doctoral students were similarly situated but treated differently. There is nothing known about those other students or their situations from which to infer as plausible that they possess relevant comparators (advisors, supervising officials, examination or doctoral committees, and program expectations and standards) and constitute a category of similarly situated individuals. *See Rashdan*, 764 F.3d at 1183. Without also some relevant set of facts from which to infer other students were similarly situated and treated differently, the FAC offers no more than a legal conclusion which is never enough. *Hwang v. Kansas State University*, 753 F.3d 1159, 1164 (10th Cir. 2014). Short of alleging that other SPAA students were in comparable circumstances but were not placed on academic probation and/or then not discharged for failing the terms of academic probation, the plaintiff's FAC fails to state a plausible claim of Title I discrimination.

<u>Sufficiency of Allegations in Count II—Title VI Retaliation</u>

A Title VI prima facie case of retaliation requires the plaintiff to show "(1) that he engaged in protected activity under Title VI; (2) that he suffered adverse action contemporaneous with or subsequent to such activity; (3) a causal nexus

between the protected activity and the adverse action; and (4) the school knew of

the retaliation and did not adequately respond." *Shahmaleki v. Kansas State*

*University*, 147 F.Supp.3d 1239, 1246 (D. Kan. 2015) (citing *Rubio v. Turner Unified*

*Sch. Dist. No.* 202, 523 F.Supp.2d 1242, 1253 (D. Kan. 2007)). The defendants point to

the Supreme Court's use of a "but-for" causation requirement for Title VII retaliation

cases. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362

(2013). The Tenth Circuit has said the following about *Nassar's* impact:

> In *Ward v. Jewell*, 772 F.3d 1199 (10th Cir. 2014), we discussed Nassar's impact
> on the *McDonnell Douglas* framework. *Ward*, 772 F.3d at 1203. Consistent with
> our precedent, we held that where a considerable length of time has elapsed
> between a protected activity and an adverse employment action, a plaintiff
> wishing to survive summary judgment must "present 'additional evidence' tying
> the adverse employment actions to [the plaintiff's protected activity]." *Id.*
> (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct.
> 1089, 67 L.Ed.2d 207 (1981)); *see Anderson*, 181 F.3d at 1179 (noting that
> where three months elapsed between the protected activity and the adverse
> employment action, "the plaintiff must rely on additional evidence beyond
> temporal proximity to establish causation"). Citing *Nassar*, we noted in *Ward*
> that "[t]he Supreme Court has likened this burden to a showing of 'but-for
> causation.'" *Ward*, 772 F.3d at 1203 (quoting *Nassar*, 133 S.Ct. at 2533).
> Ward leaves intact our precedent holding that an ADA retaliation
> plaintiff may rely solely on temporal proximity to show causation during the
> prima facie stage of the *McDonnell Douglas* framework where his protected
> activity is closely followed by an adverse employment action. *See Anderson*,
> 181 F.3d at 1179 ("[W]e have held that a one and one-half month period
> between protected activity and adverse action may, by itself, establish
> causation. By contrast, we have held that a three-month period, standing
> alone, is insufficient to establish causation." (citations omitted)); *Burrus v.*
> *United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982) ("The causal
> connection may be demonstrated by evidence of circumstances that justify an
> inference of retaliatory motive, such as protected conduct closely followed by
> adverse action."). Therefore, *Nassar* has not altered the burden a plaintiff
> bears in supporting the causation element of a prima facie case of ADA
> retaliation

*Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016). Thus, "'unless

the [adverse action] is *very closely* connected in time to the protected activity, the

plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation.'" *Meiners v. University of Kansas*, 359 F.3d 1222, 1231 (10th Cir. 2004) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

Count II may be read to allege several instances of protected activity. The first is Babakr's statement that he would be filing a grievance based on Coordinator Goerdel's discrimination against him. ECF# 3, ¶ 573. In the factual allegations at ¶ 117, the FAC sets out that in retaliation for Babakr saying he "would bring the issue of Coordinator Goerdel's discriminatory treatment to the attention of other parties outside of the school," the doctoral committee boycotted his progress and Director Robinson pushed him to proceed without an advisor. This statement appears to have been made in June of 2016. ¶ 108. The court finds this claim to be untimely and not subject to the continuing violation doctrine. Nor can this statement be tied to the Babakr's probation and dismissal.

Count II next mentions the plaintiff's filing of a grievance (January of 2017) against Coordinator Goerdel and Director Robinson and the plaintiff's pursuing of the grievance process all the way to the KU Judicial Board in July 2017 when he lost "the appeal." ¶ 573; *see* ¶¶ 234, 271-274, 384-410. As his next protected activity, Babakr alleges that losing his grievance relief meant he had "no option other than to say that I would bring the doctoral committee's discriminatory actions against me to the attention of a court." ¶ 574. In September of 2017, Babakr went to Dr. Epp asking for an advisor, asking for a new specialization due to the lack of an advisor, and indicating he "would bring the issues to the attention of a court." ¶¶ 412, 431. Babakr alleges that in retaliation for the meeting, Coordinator Epp sent him a probation

letter that required him to sit for a specialization examination by December 1, 2017. ECF# 432. Count II alleges the doctoral committee placed him on probation based on his statement about going to a court. ¶ 574. Count II states that, "[b]oth the probation and the subsequent dismissal were retaliatory as there was no basis for probation and hence no basis for termination." ¶ 576.

   The defendant KU argues that the plaintiff's claim for being placed on academic probation is time-barred as occurring more than two years before he filed his complaint. KU also contends that Count II fails to state a plausible claim of retaliation in that the time between his statement in September of 2017 and his dismissal in February of 2018 lacks temporal proximity for causation. The plaintiff counters that the continuing violation doctrine preserves the timeliness of his claim based on retaliatory probation. As for a causal connection, the plaintiff relies on his academic probation as evidence of retaliation in that it was imposed just days after protected statement and his dismissal was exclusively based on his probation. The plaintiff also notes the probation letter states that he was not making satisfactory progress by the end of the 2016-2017 academic probation, and yet his advisor wrote a progress letter to his sponsor indicating that he was making progress toward his degree in the 2016-2017 academic year. ECF# 3 at ¶¶ 457-458. He also alleges that his probation "was not based on reason, rationality, and deliberation" but in "sheer retaliation . . . for asserting . . . [his] civil rights." ¶ 644. The plaintiff also alleges that Coordinator Epp became angry after hearing Babakr say he was going to court and then refused all subsequent requests for face-to-face meetings following the letter of academic probation. ¶ 644.

In reply, KU argues the plaintiff has not plausibly alleged his dismissal was retaliatory. KU recites the terms of Babakr's academic probation as laid out in Coordinator Epp's letter of September 15, 2017, which includes, "The SPAA PhD Program Committee has determined that failure to successfully complete the PhD Comprehensive Written Examination in your specialization area by the end of the 2016-17 academic year constituted failure to maintain satisfactory progress toward the degree." ECF# 22-2. In that same letter, the SPAA assigned Babakr an advisor and an advisory committee "for the process of preparing for and taking the PhD Comprehensive Written Examination." *Id.* The letter gave Babakr the choice between October 6 or December 1 for the date of the examination. It concluded with this warning, "Failure to successfully complete the Written Comprehensive Examination in the area of Organizational Theory and Behavior by the end of the fall 2017 semester will result in your dismissal from our PhD program." *Id.* When Babakr failed to sit for and pass the specialization examination, Coordinator Epp notified Babakr in January of 2018 that the School was recommending his dismissal for failure to meet the terms of his probation. In February of 2018, the College notified Babakr that it accepted the School's recommendation and dismissed him for not meeting the terms of academic probation. KU argues that the four and one-half months which separate his alleged protected statement to Coordinator Epp in September of 2017 and his dismissal in February of 2018 lack the temporal proximity for a plausible causal connection.

Consistent with its earlier ruling, the court finds that Babakr's academic probation is a discrete adverse action that occurred before the statutory limitations period and that the continuing violation doctrine is triggered by continual unlawful

acts, and not by the continual ill effects from the original violation. *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011). As he alleges, Babakr was notified of the definite timing, terms and effect of his academic probation, and he regarded probation to be an unlawful adverse action. In this way, his academic probation was a discrete act for which the plaintiff knew or should have known he could pursue as a claim for retaliation. Thus, Babakr is precluded from relying on his academic probation as anything more than background evidence in support of his timely claim. *See Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). Nor can the continuing violation doctrine revive any earlier retaliation claims he bases on having said he would file a grievance and then filed one. The alleged retaliatory actions either fail the threshold of actionable adverse actions or are discrete actions. "[D]iscrete acts of retaliation such as a termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, and denial of training ... must be raised within the applicable limitations period or they will not support a lawsuit." *Clay v. Credit Bureau Enterprises, Inc.*, 882 F.Supp.2d 1083, 1111 (N.D. Iowa 2012) (internal quotation marks and citation omitted), *aff'd*, 754 F.3d 535 (8th Cir. 2014).

This leaves the claim of retaliatory dismissal. In most cases, the court's determination of plausibility at the Rule 12(b)(6) stage is relatively simple as the factual circumstances are rarely alleged with the detail found in Babakr's FAC. This detail provides more context for determining plausibility. Even so, the court is reluctant to overlook the strong temporal proximity between the plaintiff's protected statement and Coordinator Epp's role in having Babakr placed on academic probation. The plaintiff also alleges that Coordinator Epp emotionally reacted to Babaka's

protected statement and then refused to meet with Babakr personally after the academic probation imposed. The plaintiff also alleges that the academic probation was lacking in purpose and grounds, and its stated rationale was even contradicted by another KU official's written communication to Babakr's sponsor. This is a close call on whether the plaintiff has plausibly alleged a causal nexus between his protected statement and his dismissal. The school and college did not dismiss Babakr until he failed to sit for the specialization committee in December even after receiving an advisor and almost three months to prepare for the examination. The court, however, finds at this juncture that the additional circumstances alleged in the plaintiff's FAC are enough to allege a plausible causal connection between his protected statement and his dismissal.

## Statute of Limitations Bar and Qualified Immunity for 42 U.S.C. § 1983 Claims

The defendants assert the statute of limitations bars any § 1983 claims about which the plaintiff knows or has reason to know of an injury prior to January 21, 2018. For his First Amendment retaliation claim, the plaintiff argues the continuing violation theory applies here in the following way. The cumulative effect of saying that he would file a grievance and that he would sue was his academic probation and dismissal. The plaintiff argues, "The substance of both statements is the same." ECF# 32, p. 20. In reply, the defendants note that the Tenth Circuit has not decided whether the continuing violation doctrine applies to § 1983 actions. And even if it does, the plaintiff's action for retaliatory academic probation accrued in September 2017, and its continuing effect does not make it a continuing violation. Thus, any claim to recover for injuries prior to dismissal are barred as untimely.

A state's limitation period for personal injury claims is the applicable limitations period for § 1983 claims. *Mondragón v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). For Kansas, this is the two-year limitation period at K.S.A. 60-513(a)(4). *Delaney v. Thompson*, 812 Fed. Appx. 779, 780 (10th Cir. 2020) (unpub). Federal law governs when a § 1983 claim accrues. *Mondragón*, 519 F.3d at 1082. The long-established rule is that "1983 claims accrue, for the purposes of the statute of limitations, when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Johnson v. Johnson County Com'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991). The Tenth Circuit has yet to decide whether the continuing violation doctrine applies to § 1983 claims. *Vasquez v. Davis*, 882 F.3d 1270, 1277 (10th Cir. 2018). The panels have been able to avoid this question, because the doctrine is only "triggered by continuing unlawful acts but not by continuing damages from the initial violation." *Id*. "Said another way, the continuing violation doctrine, as we have defined it, would apply here only when a particular defendant allegedly committed wrongful acts within, as well as outside, the limitations period." *Id*. Babakr is wrongly applying the doctrine here, as he argues the cumulative effect from his retaliatory probation which accrued into an actionable claim more than two years after he filed this action. The continuing tort doctrine does not extend the limitations period for injuries from an untimely discrete act. *See Carroll v. Routh*, 812 Fed. Appx. 770, 773 (10th Cir. 2020) (unpub). "This is so because 'if an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome" the statute of limitations." *Seay v. Oklahoma Board of Dentistry*, No. 17-

682-D, 2020 WL 1930452, at *4 (W.D. Okla. Apr. 21, 2020), *appeal dismissed*, 2020 WL 6777537 (10th Cir. July 7, 2020), *and reconsideration denied*, 2020 WL 5486867 (W.D. Okla. Sept. 10, 2020) (quoting *Martin v. Nannie & The Newborns, Inc.*, 3 F.3d 1410, 1415, n.6 (10th Cir. 1993)). This limited applicability reflects its equitable premise "that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Martin*, 3 F.3d at 1415, n.6. The plaintiff's arguments for continuing violation fail the equitable purpose of this doctrine as to reach back for injuries occurring more than two years from the filing date of his complaint.

The defendants next argue that qualified immunity bars all three § 1983 counts against the government officials in their individual capacities. This inquiry "requires a plaintiff to allege that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation." *Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d 1022, 1028 (10th Cir. 2020) (citations omitted). The Tenth Circuit has described this burden as 'heavy,' in large part because our qualified-immunity inquiry 'is designed to spare a defendant not only unwarranted liability, but [also] unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" *Id*. (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 extends liability to a government

official who "causes" a citizen to be subjected to a deprivation of constitutional right. *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012). "'The requisite causal connection is satisfied if [Defendants] set in motion a series of events that [Defendants] knew or reasonably should have known would cause others to deprive [Plaintiffs] of [their] constitutional rights.'" *Id.* (quoting *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006)). If the harm is proximately caused by the defendants' conduct without any unforeseeable intervening acts to supersede liability, the defendants are liable. *Id.* Because these is no vicarious or respondeat superior liability in a § 1983 action, a plaintiff suing a government official in his or her individual capacity, "must plead that each Government-official defendant, through the officials' own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. at 676. "Instead, to establish supervisory liability, a plaintiff must show that '(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010), *cert. denied*, 563 U.S. 960 (2011)). Thus, *Iqbal* requires for qualified immunity that "§ 1983 liability only be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs prove each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation." *Dodds v. Richardson*, 614 F.3d at 1200 ("§ 1983 causation and personal involvement analysis" survive *Iqbal*).

Count III—First Amendment Retaliation

The following elements constitute an unlawful retaliation claim based on exercising the First Amendment right to petition that, "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).

The defendants repeat their argument from the Title VI retaliation claim that the time separating the plaintiff's comment to Coordinator Epp in September of 2017 and his dismissal is "too long" to show that any defendant was substantially motivated by the plaintiff's comment. Relying on its earlier analysis of this question, the court finds that the plaintiff has plausibly alleged substantial motivation here. The FAC alleges that Babakr told Coordinator Epp of his intent to petition for relief and that the doctoral committee with which Coordinator Epp worked and consulted then retaliated against him based on his stated intention.

The defendants next contend that any individual defendant who did not personally participate in the retaliatory actions should be dismissed and that the FAC alleges only the doctoral committee and the school dismissed him and the college accepted this recommendation. Therefore, the defendants argue that Dr. Goerdel, Dr. Getha-Taylor, Director Robinson, and Dr. Lejuez should be dismissed as they did not personally participate. The court agrees that the FAC has not pled individual

actions by Dr. Goerdel, Dr. Getha-Taylor and Director Robinson that violated or

caused the violation of Babakr's First Amendment rights after his statement to

Coordinator Epp in September of 2017. There is no affirmative link plausibly alleged

between the personal actions of Goerdel and Robinson and the probation/dismissal.

The allegations against Getha-Taylor are speculative. As for Dr. Lejuez, the FAC

alleges the doctoral committee consulted with him in coming up with "the retaliatory

probation letter" as part of their "plot to facilitate" his dismissal. ECF# 3, ¶ 455. This

is enough to avoid dismissal.

Finally, the defendants make the conclusory argument that there is no

particularized clearly established case law that would have put KU officials on notice

that Babakr could not be dismissed for failure to comply with the terms of his

academic probation. The plaintiff says that he does not need cases identical to his

claim and that it is enough to cite case law showing higher education students have

due process rights prior to dismissal and persons who are not employed by the

government have a First Amendment right to petition the government. In reply, the

defendant repeat their conclusory argument that they "had no reason to understand

that it would be unlawful to dismiss a student for failure to meet the requirements of

his academic probation, four and a half months after the student had threatened to

sue for other violations." ECF# 36, p. 10.

It is the plaintiff's burden to show his right was "clearly established at

the time of the defendant's unlawful conduct." *Marheim v. Buljiko*, 855 F.3d 1077,

1087 (10th Cir. 2017). "A clearly established right is one that is sufficiently clear that

every reasonable official would have understood that what he is doing violates that

right." *Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted). "Although we need not 'require a case directly on point,' it is nonetheless the case that 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d at 1031 (quoting *Mullenix*, 577 U.S. at 12). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12. "Such an inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Quintana*, 973 F.3d at 1031 (quoting *Mullenix*, 577 U.S. at 12). "Officials can still be on notice that their conduct violated established law even in novel factual circumstances;" however, the determinative issue "is whether the state of the law" gave officials "fair warning that his [or her] conduct deprived [the plaintiff] of a constitutional right." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

It is well established that government officials may not retaliate against individuals who engage in constitutionally protected conduct. *See Mt. Healthy City School Dist. Bd. of, Educ. v. Doyle*, 429 U.S. 274, 287 (1977). "[A] private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress." *Van Deelen v. Johnson* 497 F.3d at 1156. There is no dispute of "the First Amendment right to criticize public officials, *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964), and to 'petition the Government for a redress of grievances,' are protected activities, U.S. Const. amend. I; *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426

(1967)." *McCook v. Spriner School Dist.*, 44 Fed. Appx. 896, 904 (10th Cir. 2002) (unpub).

Neither side attempts to articulate the violative nature of the alleged conduct within the specific context of this case. The FAC plausibly alleges that Coordinator Epp and the doctoral committee put Babakr on academic probation in retaliation for Babakr stating his intention to sue over alleged mistreatment and discrimination. The FAC goes on to allege that his academic probation as imposed and performed by the KU officials was not fair, did not comply with school policy, and was an orchestrated effort to facilitate his dismissal. ¶¶ 439-460, 471-482. Thus, the inquiry is whether it is sufficiently clear that every reasonable official would have understood that a retaliatory academic probation designed for the failure and dismissal of the student would result in a separate constitutional violation when the student is later dismissed for failing the academic probation. This being the inquiry derived from the FAC's allegations, the court is satisfied that every reasonable official would believe that just as the retaliatory probation would be a violation so would the retaliatory dismissal of the student orchestrated by the terms and enforcement of the probation. The court realizes this inquiry arguably could include other circumstances depending on the individual defendant. The timing of this motion and the quality of the parties' submissions do not justify discussing those circumstances now. As this issue has been framed and presented at this time, the court denies the defendant's motion for qualified immunity on the First Amendment retaliation claim except for the defendants Goerdel, Getha-Taylor, and Robinson.

Count VIII-Procedural Due Process

The plaintiff alleges a property interest in his continued education and enrollment in the SPAA doctoral program and a liberty interest in his "good name, reputation, honor and integrity." ECF# 3, ¶ 616. The defendants denied him these interests without procedural due process when it acted for retaliatory reasons based on his statement about going to court, and not for academic reasons, by dismissing him from the program and by giving him insufficient notice of probation and dismissing him before giving a fair and impartial hearing. ¶¶ 621, 623, and 625.

The defendants first point out the need for publishing false and stigmatizing information for a liberty interest claim. They then argue that a dismissal for academic deficiencies does not require hearings but only that the institution has previously advised the student of the deficiencies. The officials' decision on student performance is conclusive so long as it is in good faith and not arbitrary. The defendants argue the plaintiff has failed to state a plausible procedural due process claim, because the FAC alleges the defendants repeatedly told Babakr that his failure to complete the specialization exam would cause his academic dismissal. The defendants repeat their arguments on qualified immunity and the lack of personal involvement by the defendants Goerdel, Getha-Taylor, Robinson, and Lejuez.

The two elements to a claim alleging denial of procedural due process are, "(1) a constitutionally protected liberty or property interest, and (2) a governmental failure to provide an appropriate level of process." *Citizen Center v. Gessler*, 770 F.3d 900, 916 (10th Cir. 2014) (citations omitted), *cert. denied*, 575 U.S. 983 (2015). The FAC plainly alleges that Babakr had a property interest in his

continued enrollment. *Regents v. University of Michigan v. Ewing*, 474 U.S. 214 (1985); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston University*, 245 F.3d 1172, 1181 (10th Cir. 2001); *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986), *cert. denied*, 479 U.S. 1033 (1987); *see Lemon v. Labette Community College*, 6 F.Supp.3d 1246, 1251 (D. Kan. 2014).  The FAC, however, does not allege a factual basis sufficient for a liberty interest, as there is no alleged public dissemination of false information that constituted a reputation-harming statement. *See Lee v. University of New Mexico*, 449 F.Supp.3d 1071,1122 (D.N.M. 2020); *Brown v. University of Kansas*, 16 F.Supp.3d 1275, 1288 (D. Kan. 2014), *aff'd*, 599 Fed. Appx. 833 (10th Cir. Jan. 13, 2015) (unpub.).  The court only addresses a property interest in discussing the balance of this claim.

The plaintiff responds that his procedural due process claim alleges his probation and dismissal were retaliatory; therefore, the academic deference on which the defendants base their arguments is inapplicable. As summarized above, Count VIII alleges the defendants denied him procedural due process in acting for retaliatory reasons, not academic reasons, in placing him on probation and dismissing him without a fair and impartial hearing. The court has already found that the plaintiff has alleged a Title VI retaliation claim and a First Amendment retaliation claim based on his probation/dismissal. The Tenth Circuit in *Gossett* held:

> We are mindful of the Supreme Court's admonition that "the decision whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking," *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), and that "when judges are asked to review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment," *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106

44

S.Ct. 507, 88 L.Ed.2d 523 (1985). As the Court indicated in *Ewing*, however, the notion of judicial deference to academic decisions loses force when, as here, the decisionmaker is "accused of concealing nonacademic or constitutionally impermissible reasons" for its action. *Id.*

We turn first to Mr. Gossett's claim that the manner in which he was required to involuntarily withdraw from the nursing program denied him procedural due process. When a school makes an ostensibly academic judgment about a student, the procedural requirements of the Due Process Clause are satisfied if the student is given prior notice of the deficiencies in his academic performance and if the challenged decision is "careful and deliberate." *Horowitz*, 435 U.S. at 85, 98 S.Ct. 948; *see also Trotter v. Regents of Univ. of N. Mex.*, 219 F.3d 1179, 1184–85 (10th Cir.2000). The district court concluded that the procedural requirements for an academic decision were met here. We conclude to the contrary, however, that Mr. Gossett has raised a fact issue as to whether the decision to require his withdrawal was the result of impermissible gender discrimination rather than a careful and deliberate evaluation of his academic ability. Accordingly, we reverse and remand Mr. Gossett's procedural due process claim for further proceedings.

245 F.3d at 1181–82 (footnote omitted); *see Assenov v. University of* Utah, 553

F.Supp.2d 1319, 1330 (D. Utah 2008) (Fact issue on whether university official's

decision to dismiss doctoral student "was tainted by discrimination," and if the

decision was so motivated then official "could be found liable for a denial of

procedural due process."). Resolving the motives behind the defendants' probation

and dismissal as only academic is a fact question not suited for a motion to dismiss.

*Rossi v. University of Utah*, No. 15-cv-767, 2016 WL 3570620, at *4 (D. Utah Jun. 24,

2016) (Unpub.). *appeal filed*, (10th Cir. Jun. 4, 2020); *Lee v. Kansas State University*,

No. 12-CV-2638-JAR, 2013 WL 2476702, at *8 (D. Kan. Jun. 7, 2013). *Gossett* is clearly

established law in this Circuit. As the plaintiff here has alleged his academic

probation and dismissal concealed nonacademic, retaliatory and constitutionally

impermissible reasons, the defendants are not entitled to dismissal on either ground,

failure to allege a viable claim or qualified immunity. The court, however, grants the

dismissal of the defendants Goerdel, Getha-Taylor, and Robinson for the same reasons given in its earlier ruling on the First Amendment retaliation claim.

Count IX-Substantive Due Process

As in Count VIII, the plaintiff alleges here that his academic probation and subsequent dismissal were retaliatory and, therefore, were arbitrary and capricious in violation of his right to substantive due process. The defendant argues the FAC fails to allege that the challenged actions "shock the conscience" and fails to allege facts for a plausible substantive due process violation. ECF# 21, p. 31. "It is not shocking to the conscience that Defendants would academically dismiss a doctoral student who failed to complete a specialization exam after he was repeatedly notified of the requirement and given time to do so over at least three semesters." *Id.* The individual defendants Goerdel, Getha-Tayor, Robinson, and Lejuez seek dismissal for lack of personal participation. The plaintiff argues his FAC adequately alleges retaliatory probation and dismissal as to avoid dismissal. "A retaliatory dismissal based on a retaliatory probation when I exercised my right of free speech to petition the doctoral committee for discrimination is highly egregious, outrageousness, and shocking to a federal judicial conscience." ECF# 32, p. 35.

Finding a factual dispute on whether the University's decisions were "in fact based on gender discrimination rather than a careful evaluation of Mr. Gossett's academic performance," 245 F.3d at 1181, the Tenth Circuit in *Gossett* reversed a summary judgment order for the University and explained what constitutes a student's substantive due process claim under the circumstances:

> Under Supreme Court authority, a plaintiff asserting a substantive due process claim based on an academic decision must show that the decision was the

46

> product of arbitrary state action rather than a conscientious, careful and deliberate exercise of professional judgment. *See Ewing*, 474 U.S. at 224–25, 106 S.Ct. 507; *Harris [v. Blake]*, 798 F.2d [419] at 424 [(10th Cir. 1986)]. A plaintiff may make such a showing by evidence that the challenged decision was based on "nonacademic or constitutionally impermissible reasons," rather than the product of conscientious and careful deliberation. *Ewing*, 474 U.S. at 225, 106 S.Ct. 507; *Harris*, 798 F.2d at 424. Mr. Gossett presented evidence sufficient to create a fact issue on whether the decision to require his withdrawal from the nursing program was motivated by impermissible gender discrimination rather than based on an exercise of professional judgment as to his academic ability. Accordingly, summary judgment was not proper on his substantive due process claim.

245 F.3d at 1182. "[T]o establish that a deprivation of a property interest [in continued education] violates substantive due process, a student must prove that the university's decision to expel her was arbitrary, lacked a rational basis, or shocks the conscience." *Yeasin v. Durham*, 719 Fed. Appx. 844, 852 (10th Cir. Jan. 5, 2018) (unpub.) (citing *Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1200 (10th Cir. 2003)). Because the FAC alleges his probation and dismissal were retaliatory and, therefore, arbitrary and capricious, the plaintiff has alleged a substantive due process claim in that his dismissal was the product of arbitrary state action and not the conscientious and careful deliberation of professional academic judgment. The court, however, dismisses the defendants Goerdel, Getha-Taylor, and Robinson for the same reasons given in its earlier ruling on the First Amendment retaliation claim.

**STATE LAW CLAIMS**

### Count IV--Negligence

In his FAC, Babakr explains that his lawful immigration status in the United States as a doctoral student required KU affirmatively commit to the United States government that he was a KU student. Babakr alleges this relationship meant the defendants owed him the duty to follow its policies and ensure he always had an

advisor. He alleges the defendants breached this duty and caused him in his last semester at KU to violate federal immigration regulations and break his sponsor contract. Specifically, he alleges, "What the doctoral committee identified for me in the last semester was a hostile forced one-semester form signer, Dr. Maynard-Moody." ECF# 3, ¶ 588.

The defendants seek dismissal on several grounds. Kansas' two-year statute of limitations expired before the plaintiff filed this action. Kansas law does not recognize a claim for educational malpractice or legal duties arising from mere school policies. The FAC alleges he had an advisor, just not Babakr's choice of one, so no breach is alleged. Finally, the plaintiff's dismissal in the Spring 2018 semester had nothing to do with his immigration status or failure to enroll in dissertation hours.

In response to the limitations bar, the plaintiff argues for the continuing tort doctrine discussed by the Tenth Circuit in *McBride v. Peak Wellness Center, Inc.*, 688 F.3d 698, 710 (10th Cir. 2012), *superseded by statute on other grounds*, *United States ex rel. Reed v. KeyPoint Government Solutions*, 923 F.3d 729, 765 (10th Cir. 2019), when it applied Wyoming law to a defamation claim. Babakr argues the defendants' core continuing activity was the denial of an advisor which caused him to breach his contract with his sponsor and to not finish his degree.

This claim of negligence is subject to the two-year limitations period in K.S.A. 60-513(a), and a tort action generally accrues when: "the act giving rise to the cause of action first causes substantial injury, or, if the fact of the injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of the injury becomes reasonably

48

ascertainable to the injured party . . . ." K.S.A. 60-513(b). The plaintiff alleges the injuries in this negligence claim from not having an advisor occurred in the 2017 Fall semester, which is more than two years before he filed this action. ECF# 3, ¶¶ 587-88. The plaintiff's argument for a continuing violation doctrine does not apply here and is not supported by Kansas case law. The continuing torts remain timely only because the cause of action continues to accrue. *See Hoery v. United States*, 324 F.3d 1220, 1224 (10th Cir. 2003). The plaintiff's alleged substantial injury occurred more than two years before filing his complaint. The FAC alleges his sponsor contract and immigration form expired in December of 2017. ECF# 3, ¶¶ 489, 501. Nor does the plaintiff cite any case applying this doctrine under circumstances resembling this case. *See Cline v. S. Star Cent. Gas Pipeline, Inc.*, 356 F.Supp.2d 1203, 1214 (D. Kan. 2005)(and cases cited therein), *aff'd*, 191 Fed. Appx. 822 (10th Cir. 2006) (unpub.) . Instead within Kansas, the doctrine is regarded as "a narrow concept" applied only in "limited areas" where endorsed by "explicit statutory language, unequivocal legislative intent, or contractual arrangements." *Lowe v. Surpas Resource Corp.*, 253 F.Supp.2d 1209, 1251-52 (D. Kan. 2003). The FAC fails to allege a timely claim of negligence.

### Count V—Civil Conspiracy

Count V alleges two conspiracies. In an effort to remove Babakr from the program, Director Robinson and the doctoral committee conspired to have him leave the United States without first obtaining a leave of absence. Babakr eventually secured a leave of absence but never left the United States and revoked his leave of absence. The second conspiracy alleged is that after he commented about bringing a

49

discrimination suit in court, the doctoral committee and others conspired to dismiss him from the program by putting him on probation and having him enroll for one semester with his new advisor. This conspiracy resulted in his probation and dismissal.

The defendants seek dismissal in that "employees working in their corporate capacity and not for their individual advantage cannot conspire with each other because their conducts is actually attributable to one single entity, their corporate employer. *Butler v. City of Prairie Village*, 961 F.Supp. 1470, 1477 (D. Kan. 1997), *aff'd in part, rev'd in part sub nom. Butler v. City of City of Prairie Village, Kan.*, 172 F.3d 736 (10th Cir. 1999)." ECF# 22, p. 34. Having sued all KU employees in their official and individual capacities, this claim fails for not involving two or more legal persons. The defendants also contend the FAC offers only bare, conclusory allegations about a meeting of minds. Finally, the defendants deny the FAC alleges a connection between his claimed damages and a specific unlawful overt act producing an unlawful result for which a defendant is responsible. The defendants contend there are no unlawful overt acts alleged.

In response, the plaintiff asks leave to amend his FAC to add a § 1983 conspiracy claim. The plaintiff will need to file a separate motion seeking such relief. As for the intra-corporate doctrine on conspiracy claims, the plaintiff says it's enough that he has sued the KU officials in their individual capacities, citing *Wegerer v. First Commodity Corp. of Boston*, 744 F.2d 719, 726 (10th Cir. 1984). He disputes that his allegations on a meeting of the minds are insufficient, and he points to the opening paragraph from the letter of probation sent to him:

> The course of action outlined in this letter is based on consultation with the Dean of the College of Liberal Arts and Sciences, the professional staff in the

> College Office of Graduate Affairs, and Director of the School of Public Affairs and Administration (SPAA). These officials are in agreement that the following course of action is the best way forward consistent with the SPAA and University policies and offers you a fair opportunity to succeed in our PhD program.

ECF# 22-2.

Under Kansas law, the elements of a civil conspiracy claim are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984)(citation omitted). There is no actionable conspiracy claim "without commission of some wrong giving rise to a cause of action independent of the conspiracy." *Id*. Babakr's first alleged conspiracy regarding taking a leave of action fails to state a claim for relief, because there is no alleged unlawful overt act that resulted in damages occurring within the statute of limitations. Babakr's second alleged civil conspiracy alleges the doctoral committee with other KU officials conspired to dismiss him from program in retaliation for having said he would bring a discrimination action. The plaintiff's First Amendment retaliation claim remains and qualifies as an unlawful act. The defendants' probationary letter as alleged is enough at this point to state a plausible basis for a meeting of the minds on the concerted action to be taken against Babakr. While the intracorporate conspiracy doctrine has been applied to government agents and employees acting in their official capacities, its application has not necessarily been extended to government employees acting in their individual capacities." *Snell v. Asbury*, 792 F.Supp. 718, 720 (W.D. Okla. 1991) (citing *Barger v. Kansas*, 620 F.Supp. 1432, 1435 (D. Kan.) (citing cases), *on*

*reconsideration summary judgment granted on other grounds*, 630 F. Supp. 88, 92 (1985)). The plaintiff has alleged claims against these defendants in their individual capacities. Even if some independent personal stake would have to be alleged, there is arguably enough here in that KU officials are alleged to have retaliated in response to a threat of exposing discriminatory actions on their part. *See N.R. by Ragan v. School Board of Okaloosa County, Fla.*, 418 F.Supp.3d 957, 1001–02 (N.D. Fla. 2019); *Doe 20 v. Board of Educ. of Community Unit School Dist. No. 5*, 680 F.Supp.2d 957, 980 (C.D. Il. 2010). Moreover, the Tenth Circuit in *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir.1994), rejected the applicability of the "intracorporate conspiracy doctrine" in the civil rights context. The defendants are not entitled to dismissal on the plaintiff's second alleged civil conspiracy based on alleged First Amendment retaliation.

### Count VI--Defamation

The plaintiff here alleges that the doctoral committee and Director Robinson released information which Dr. Getha-Taylor then communicated to the School of Business. ECF# 3, ¶ 599. According to Babakr, this information falsely stated he was wanting to transfer to the School of Business because he had failed his first specialization exam. ¶ 600 The plaintiff asserts he wanted a transfer because he did not have an advisor and because his efforts to obtain a new specialization and a new advisor were being denied by the doctoral committee and Director Robinson. ¶ 600. The plaintiff also alleges the following as defamatory statements:  1) Coordinator Goerdel and Director Robinson provided false information to other university parties that he had several options for completing his doctoral program when he did not (¶

601); (2) Coordinator Goerdel and Director Robinson provided false information to the college that he filed his grievance because he was worried about passing the specialization exam (¶ 602); (3) Dean Lejuez provided false information to the KU Judicial Board that nothing kept him from completing his degree(¶ 603) ; and (4) Director O'Leary or Coordinator Epp falsely informed his sponsor that he decided not to finish his degree when he had no choices due to the lack of an advisor (¶ 604).

Defendants argue that only one of the plaintiff's alleged claims of defamation has been brought within the one-year statute of limitations. At ¶ 515 of the FAC, the plaintiff alleges, in part:

> I received an email from my sponsor on January 22, 2019 telling me that KU told them that I had left school. I did not leave the school. The school *dismissed* me. As a result of this misleading information, my sponsor thinks that I myself chose to leave school and hence I am being held responsible by my sponsor to repay the money they invested in my education.

ECF# 3, ¶ 515. This allegation indicates it may be arguably timely. The defendants still challenge it for not alleging a plausible claim of defamation in that the statement is not false, Babakr did leave the school, regardless of the statement's failure to disclose also Babakr's reason for leaving.

The plaintiff wants to apply the continuing violation doctrine saying all the defamation incidents share his lack of an advisor and his having no reason to leave the school. Because his sponsor understands that he chose to leave the school, the plaintiff alleges the KU officials must have communicated false information as to the reason for his departure. In reply, the defendants cite *McBride v. Peak Wellness Center, Inc.*, 688 F.3d at 710, as authority that a defamation action accrues when the tort occurs and is not subject to the continuing violation doctrine. As for the

remaining claim, the defendants argue it is not enough for the plaintiff to allege his sponsor's thoughts, as the defamation claim depends on what they were told, not what conclusions they might have reached.

The court agrees with the defendants that the plaintiff's defamation claims alleged in ¶¶ 599-603 are untimely and dismissed for that reason. The continuing violation doctrine does not apply, and the plaintiff has no tenable legal ground for arguing it. As for the claim in ¶ 604, the FAC fails to allege when the defamatory statement was made and, therefore, when the defamation claim accrued as to determine the claim is timely. The FAC also fails to allege a statement of false and defamatory words made to a third person that damaged the plaintiff's reputation. The claim in ¶ 604 will be dismissed too, but the plaintiff will be given the opportunity to allege a timely and plausible claim for relief.

Count VII—Fraudulent Misrepresentation

The plaintiff concedes this claim is time barred. It is dismissed.

Count X—Unjust Enrichment

The FAC alleges that for six semesters, Spring, Summer and Fall of 2016 and 2017, KU charged him tuition and fees, but he did not receive anything because the KU officials denied him effective advising relationships each of those semesters. "KU's retention of the charged tuition and fees some of which is yet to be paid was unjust because the defendants violated their own policies and dismissed me from KU without justification." ECF# 3, ¶ 652. This claim is brought against the KU officials in their individual and official capacities.

The defendants want dismissal as the FAC does not allege the conferral of any benefit upon them but only alleges the payment of tuition and fees to KU, and Eleventh Amendment immunity bars state law claims against the KU. The plaintiff does not explain how the FAC alleges any benefit conferred upon the defendants in their individual capacities. *See Jagnandan v. Giles*, 538 F.2d 1166, 1173 (5th Cir. 1976) ("[T]he defendant University officials are not personally liable for the excess tuition payments tendered by plaintiffs. Thus, if plaintiffs are to recover, payment must come from defendants in their official capacity."), *cert. denied*, 432 U.S. 910 (1977). In here seeking a return of tuition and fees paid, the plaintiff is seeking "retrospective monetary relief against the state and the official capacity claim, although styled as seeking prospective relief, is barred by the Eleventh Amendment." *Miller v. Board of Trustees of the California State University*, No. 20-cv-3833-SVW, 2021 WL 358376, at *8 (C.D. Cal. Jan. 13, 2021) (citation omitted); *see Jagnandan*, 538 F.2d at 1173-75. The plaintiff has failed to allege a plausible claim of unjust enrichment. It is dismissed.

<u>Count XI—Intentional Infliction of Emotional Distress</u>

Against Coordinator Goerdel, Director Robinson, Coordinator Epp, and Director O'Leary, the FAC alleges their conduct caused Babakr severe emotional distress causing him sleep loss, emotional anxiety, periodic headaches, stress, and feelings of being bullied and humiliated. Goerdel is alleged to have "micromanaged," "boycotted," "foment[ed] dissent" against him, and "removed" him from an email list. ECF# 3, ¶¶ 655, 657. Robinson is alleged to have "declined" his request to change specializations, "ignored" his viewpoint, "interrupted" him, "criticized" him,

"yell[ed] and scream[ed]," "used accusatory language," "threaten[ed] to dismiss" from program in emails, and "forc[ed]" him to work with faculty against his choice. *Id*. at ¶¶ 657-658, 660-661. Epp is alleged to have "attacked" him for misrepresenting other faculty members, required an administrative officer to witness the meeting with Babakr, "twice showed" him the door, "yelled at" him, and "threatened to dismiss" from the program. *Id*. at ¶¶ 662-64. O'Leary is alleged to have chosen to receive communications about Babakr from Epp and failed to return his greeting one time at school. *Id*. at ¶ 665.

The defendants seek dismissal as all these tort claims accrued more than two years before the plaintiff filed his complaint. The defendants also contend the FAC fails to allege a plausible claim that the defendants' conduct was extreme and outrageous and that the plaintiff's mental distress is extreme and severe. In response, the plaintiff repeats his "continuing tort" argument and points to the emotional distress that resulted from his dismissal and from his sponsor being told that he had chosen to leave school. The plaintiff contends the defendants' conduct is extreme and outrageous when considered within the context of how university administrators are reasonably expected to treat students. The plaintiff emphasizes his emotional distress continues "and will not abate absent intervention by law." ECF# 32, p. 44.

The elements for a prima facie case of intentional infliction of emotional distress are that: (1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) defendant's conduct was extreme and outrageous; (3) there is a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress is extreme and severe. *Bolden v. PRC Inc.*, 43 F.3d 545, 553

(10th Cir. 1994)) (citing *Moore v. State Bank of Burden*, 240 Kan. 382, 388, 729 P.2d

1205 (1986)), *cert. denied*, 516 U.S. 826 (1995). *See Veladez v. Emmis*

*Communications*, 290 Kan. 472, 476, 229 P.3d 389, 394 (2010). The Kansas Supreme

Court has explained these elements in these terms:

> Liability for extreme emotional distress has two threshold requirements which
> must be met and which the court must, in the first instance, determine: (1)
> Whether the defendant's conduct may reasonably be regarded as so extreme
> and outrageous as to permit recovery; and (2) whether the emotional distress
> suffered by plaintiff is in such extreme degree the law must intervene because
> the distress inflicted is so severe that no reasonable person should be expected
> to endure it. [*Roberts v.*] *Saylor*, 230 Kan. [289] at 292‑93, 637 P.2d 1175
> [(1981)].
> Conduct that rises to the level of tortious outrage must transcend a certain
> amount of criticism, rough language, and occasional acts and words that are
> inconsiderate and unkind. The law will not intervene where someone's feelings
> merely are hurt. In order to provide a sufficient basis for an action to recover
> for emotional distress, conduct must be outrageous to the point that it goes
> beyond the bounds of decency and is utterly intolerable in a civilized society.
> *Taiwo* [*v. Vu*], 249 Kan. [585] at 592‑93, 822 P.2d 1024 [(1991)].

*Valadez*, 290 Kan. at 477.

Every incident of extreme and outrageous conduct alleged in the FAC

against these defendants occurred outside the two-year limitations period. The latest

alleged conduct was by Coordinator Epp in the September 2017 meeting, and the FAC

certainly alleges substantial injury occurred no later than that meeting. "The harshest

treatment came from Coordinator Epp." ECF# 3, ¶ 662. "While the issues started

before Dr. Epp became the program coordinator, he turned out to be the most severe

administrator with me. No one in my life, inside or outside the university, has ever

treated me as humiliatingly and as severely as Coordinator Epp." *Id*. at ¶ 664. The

plaintiff did not file this claim less than two years before it accrued. His continuing

emotional distress does not extend the limitations period. Nor does he allege a tort

claim based on his probation and dismissal. The procedure for Babakr's dismissal--imposing a deadline for the plaintiff to complete the specialization exam, warning of his dismissal if the exam was not completed, and then dismissing him for not completing the exam—does not come close to reaching "the level of being intolerable by society." *See Lee v. Reed*, 221 F.Supp.3d 1263, 1274 (D. Kan. 2016) ("Harsh language and occasional inconsiderate acts do not constitute outrageous behavior."). "Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims." *Bolden v. PRC Inc.*, 43 F.3d at 554. This count is dismissed for being untimely and for failing to allege acts constituting outrageous behavior.

<u>Count XII—Breach of Contract</u>

The FAC alleges the defendants "violated many of the school, college and, university policies several times in different ways" all of which were part of an implied contract between him and KU. ECF# 3, ¶ 668. The defendants seek dismissal because KU is not a defendant due to Eleventh Amendment immunity and because this count alleges no contract between the plaintiff and the defendants in their individual capacity. The plaintiff responds the individual defendants are not immune for breach of contract. The plaintiff points to Director Robinson's signed letter to him indicating Dr. O'Leary was willing to be Babakr's advisor when it turned out she was not interested.

The individually defendants are not personally liable for a breach of contract, as the FAC fails to allege any implied contract that they were parties to in their individual capacities.

**LEAVE TO AMEND**

The plaintiff asks for leave to amend to cure pleading deficiencies that have resulted in dismissal, and the defendants argue leave should be denied as futile. The Tenth Circuit's rule is that "dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010) (internal quotation marks and citation omitted). "[T]he district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim." *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir.), *cert. denied*, 534 U.S. 922 (2001). While Fed. R. Civ. P. 15(a)(2) instructs that leave should be given "freely . . . when justice so requires," a court may refuse leave "if the amendment would be futile." *U.S. ex. rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 166 (10th Cir.2009) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). A court also may consider whether "it appears that the plaintiff is using Rule 15 to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, [or] to present theories seriatim in an effort to avoid dismissal . . . ." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir.2006) (quotations, alterations, and citations omitted.)). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir.2006).

The court will allow the plaintiff to file a separate motion for leave to amend his FAC. His motion should address only those counts and claims expressly

noted below as having pleading deficiencies that are possibly curable. The court will likely regard any effort to amend the other counts and claims as futile. In summary, the court rules as follows:

--On Eleventh Amendment immunity grounds as conceded by the plaintiff, KU is dismissed from all counts except for Counts I and II, and the individual KU officials sued in their official capacities for damages under 42 U.S.C. § 1983 and for damages and injunctive relief under state law are dismissed. As for any § 1983 claim for reinstatement, the plaintiff may seek leave to add this prospective relief and to allege which KU officials have the power to perform this prospective relief.

--Counts I and II, Title VI--discrimination and retaliation. The plaintiff concedes that all KU officials in their individual and official capacities may be dismissed from these counts. All Title VI claims for relief based on discriminatory and/or retaliatory acts committed more than two years before the filing date of this action are time-barred and dismissed. Count I is dismissed for failure to allege a plausible claim of discrimination, but the plaintiff may seek leave to amend this count. Dismissal of Count II is denied to the extent discussed above.

--Counts III, VIII and IX, 42 U.S.C. § 1983--First Amendment, Procedural Due Process, and Substantive Due Process. The governing statute of limitations bars all claims for injuries that accrued more than the two years prior to the filing of this suit. Any claim to recover for injuries prior to dismissal are barred as untimely. On all three counts, the court denies dismissal on qualified immunity grounds but grants dismissal of the defendants Goerdel, Getha-Taylor and Robinson for lack of personal involvement.  On

Counts VIII and IX, the court finds the plaintiff has alleged plausible claims only for a property interest.

--Counts IV, V, VI, VII, X, XI, and XII, State Law Claims.  Count IV alleging negligence is dismissed for failure to allege a timely claim of relief. Count V alleging civil conspiracy surrounding his taking of a leave of absence is dismissed. Count V alleging a civil conspiracy to dismiss him from program in retaliation for having said he would bring a discrimination claim is denied.  Count VI alleging defamation is dismissed as untimely as to the allegations in ¶¶ 599-603 in FAC. Count VI alleging defamation in ¶ 604 is also dismissed, but the plaintiff may seek leave to amend this claim curing the pleading deficiencies noted above. Count VII alleging fraudulent misrepresentation is dismissed as conceded by the plaintiff. Counts X, XI, and XII alleging unjust enrichment, intentional infliction of emotional distress, and breach of contract, respectively, are all dismissed for failure to state a plausible claim for relief.

With this ruling, the court expects the parties will act on the suggestion of death that has been filed for the defendant Robinson.

IT IS THEREFORE ORDERED that the defendants' motion to dismiss (ECF# 21) is granted in part and denied in part as set forth above.

Dated this 25th day of February, 2021, Topeka, Kansas.

/s Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge