## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MUZAFAR BABAKR,

> Plaintiff,

v.                                                    Case No. 20-2037-SAC-ADM

JACOB T. FOWLES, et al.,

> Defendants.

## PRETRIAL ORDER

On May 25, 2022, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case, by phone.  Plaintiff Muzafar Babakr ("Babakr") appeared pro se. Defendants Jacob Fowles, Dorothy Daley, Steven Maynard-Moody, Charles Epp, Heather Getha-Taylor, Rosemary O'Leary, Carl Lejuez, Kristine Latta, and the University of Kansas (collectively, "Defendants") appeared through counsel Eric Aufdengarten.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  *See* FED. R. CIV. P. 16(d) & (e); D. KAN. RULE 16.2(b).

1.      **PRELIMINARY MATTERS.**

    a.      **Subject-Matter Jurisdiction.**   Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331, 28 U.S.C § 1343, 28 U.S.C. § 1332(a)(2), and 28 U.S.C. § 1367, and is not disputed.

    b.      **Personal Jurisdiction.**   The court's personal jurisdiction over the parties is not disputed.

    c.      **Venue.**   Venue in this court is not disputed.

1

      **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the claims and defenses are governed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* ("Title VI") (Count I); 42 U.S.C. § 1983 (Counts II, IV, V, and VI); and Kansas law regarding common law civil conspiracy (Count III).

**2.**    **STIPULATIONS.**

    **a.**    The following facts are stipulated:

        i.    Babakr was a doctoral student at the University of Kansas ("KU") School of Public Affairs and Administration ("the School").

        ii.    Babakr was pursuing a doctoral degree in Public Administration with a specialization in Organization Theory.

        iii.    Babakr started his first semester in January 2013.

        iv.    Babakr was an international student from Kurdish Iraq.

        v.    Babakr enrolled in coursework up to and including the Spring 2015 semester.

        vi.    Babakr's remaining enrollment for the Fall 2015, Spring 2016, Fall 2016, Spring 2017, and Fall 2017 semesters was for dissertation hours.

        vii.    Babakr filed a grievance with the University of Kansas Judicial Board on January 19, 2017.

        viii.    On May 15, 2017, a hearing on Babakr's grievance was held at which testimony was provided and exhibits were presented to a hearing panel.

        ix.    On June 1, 2017, Dean Carl Lejuez emailed Babakr the outcome of Babakr's grievance proceeding.

        x.    On July 3, 2017, Babakr submitted his appeal to the Judicial Board.

        xi.    The final University decision regarding Babakr's grievance was sent to him on August 24, 2017.

        xii.    Babakr was placed on probation in September 2017.

        xiii.    Babakr was dismissed from the doctoral program on February 9, 2018.

**b.**    The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

      i.    The following documents produced in discovery:

- KU 000001 – 003111

- P 00001 – 000591

     ii.    University of Kansas Policies and Procedures, including those of the College of Liberal Arts and Sciences and the School of Public Affairs and Administration

    iii.    Audio recording of Babakr's grievance hearing

**3.**    **FACTUAL CONTENTIONS.**

**a.**    **Plaintiff Babakr's Contentions.**

I enrolled in the School as an international student at KU in the Spring 2013 semester to complete a PhD in Public Administration.  I received funding through a scholarship from the Iraqi Kurdistan Ministry of Higher Education and Scientific Research, my sponsor.  During my time in the doctoral program, my grade point average ("GPA") was a 3.84 out of a possible 4.0 points.  Specifically, my foundations GPA was 3.85 and my specialization GPA was 4.0.  As a PhD student, I passed one written comprehensive exam, the Foundations exam, and spent at least three semesters working on my dissertation research.

Since my very first moments at the School, I felt I was treated differently than other students because I was an international student of Iraqi Kurd origin.  An example of this is that the School provided other students office space, but did not provide it to me.  International students were specifically targeted for discrimination, to such extent that none remained at the School after KU dismissed me.  Since 2013, the School has not admitted any other international student.

3

Moreover, the only two students the School dismissed were international students.  An additional international student took a leave of absence several years ago and never returned.  The aforementioned international students were all from Asia.

During my time at KU, I heard students from various protected classes complaining about the School's discrimination and unequal treatment.  I believe the PhD program coordinator, Dr. Holly Goerdel ("Coordinator Goerdel"), made comments to others about my national and cultural background.  Several times, School students and staff asked me about my national cultural background.  One student immediately removed me from her Facebook friends list once she asked about my national cultural background.  Another student always tried to avoid me.  I generally felt unwelcome.

The School has a history of discriminating against its students of protected classes, especially international students.  Of the four doctoral students who were members of protected classes and faced problems in our School, three were students of my advisor, Dr. Rosemary O'Leary ("Dr. O'Leary").  All students who were dismissed or forced to leave the School when there was no way they could continue were from protected classes.  No Caucasian majority students faced these types of challenges or were forced to leave the school.

I faced intentional national origin discrimination while at KU.  For example, as with all PhD students, I was required to take a written PhD Comprehensive Exam in my specialization ("specialization exam").  But I was the only student whose specialization exam was chaired by Coordinator Goerdel rather than by my advisor, Dr. O'Leary.  This was a clear violation of School policy.  In Spring 2015 semester, Dr. O'Leary told me that Coordinator Goerdel would chair my specialization exam, which was scheduled for the Fall 2015 semester.  Upon contacting other

students, they all told me that the student's advisor chairs the specialization exam.  Coordinator Goerdel did not have the academic credentials to chair my specialization exam.  She had no prior working relationship with me, and I faced hostility from her.

In the Fall 2015 semester, Coordinator Goerdel was on parental leave, so she could not chair my specialization exam at that time.  When she returned in the Spring 2016 semester, she chaired my specialization exam in violation of the School's policy.  This led to Dr. O'Leary losing interest and ending my advising relationship with her.  Because no one had accepted me as his/her student after Dr. O'Leary, I could not retake the specialization exam in the Spring 2016 semester.  Due to the failure of the exam committees to conduct the exams in a similar way to how they were done for other students, I was forced to retake the exams.  I was, and continue to be, ready to take my specialization exam.  However, for two years, Coordinator Goerdel has made it impossible for me to sit for the exam.  This was due to my national and ethnic background as an Iraqi Kurd.

Doctoral students work with an advisor to prepare them for the specialization exam.  It is important that an advisor who is familiar with and knowledgeable about the student's field of expertise chair the student's specialization exam.  Coordinator Goerdel realized that she had caused my advising relationship with Dr. O'Leary to end, so she began forcing me to return to Dr. O'Leary for advising in violation of School policy.  Coordinator Goerdel asked me not to ask other faculty members to serve as my advisor in the Spring 2016 semester.  Coordinator Goerdel also asked me to copy her on my emails asking faculty members to serve as my advisor.  She negatively affected the view of faculty members who I was contacting.  The result was that none of them accepted me as their student.

In the Spring 2016 semester, I tried to change my specialization because the faculty members I contacted could not serve as my advisor.  In March 2016, Coordinator Goerdel and the doctoral committee that she was chairing—which was composed of Drs. Jacob Fowles, Dorothy Daley, Steven Maynard-Moody, and O'Leary (the "doctoral committee")—interfered in my program in violation of School policy and put me in unreasonable conditions in that semester and the subsequent semesters.  The doctoral committee forced me to stay in my specialization even though I did not have an advisor for my specialization.  Instead, they made the unprecedented decision of assigning me to work with a "group of advisors" in violation of School policy.

In a March 2016 meeting, Coordinator Goerdel realized that the doctoral committee's decision to force me to have a "committee of advisors" but no "single advisor" made no sense, so she raised the idea of reinstating the advising relationship with Dr. O'Leary.  At a meeting on March 15, 2016, Coordinator Goerdel and Director Reginald Robinson ("Director Robinson") forced me to reinstate the advising relationship with Dr. O'Leary.  I reinstated the advising relationship with Dr. O'Leary, and I registered for the specialization exam that was to be offered in Fall 2016 semester.  However, the advising relationship with Dr. O'Leary came to an end again in May 2016 because she was not interested in working with me.

After May 2016, I remained without an advisor; hence, I tried to change my specialization. In July 2016, the doctoral committee did not allow me to change my specialization and said nothing about how I could pursue a specialization without an advisor.  At that time, I said I would bring those issues to the attention of someone outside the School.  Upon saying that, the doctoral committee, under the leadership of Coordinator Goerdel and Director Robinson, retaliated against me simply because I said I was going to file a grievance within KU.  The doctoral committee

stopped communicating with me, and Director Robinson singled me out among the doctoral students by saying he would be my point of contact and that I was no longer allowed to communicate with Coordinator Goerdel or any member of the doctoral committee.

In Summer 2016, Director Robinson forced me to sit for the specialization exam that was scheduled for the Fall 2016 semester.  He did this despite me not having an advisor, and the registration was subsequently cancelled.   Director Robinson also obliged me to enroll in dissertation hours with Coordinator Goerdel even though Coordinator Goerdel has no academic credentials to serve as my advisor and she stopped communicating with me.  Director Robinson then suggested that I enroll in dissertation hours with him.  He also had no academic credentials to serve as my advisor and I was not his student.  Both Coordinator Goerdel and Director Robinson neglected my need for an advisor, despite raising this issue with Director Robinson in an August 2016 meeting.  Because I had no advisor, I was forced to take a leave of absence to maintain my J-1 visa status in August 2016.   At that time, I received an email from Director Robinson notifying me that I should consider the implications of taking a leave of absence.  I then realized that they were plotting to have me discontinue the program.

As no one accepted me as a student at the School, I considered transferring to the KU School of Business because I had taken several classes there.  But Dr. Heather Getha-Taylor ("Dr. Getha-Taylor") provided misleading information about me to the School of Business. Additionally, as I was trying to contact other higher administrators within KU about the issue of not having an advisor, Coordinator Goerdel or Director Robison provided false information to other university parties by making the case that I had been provided with several options.  In reality, there was no option for me to continue in the doctoral program.

Although the College of Liberal Arts and Sciences ("College") finally approved my leave of absence in August 2016, I revoked it partly because I felt I could not trust the information provided to me nor the School's intention.  The School's discriminatory actions continued and, at Director Robinson's request, I signed a letter under duress in September 2016 agreeing to stay with Dr. O'Leary until I completed my program.

In the Fall semester of 2016, Director Robinson told me that Dr. O'Leary was interested in having me once again as a student while, in fact, she was not.  In a meeting in her office, she was about to physically attack me.  Hence, the advising relationship came to an end for the second time.  I remained without an advisor and, therefore, could not take any further steps in the program.  The discrimination continued, with Coordinator Goerdel and Director Robinson then forcing me to sit for the specialization exam without even completing registration as the pre-registration requirements were not present.

The doctoral committee and Director Robinson neglected ensuring that I had an advisor.  Without an advisor, I could violate federal immigration rules for J-1 visa holders.  Because I did not have an advisor, I could not enroll for the Spring 2017 semester.  However, I eventually enrolled with a faculty member as a "place holding" mechanism to avoid falling out of legal status.  The doctoral committee and Director Robinson, through these actions, could have led to violating the contract with my program sponsor.

In January 2017, I filed a grievance with the KU Judicial Board against Coordinator Goerdel and Director Robinson.  While the grievance was pending, I received an email from Director Robinson telling me that I needed to sit for the specialization exam in February 2017.  I

could not sit for the specialization exam because I did not have an advisor, I was not registered for the exam, and there was a pending grievance.

For the pending grievance, Coordinator Goerdel or Director Robinson provided false information to Dean Carl Lejuez ("Dean Lejuez"). They made the case that I had filed the grievance because I was worried about the outcome of the specialization exam, thereby misleading Dean Lejuez who, like the KU Judicial Board, was initially willing to consider the grievance. I was never worried about the outcome of the specialization exam. I was worried about a situation where somebody other than my advisor, and especially someone like Coordinator Goerdel who, besides being hostile towards me also holds no academic credentials, would chair my specialization exam. Coordinator Goerdel and Director Robinson also admitted in their response to Dean Lejuez that the reason I tried to change my specialization was that I did not have an advisor. Because of the misleading information provided to Dean Lejuez, I lost the grievance at the college level in June 2017. The grievance was not handled according to the policies in place due to the misleading information provided to Dean Lejuez.

I appealed that decision to the KU Judicial Board. When Dean Lejuez was asked to provide a response about my appeal of his decision in August 2017, he provided false and misleading information to the KU Judicial Board by making the case that nothing was preventing me from finishing my degree. In reality, the doctoral committee and Director Robinson impeded my education and made it impossible for me to finish the degree. Because of the misleading information provided, I lost the appeal at the KU Judicial Board level in August 2017.

As part of the doctoral committee's collective discriminatory actions against me, the committee continued to put me in an unreasonable condition. After I filed the grievance in January

2017, Coordinator Goerdel and Director Robinson stepped down and the School formed a new administration. Dr. Charles Epp ("Coordinator Epp") became the new program coordinator and Dr. O'Leary became the new School Director ("Director O'Leary"). I contacted Coordinator Epp in July and then in September 2017 about the issue of not having an advisor and the need to pursue a new specialization. In September 2017, under Coordinator Epp's leadership, the doctoral committee came up with the inexplicable decision of a "form signer" and asked me to enroll in dissertation hours with Director O'Leary as a form signer. The doctoral committee also forced a "committee of hostile advisors" on me, which was composed of Director O'Leary, Drs. Maynard-Moody, and Getha-Taylor. This decision violated School policy. None of those three faculty members agreed to serve as my advisor, yet they were all ready to serve as my advisors. If a group/committee of advisors was available, it logically follows that one advisor was also available.

In September 2017, as I brought the issue of not having an advisor to Coordinator Epp's attention, I was left with no option other than saying I would bring the doctoral committee's discriminatory actions against me to the attention of the court. Upon saying this, the doctoral committee, in consultation with Director O'Leary, Dean Lejuez, and Dr. Kristine Latta ("Dr. Latta"), and with the participation of Dr. Getha-Taylor, plotted against me and placed me on probation as retaliation. They designed a pathway in which I had to enroll in dissertation hours with Dr. Maynard-Moody for only one semester and without discussing my dissertation with him. I was placed on probation and eventually terminated without regard to due process of law such as a fair hearing and such decisions were not made by impartial people.

If a doctoral student is placed on real probation, the student will typically be first notified that the student will be placed on probation if he/she does not meet certain requirements. In my

case, when I asked Coordinator Epp for a meeting about the probation, he refused to even meet with me despite numerous requests from me to meet with him. Because he was so angry after I stated that I would go to court, he did not even want to see me face to face.

The retaliatory probation letter violated School policy and the outlined course of action was illogical, illegitimate, and unimplementable.   The retaliatory probation letter says it addresses two issues; one is progress towards degree and the other is my request to be assigned an advisor. As for progress towards degree, the retaliatory probation letter states that I was placed on academic probation for not making progress towards my degree.  However, this letter was merely a pretext, as I have a progress letter from the School contradicting that claim.  Further, when I submitted the self-evaluation form used to determine whether a doctoral student is making progress, I was not told that I was not making progress.

As for my need for an advisor, the retaliatory probation letter did not identify an advisor. It again suggested the odd, illogical, and un-implementable idea of a committee/group of advisors with one faculty member assigned as a "form signer."  There was no clear reason for forcing me to enroll in dissertation hours with Dr. Maynard-Moody, as he lacks the required academic qualification, had no prior work relationship with me, and was also hostile to me.  Further, Dr. Maynard-Moody's relationship to me was restricted to one semester and one task which is dubious unless understood that his sole function was to facilitate my dismissal in that particular semester.

According to Dr. Maynard-Moody, my enrollment in dissertation hours with him was to prepare to the exam and not to work on my dissertation. In academia, there is nothing called enrollment in dissertation hours to prepare for examination. Enrollment in dissertation hours means that the student works on his/her dissertation. On an academic level, I must make progress towards

11

the degree and one semester is half an academic year. I cannot tell my sponsor I did not make progress for a half year because the faculty member with whom I was enrolled in dissertation hours does not have expertise in my area of research and asks me not to discuss my dissertation with him. If I make this argument to my sponsor, my sponsor will say I had to enroll with someone with expertise in my research area so I could make continuous progress.

Thus, Dr. Maynard-Moody was a hostile, forced, one-semester form signer.  He did not want to be my advisor, and he told me as much by email when I asked him to serve as my advisor in the Spring 2016 semester.  In an email to my advisor in the Spring 2016 semester, Dr. Maynard-Moody described my request to him to serve as my advisor as a strange request. When reading Dr. Maynard-Moody's response to my request to serve as my advisor, the Court can easily conclude that a faculty member who so strongly reacts when the student asks him to serve as his advisor back in the Spring 2016 semester does not actually mean it when he says he is assigned as an "advisor" in the Fall 2017 semester. What he, along with other members of the doctoral committee in consultation with Dean Lejuez, Director O'Leary, and Dr. Latta came up with in the retaliatory probation letter was a plot to facilitate my dismissal in the program.

The retaliatory probation letter also says the specialization examination was administered in the Spring 2016 semester, Fall 2016 semester, and Spring 2017 semester. All three of these specialization examination administrations violate School policy.

Under School policy, 2-3 faculty members sitting on the student's committee conduct the specialization examination. Among the 2-3 faculty members, the student's advisor chairs the specialization examination. During none of these three times did Dr. O'Leary who worked with me as my chosen advisor agree to chair the specialization examination and this was at the heart

12

of all the problems. Not only did she not agree; she also lost interest in working with me. Instead, Coordinator Goerdel discriminated against me by chairing my specialization exam.

For the Fall 2016 and Spring 2017 semesters, it was impossible for me to sit for the specialization exam. As for the Fall 2016 semester, I was on a leave of absence. When a student takes a leave of absence, his/ her program activities will come to a halt. In the Spring 2017 semester, I had a pending grievance. Filing a grievance would serve no purpose if I sat for the specialization examination back then.

A doctoral student can do nothing without an advisor. The government of the United States allowed me to stay in the United States because KU committed that I was their student and, hence, could study at the KU. Yet the doctoral committee was neglectful about my need for an advisor. I thus fell out of legal visa status in October 2017. The doctoral committee continued to put me in an unreasonable situation. Coordinator Epp said by email that the Fall 2017 semester would be my last, thereby predetermining the result of the specialization exam that semester.

The doctoral committee finally dismissed me based on a retaliatory probation in violation of several policies. Thus, the dismissal was also retaliatory. I was dismissed during Spring 2018 semester while the dismissal should have been done at the end of the Spring 2018 semester. I was not allowed to appeal the dismissal decision because it was retaliatory in nature.

Director O'Leary or Coordinator Epp caused the release of false and misleading information to my sponsor, the Iraqi Kurdistan Ministry of Higher Education and Scientific Research. Based on this misleading information, my sponsor has the impression that I myself chose not to finish the degree at KU when, in reality, the doctoral committee left me with no option other than a situation where I could not pursue the degree due to a lack of an advisor.

13

The manner I was treated when at KU and the adverse actions taken against me caused me enormous emotional distress.   For example, Coordinator Goerdel had me removed from the PhD email listserv in July 2016.   I was then added again only after re-establishing the advising relationship with Dr. O'Leary in the Fall 2016 semester, thereby isolating me from the School, which made me feel alienated, as she regularly ignored me and never responded to my emails.

Coordinator Goerdel was the cause of everything that was inflicted on me while I was in the School.   Also, she misled Dean Lejuez, making him dismiss parts of my grievance and deny the remaining parts.   After I wrote the appeal, I met with Dean Lejuez.   He was very angry with me and stood up from his chair in a threatening manner.

For his part, Director Robinson was targeting me for verbal and nonverbal harassment, including yelling and screaming at me.   In his meetings with me, he continually interrupted me, used accusatory language, and ignored my viewpoint and my need for an advisor.   He often criticized me, singled me out among other students, and treated me differently than Caucasian students.   Director Robinson also intimidated and undermined me by continuously pushing me to proceed in the program without an advisor, which violated the School policy.   He targeted me through cyberbullying by sending emails to me in which he continuously threatened to dismiss me from the program.   He also continuously pushed me to do things I did not want to do, such as forcing me to work with faculty members of his choice and ignoring what the School policy says.

The harshest treatment, however, came from Coordinator Epp.   In meeting, he twice showed me the door and yelled at me.   He also targeted me for cyberbullying by continuously threatening to dismiss me from the program even though I did not have an advisor and a doctoral student can take no steps without an advisor.

14

For her part, Director O'Leary singled me out among the doctoral students. After Coordinator Epp took office, Director O'Leary chose to be copied in Coordinator Epp's communications with me.

### b.   Defendants' Contentions.

Babakr was a doctoral student at the University of Kansas ("KU") in the School of Public Affairs and Administration ("School") beginning in the Spring 2013. He completed all the required coursework by the end of the Spring 2015 semester. In the Fall of 2015, he failed a required specialization exam in his specialization of Organization Theory. He was informed that he would be allowed one more chance to pass the specialization exam and that his failure to take or pass the specialization exam would result in his dismissal from the program.

Babakr refused to sit for the specialization exam after that time. In Spring 2016, Babakr withdrew from the February 19 exam two days before it was scheduled. He claimed his advisor, Dr. O'Leary, was no longer interested in working with him. In Fall 2016, Babakr refused to sit for the September 9 exam and even submitted a Leave of Absence, which was approved August 29. By September 16, Babakr was allowed to revoke the Leave of Absence upon his express agreement to sit for the exam by November 18 and to continue working with Dr. O'Leary. In Spring 2017, Babakr refused to sit for the February 10 exam after he filed a grievance against Director Robinson and Goerdel for refusing his request to change his specialization. The grievance and appeal process concluded August 24, 2017. Babakr did not seek judicial review of the decision.

On September 9, 2017, Babakr emailed Epp, the new PhD program coordinator, to again request to change his specialization. Epp responded that the School had offered Babakr a way

forward to take the exam and complete the remaining steps of his degree program. On September 11, Babakr objected, stating that the plan did not provide him with a proper advisor. Epp responded that the committee of professors would jointly serve as Babakr's advisors for the exam. On September 13, Babakr met with Epp and Diana Kozlowsky, the School's administrative officer, to discuss Babakr's path forward. Babakr objected to taking the exam scheduled for October 6. On September 15, Epp wrote to Babakr that Maynard-Moody would be Babakr's advisor for the specialization exam and for enrolling in credits. Epp also informed Babakr that the School was recommending Babakr be placed on academic probation for the Fall 2017 semester because of his repeated failure to pass and take the specialization exam.

Babakr was placed on academic probation in the Fall 2017 semester, with the requirement that he successfully complete the specialization exam by December 15, 2017. Babakr again did not sit for the specialization exam. As a consequence, Epp notified Babakr on January 30, 2018, that the School recommended to the College of Liberal Arts and Sciences (the "College") that he be dismissed from the PhD program effective with the start of the Spring 2018 term. On February 9, 2018, the Director of the College Office of Graduate Affairs informed Babakr of his dismissal from graduate studies at the University.

## 4.   LEGAL CLAIMS AND DEFENSES.

### a.   Plaintiff Babakr's Legal Claims.

Babakr asserts he is entitled to recover upon the following alternative theories:

    i.    <u>Title VI Retaliation against KU</u> (Count 1 of the Second Amended Complaint) – KU took materially adverse actions against me in retaliation for my opposition to its intentional, national-origin discrimination.

    ii.    <u>First Amendment Retaliation under of 42 U.S.C. § 1983 against Epp, Fowles, Daley, O'Leary, and Maynard-Moody in their individual and official capacities; and against Lejuez and Latta in their individual</u>

<u>capacities</u> (Count II) – I engaged in protected activity by exercising my right of free speech when I said I would file a lawsuit against the doctoral committee. Epp, Fowles, Daley, O'Leary, Maynard-Moody, Lejuez, and Latta retaliated against me for this.

iii. <u>Common Law Civil Conspiracy against Epp, Fowles, Daley, O'Leary, Maynard-Moody, Getha-Taylor, Lejuez, and Latta in their individual capacities</u> (Count III) – After stating in September 2017 that I would sue, Epp, Fowles, Daley, O'Leary, Maynard-Moody, Getha-Taylor, Lejuez, and Latta conspired against me.

iv. <u>Civil Conspiracy under 42 U.S.C. § 1983 against Epp, Fowles, Daley, O'Leary, Maynard-Moody in their individual and official capacities; and against Getha-Taylor, Lejuez, and Latta in their individual capacities</u> (Count IV) – After stating I would sue in September 2017, Epp, Fowles, Daley, O'Leary, Maynard-Moody, Getha-Taylor, Lejuez, and Latta conspired against me.

v. <u>Procedural Due Process under 42 U.S.C. § 1983 against Epp, Fowles, Daley, O'Leary, Maynard-Moody in their individual and official capacities; and against Lejuez and Latta in their individual capacities</u> (Count V) – Epp, Fowles, Daley, O'Leary, Maynard-Moody, Lejuez, and Latta deprived me of property interest in violation of procedural due process of law by a retaliatory probation and dismissal from the doctoral program.

vi. <u>Substantive Due Process under 42 U.S.C. § 1983 against Epp, Fowles, Daley, O'Leary, Maynard-Moody in their individual and official capacities; and against Lejuez and Latta in their individual capacities</u> (Count VI) – Epp, Fowles, Daley, O'Leary, Maynard-Moody, Lejuez, and Latta deprived me of property interest in violation of substantive due process of law by a retaliatory probation and dismissal from the doctoral program.

**b.   Defendants' Defenses.[1]**

Defendants assert the following defenses:

---

[1] The following claims have been dismissed:
   a. Eleventh Amendment immunity as to KU and individual officials sued in their official capacity for damages under § 1983 and for damages and injunctive relief on state law claims (ECF 38, at 17);
   b. Title VI discrimination (*id.* at 28-29; ECF 58, at 7-8, adopted by ECF 67);
   c. Claims for acts occurring prior to January 21, 2018 (ECF 38, at 24 (Title VI discrimination), 31 (Title VI retaliation June 2016), 48-49 (negligence), 54

i.    As to all counts, Babakr will be unable to prove each element of the claim.

ii.    As to all counts, Defendants had legitimate, non-retaliatory reasons for their actions.

iii.    As to all counts, claims for acts occurring prior to January 21, 2018, are untimely. (ECF 38, at 24 (Title VI retaliation generally), 33-34 (Title VI retaliation regarding probation), 37 (§ 1983 claims), 51 (common law conspiracy).)

iv.    As to Counts II, IV, V, and VI, Defendants are entitled to qualified immunity.

v.    As to Counts II, IV, V, and VI, Fowles, Day, Maynard-Moody, and Getha-Taylor did not personally participate in the decisions to place Babakr on academic probation or to dismiss Babakr (sustained as to Goerdel, Getha-Taylor and Robinson; overruled as to Lejuez, ECF 38, at 39-40, 45-46, 47).

vi.    Defendants are entitled to Eleventh Amendment immunity for § 1983 claims seeking prospective relief from individual defendants in their official capacities, as individuals do not the power to reinstate Babakr (ECF 38, at 19; ECF 58, at 4-5 (Lejuez, Latta, Getha-Taylor), adopted by ECF 67).

vii.    As to Count 1, Babakr is not entitled to emotional distress damages for Title VI retaliation. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1576 (Apr. 28, 2022).

viii.    As to Count 1, Babakr is not entitled to punitive damages for Title VI retaliation. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

ix.    As to Counts IV, V, and VI, Babakr is not entitled to punitive damages as to § 1983 claims against individual defendants because their conduct did not involve reckless or callous indifference to plaintiff's federally protected rights, and they were not motivated by evil motive or intent. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

x.    As to Count III, Babakr is not entitled to punitive or exemplary damages or for interest prior to judgment as to state law civil conspiracy claims against

---

(defamation), 54 (fraudulent misrepresentation), 57-58 (intentional infliction of emotional distress));

d.  Defamation (*id.* at 54; ECF 58, at 9-10, adopted by ECF 67);

e.  Unjust enrichment (ECF 38, at 55);

f.  Intentional infliction of emotional distress (*id.* at 58); and

g.  Breach of contract (*id.*).

individual defendants because they did not act with actual fraud or actual malice. *See* KAN. STAT. ANN. § 75-6105(c).

xi. Babakr's damages, if any, are not of the nature or to the extent alleged because he did not disclose documents that form the basis of his calculated damages; his claimed economic loss is based on amounts available to him from his sponsor and not expenses he personally incurred; and his claimed future economic loss is not based on any disclosed facts or documents or expert testimony.

xii. Babakr has failed to mitigate his damages by not working since his academic dismissal and by not attempting to take his specialization exam.

xiii. As to Count III, Babakr's damages for state law civil conspiracy are limited to $500,000 for all claims arising out of a single occurrence. *See* KAN. STAT. ANN. § 75-6105(a).

## 5. DAMAGES AND NON-MONETARY RELIEF REQUESTED.

Babakr seeks the following damages and non-monetary relief:

a. Past economic loss: $250,087.59

b. Future economic loss: $25,000 annually for the period of February 2018 until reinstatement to the doctoral program or retirement.

c. Past and future emotional distress: $200,000

d. Punitive damages: $1,000,000

e. Litigation expenses: unliquidated

f. Injunctive relief as follows:

   i. Ordering KU and the individual defendants in their official capacities—namely, the doctoral committee and the School Director—to reinstate me and allow me to pursue a new specialization;

   ii. Ordering Defendants not to target me for further retaliation when I am re-admitted;

   iii. Ordering KU to get my sponsor's approval to reinstate my scholarship and grant me the additional required time to finish the degree;

19

iv.    Ordering KU to write a letter to the United States Citizenship and Immigration Services and the United States Department of State indicating that the reason I fell out of my J-1 visa status was beyond my control;

v.    Ordering Defendants to follow their policies, including allowing my committee to be chaired by my advisor to conduct my specialization examination;

vi.    Ordering Defendants to normalize the environment in terms of how faculty members, staff, and students treat me and to create a healthy environment in which I do not feel that I am unwelcome or that I am the subject of departmental gossip or faculty meetings;

vii.    Ordering Defendants to deduct the period of January 2014 to December 2017 from the number of years required to gain the PhD degree at the School, as new classes should be taken in lieu of classes taken in those years. As for the semesters in which I was enrolled in dissertation hours, it was merely a place-holding mechanism that took me nowhere; and

viii.    Ordering Defendants to drop the incidence of probation in my records.

## 6.   AMENDMENTS TO PLEADINGS.

Babakr intends to file a motion for leave to amend to add Morgan Swartzlander, a manager at the College of Graduate Affairs, and Rachael Rolf, an attorney formerly in KU's general counsel office, as parties to the civil conspiracy claims in Counts III and IV. By separate order, the court set briefing deadlines for this anticipated motion.

## 7.   DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by April 1, 2022. Babakr asserts that discovery is incomplete, whereas Defendants assert that discovery is complete, and they object to any additional discovery and to Babakr's proposed motion to compel.

By stipulation of the parties, Defendants served their responses to Babakr's written discovery on April 21. On April 22, Defendants produced additional documents in response to

Babakr's requests for production. On April 27, Defendants provided Babakr with O'Leary's verification page to her Answers to Interrogatories. Babakr asserts that Defendants' answers to Babakr's written discovery are deficient. The court directed the parties to meet and confer in an attempt to resolve Babakr's concerns about these deficiencies and, to the extent that they reach an impasse, the court directed them to contact the undersigned's chambers to request a discovery conference before filing any disputed discovery-related motion.

Babakr sought leave of court to conduct 10 depositions after the discovery deadline. That request was denied. (ECF 105.) Babakr has not taken any depositions.

Babakr intends to provide supplemental disclosures now that he has access to his PST files.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

## 8. MOTIONS.

### a. Pending Motions.

None.

### b. Additional Pretrial Motions.

After the pretrial conference, the parties intend to file the following motions:

  i.  Babakr intends to file a motion to compel discovery responses and a motion in limine,

  ii. Defendants intend to file a motion for summary judgment and a motion in limine.

The dispositive-motion deadline, as amended, is **June 22, 2022**.  The parties should follow the summary-judgment guidelines available on the court's website:

http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

**c.      Motions Regarding Expert Testimony.**

Not applicable, i.e., the parties have stipulated that no expert testimony will be used in this case.

**9.      TRIAL.**

The court will subsequently set this case for trial.  Trial will be set in **Kansas City, Kansas**. This case will be tried by jury.  Trial is expected to take approximately 5 days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated June 8, 2022, at Kansas City, Kansas.


_____s/ Angel D. Mitchell_____
Angel D. Mitchell
U. S. Magistrate Judge