## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MUZAFAR BABAKR,

     *Plaintiff,*

vs.

                                Case No. 2:20-cv-2037-EFM

DR. JACOB T. FOWLES, et al.,

     *Defendants.*

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 118) on each of Plaintiff Muzafar Babakr's claims. Plaintiff, proceeding pro se, has sought redress for the alleged wrongs done to him by Defendants through his probation and subsequent dismissal from his doctorate studies at the University of Kansas ("KU"). After reviewing the evidence properly before the Court on summary judgment, the Court grants Defendants' Motion.

### I.      Procedural and Factual Background

**A.     Procedural history**

Before delivering the undisputed facts of the case, the procedural history here warrants discussion. Plaintiff has proceeded pro se, filing his 78-page, single-spaced Complaint with 546 numbered paragraphs against Defendants on January 21, 2020. After two amended complaints, a

few partially successful motions to dismiss, lengthy and litigious discovery, and numerous motions for extensions of time by Plaintiff on all the above, Defendants filed the present Motion for Summary Judgment on all of Plaintiff's remaining claims on June 22, 2022.

Only July 13, 2022, Plaintiff filed a self-titled "Motion for Extension of Time to File response." in reality, Plaintiff's motion was a motion to defer, asking for an additional 60 days to complete discovery.  The Court denied this motion, setting the new deadline to respond as September 29, 2022.  In effect, this functioned as the first extension of time to respond for Plaintiff.

Plaintiff filed his first real motion for extension of time to file his response on September 28, 2022.  The Court granted the motion, extending the deadline to October 20, 2022.  On October 20, 2022, Plaintiff filed his "Second MOTION for Extension of Time to File response."  This motion was granted in part, extending Plaintiff's deadline to file a response to November 4.

When November 4 arrived, Plaintiff filed yet another motion for extension of time.  Once again, the Court granted the motion in part and extended the deadline to November 15.  However, the Court unequivocally stated in its order that "[t]here will be no further extensions granted."  The Court also cautioned Plaintiff to review the relevant page limitations for any future filings based on Plaintiff's demonstrated proclivity toward lengthy briefing.  At the time, the limitation was 50 pages.

Seemingly deaf to the Court's admonishment, Plaintiff filed *yet another* motion for extension of time—his fourth—on November 15.  When this motion was denied, Plaintiff went ahead and filed a 151-page response on November 28 anyway.  Included within this response was a motion to exceed the page limit and a motion for leave to file out of time, functioning essentially as a fifth request for an extension.  Based on this Court's previous statement that no more extensions would be granted, the Court ordered that his response and accompanying exhibits be

stricken from the record.  The Court also denied Plaintiff's motion to file excess pages as moot and unsupported by any good reason on Plaintiff's part.

Undeterred, Plaintiff filed a motion for reconsideration regarding the Court's decision to not grant another extension.  In an order simultaneous with the present Order, the Court denied this motion as well.  Therefore, as it stands before this Court, Defendants' Motion for Summary Judgment is unopposed.

**B.**     **Uncontroverted facts**[1]

*1.*     *The parties*

Plaintiff Muzafar Babakr was a doctoral student at the University of Kansas ("KU") School of Public Affairs and Administration (the "School") pursuing a doctoral degree in Public Administration with a specialization in Organization Theory.  The Defendants are: Dr. Rosemary O'Leary, Plaintiff's primary advisor during the time in question; Dr. Charles Epp, Coordinator of the Doctoral Program at the School and chair of the Doctoral Committee from June 1, 2017 to May 31, 2021; Dr. Steven Maynard-Moody, a Professor in the School who served on the Doctoral Committee from 2015 through 2018; Dr. Dorothy Daley, a Professor in the School; Dr. Carl Lejuez, the Dean of the College of Liberal Arts and Sciences at KU from January 2016 to April 29, 2018; Dr. Kristine Latta is the Director of the Office of Graduate Studies in the College of Liberal Arts and Sciences; Dr. Heather Getha-Taylor, a Professor in the School; and KU itself.

---

[1] The following facts are taken from Defendants' Statement of Material Facts and are supported by the evidence.  As Plaintiff failed to timely respond, these facts are uncontroverted for the purposes of this Order.

2.    *Background facts*

To achieve his doctoral degree in Public Administration with a specialization in Organization Theory, Plaintiff had to take two different written exams. The first, the Foundations Exam, he passed in the fall of 2015. Plaintiff knew that for the second, the Specialization Exam, he would have only two chances to pass it. Failure to pass the exam on his second attempt would result in dismissal from KU's doctoral program.

Plaintiff first took the Specialization Exam in Fall 2015, failing it. He was informed that he would have one more opportunity to pass the exam. He then let the School know that he would attempt the exam for the second time on February 19, 2016. On February 15, 2016, O'Leary— Plaintiff's advisor at the time—met with Plaintiff and informed him that she would submit questions for the Specialization Exam but would not participate in grading the exam. When Plaintiff expressed that he wanted O'Leary to serve as a grader, she informed him that she would be part of the committee grading his exam. Plaintiff then wrote on February 17, 2016, that he understood O'Leary's original preference to not grade his exam as a loss of interest in working with him. Plaintiff immediately broke off his advising relationship with O'Leary.

On February 17, 2016, Plaintiff informed Getha-Taylor, Maynard-Moody, and Goodyear that he would not be taking the Specialization Exam. He also asked to change his specialization, a request which the Doctoral Committee denied. After asking several professors to be his advisor without success, Plaintiff eventually went back to O'Leary. It did not last long, as he broke off the advising relationship again a little while later.

Once again, Plaintiff requested a new advisor and asked to change his specialization. Both these requests were denied. The School reminded Plaintiff that he had only one more chance to take the exam and was required by school policy to take it at the next available opportunity in

September 2016.  The School emphasized to Plaintiff that failure to take the exam at that time would result in dismissal from the program.

On August 2, 2016, Plaintiff informed KU's administration that he would not take the September 2016 exam.  Instead, he submitted a leave of absence request, one that was approved on August 26, 2016.  Soon after, Plaintiff withdrew his request for a leave of absence, in essence asking that his previously granted leave of absence be revoked.  His leave of absence was subsequently revoked five days *after* the September exam was scheduled to take place.

Already sensing trouble brewing, Director Robinson sent Plaintiff a clearly worded letter outlining the requirements for Plaintiff to continue in the program and requiring his signature as acknowledgement of the letter's contents and Plaintiff's commitment to adhere them.  Robinson informed Plaintiff that not signing the letter would result in dismissal from the doctoral program. In response, Plaintiff signed this letter, thereby agreeing to its requirements.  Specifically, Plaintiff committed to setting a date certain to retake the Specialization Exam no later than November 18, 2016.  He further committed that he would only pursue the Organization Theory specialization, with the letter stating that the School would not entertain any requests for a specialization change. Likewise, Plaintiff agreed to keep O'Leary as his advisor without further issue.

On November 16, Plaintiff terminated O'Leary as his advisor.  At or around that time, Plaintiff also submitted a request that he be allowed to take the Specialization Exam in February 2017 instead of November as he agreed in the letter.  The Doctoral Committee agreed to this request on the condition that Plaintiff was informed that failure to sit for the February exam would result in dismissal from the doctoral program.  Plaintiff did not sit for the February exam.

Instead, Plaintiff filed a grievance with the KU Judicial Board on January 19, 2017.  In the grievance, Plaintiff alleged that he was not allowed to change his specialization and that he had

been forced to proceed without an advisor in retaliation for him saying he would bring his situation to the attention of other appropriate parties.  Plaintiff, however, did not allege discrimination or retaliation based on his race or national origin.

With his grievance pending, Plaintiff declined to register for the February Exam.  The Doctoral Committee concurred with this course of action, at least in practice, by postponing any disciplinary measures for Plaintiff's failure to take the exam until after the grievance process had complete.

On May 18, 2017, the College Grievance Committee provided a summary of findings and recommendations, which found that: (1) the evidence showed the September 14, 2016 letter of agreement facilitated rather than prevented his pursuit of his degree; (2) the three-person advising relationship was not a violation of policy; and (3) the decision not to allow him to change his specialization was not a violation of policy, but rather was an academic matter within the discretion of the School.  On July 3, 2017, Plaintiff submitted his appeal to the Judicial Board.  The Judicial Board found in favor of the School on August 24, 2017.

While the appeal was ongoing, Plaintiff informed the administration that he intended to continue in his specialization and sit for the Specialization Exam in October 2017.  Epp told Plaintiff that *if* he agreed with the decision to use a committee of advisors and that committee would evaluate his work through collective deliberation, then he would be allowed to take the exam.  Plaintiff apparently agreed with these conditions.  A series of emails and meetings between Plaintiff and the different Defendants followed, each sharing the same theme.  Plaintiff would consistently commit to the plan outlined for him by the Doctoral Committee and then renege almost immediately, renewing his requests for a different advisor and to change his specialization.

On September 13, 2017, Plaintiff met with Epp and Koslowsky. During the meeting Plaintiff said that he was not willing to accept a committee of advisors to guide his preparation for the Specialization Exam.  Epp encouraged Plaintiff to accept the proposal of a committee of advisors and assured Plaintiff that the committee and Epp were trying to help Plaintiff prepare and pass the Exam.  Plaintiff refused to accept a committee as advisor.  Plaintiff then said he was prepared to sue if the School did not provide him a single advisor.  According to Plaintiff, the "issues" that would form the basis of the lawsuit were that: (1) he was prevented from switching to a different specialization, and (2) the School was not following its own rules in refusing to assign him the advisor of his choosing.  Plaintiff did not tell Epp in that meeting that he was being treated unequally as compared to other students or that he was being discriminated against based on his race or national origin.  The uncontroverted evidence shows that the School has no policy requiring it to either let doctoral students switch specializations at their discretion or choose their own advisor.

On the basis of Plaintiff's refusal in the meeting of September 13, 2017 to accept the School's offer of a committee of advisors, Epp engaged in discussions with O'Leary and members of the Doctoral Committee about whether the School should recommend that Plaintiff be placed on academic probation for persistently refusing to take his Specialization Exam.  In the meantime, Maynard-Moody, agreed to serve as Plaintiff's principal advisor to help him prepare for the retaking of the Specialization Exam with Getha-Taylor agreeing to serve on the Advisory Committee for Plaintiff's Specialization Exam.

With Plaintiff's advisory committee set, Epp notified Plaintiff that the Specialization Exam was scheduled for October 6, 2017.  In response, Plaintiff told Epp that he was *not* scheduled to

take the specialization exam because he had not registered for the exam, once again claiming he did not have an advisor.

Because of his consistent refusal to accept his advisors and his failure to take the require exams because of his baseless misapprehensions of school policy, Plaintiff was placed on academic probation in September 2017. Nevertheless, Plaintiff was not immediately dismissed. Rather, he had until the end of the semester to sit for the Specialization Exam.

The next few months passed unsurprisingly for any individual who has waded through the facts so far. Plaintiff continually insisted that he could not take the exam because he did not have an advisor; the Defendants consistently pointed out that he *did* have an advisor. The Doctoral Committee even offered to delay Plaintiff's Specialization Exam until December 2017, an offer which Plaintiff accepted. Plaintiff did not take the December exam.

On January 30, 2018, Epp notified Plaintiff that the School had recommended that Plaintiff be dismissed from the doctoral program for failure to meet the terms of his academic probation. Slightly less than two years later, Plaintiff filed the present case, stating claims for: (1) Title VI retaliation; (2) First Amendment retaliation under § 1983; (3) violation of procedural due process under § 1983; (4) violation of substantive due process; (5) conspiracy to violate procedural due process under § 1983; and (6) common law conspiracy under Kansas law.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[2]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered

---

[2] Fed. R. Civ. P. 56(a).

evidence permits a reasonable jury to decide the issue in either party's favor.[3]  The movant bears

the initial burden of proof and must show the lack of evidence on an essential element of the claim.[4]

The nonmovant must then bring forth specific facts showing a genuine issue for trial.[5]  These facts

must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—

conclusory allegations alone cannot survive a motion for summary judgment.[6]  The court views

all evidence and reasonable inferences in the light most favorable to the non-moving party.[7]

### III.    Analysis

This case is one where the facts speak for themselves.  Plaintiff has alleged six separate

counts based on his probation and dismissal from KU's doctorate program: (1) Title VI retaliation;

(2) First Amendment retaliation under § 1983; (3) violation of procedural due process under

§ 1983; (4) violation of substantive due process; (5) conspiracy to violate procedural due process

under § 1983; and (6) common law conspiracy under Kansas law.  The Court will discuss each

claim in turn.

### A.    Title VI retaliation

Title VI, codified as 42 U.S.C. § 2000d, prohibits "discrimination under any program or

activity receiving Federal financial assistance" based on race, color, or national origin.  Such

discrimination must be intentional for Title VI to apply.[8]  "Although Title VI does not specifically

---

[3] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[4] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[5] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[6] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[7] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[8] *See Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001).

prohibit retaliation, courts generally imply a private cause of action for retaliation based on the general prohibition of intentional discrimination."[9]

To prove discriminatory retaliation under Title VI, a plaintiff must establish: "(1) he engaged in protected activity; (2) he suffered adverse action contemporaneous with or subsequent to such activity; (3) a causal connection exists between the protected activity and the adverse action; and (4) the defendants knew of the retaliation and did not adequately respond."[10]  Protected activity in this context means "either (1) participating in or initiating a Title [VI] proceeding or (2) opposing discrimination made unlawful by Title [VI]."[11]

Regarding the third element, a plaintiff must either show direct evidence of discrimination or utilize the *McDonnell Douglas Corp. v. Green*[12] burden-sifting analysis.[13]  Under *McDonnell Douglas*:

> If the plaintiff can establish a prima facie case, then the burden shifts to the defendants to produce a legitimate non-discriminatory reason for their actions.  If the defendants meet that burden, then the plaintiff must demonstrate that the defendants' proffered reason is merely pretextual, meaning that it is "unworthy of credence."[14]

Here, Plaintiff fails to establish a prima facie case of retaliation under Title VI because there is no evidence that Plaintiff engaged in protected activity by opposing discrimination based on race, color, or national origin.  Even Plaintiff's threatened filing of a lawsuit—the alleged basis

---

[9] *Silva v. St. Anne Cath. Sch.*, 595 F. Supp. 2d 1171, 1187 (D. Kan. 2009) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) (analyzing Title IX)).

[10] *Id.*

[11] *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), *aff'd*, 462 F. App'x 797 (10th Cir. 2012) (analyzing Title VII case); *see also Silva*, 595 F. Supp. 2d at 1182 (recognizing that analysis is the same under Title VII and Title VI).

[12] 411 U.S. 792, 802–04 (1973)

[13] *See Silva*, 595 F. Supp. 2d at 1187.

[14] Id. (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

-10-

for each of his claims—did not mention nor imply discrimination of any kind, much less any discrimination based on his race or national origin.  Without having engaged in protected activity, Plaintiff cannot recover under Title VI for retaliation.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VI retaliation claim.

**B.      Constitutional claims: First Amendment retaliation, procedural due process, and substantive due process**

Plaintiff also asserts several constitutional claims—First Amendment retaliation, procedural due process, substantive due process, and conspiracy under 42 U.S.C. § 1983 against Defendants.  Defendants have responded to each of these claims by asserting qualified immunity.  "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."[15]

By failing to submit a timely response, Plaintiff has in effect waived his chance to meet his burden in overcoming qualified immunity.  To analyze the merits of these constitutional claims without Plaintiff arguing them would impermissibly shift the burden of qualified immunity to Defendants.[16]  This is something the Court cannot do for even a pro se plaintiff.[17]  Therefore, Defendants' Motion is granted as to each of Plaintiff's constitutional claims.

---

[15] *Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013); *see also Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1061 (D. Kan. 2021) (addressing qualified immunity as applied to § 1983 civil conspiracy).

[16] *See Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013) (Gorsuch, J.) (finding district court's grant of summary judgment to defendants when plaintiff failed to respond to qualified immunity defense "unassailable" because burden was on plaintiff).

[17] *See, e.g.*, *Kelley v. Wright*, 2019 WL 6700375, at *11 (D. Kan. 2019).

### C.      Common law civil conspiracy

Plaintiff's final remaining claim is common law civil conspiracy.  To prevail on a civil conspiracy claim under Kansas law, a plaintiff must show: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."[18]  From these elements, it is obvious that "[c]onspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy."[19]

Here, Plaintiff's claim for civil conspiracy rests on the same allegation that he was put on probation and dismissed because of his threat to sue the school.  That is the sole "unlawful act" alleged by Plaintiff in support of his conspiracy claim.  However, there simply is no evidence before the Court that Defendants' decision to dismiss Plaintiff from the doctoral program was related to Plaintiff's alleged threat.  Instead, the evidence demonstrates that Plaintiff's dismissal was fully warranted under school policy and long overdue, postponed only by a faculty committed to bending over backwards to accommodate a difficult student.  Furthermore, Plaintiff does not show through any evidence that Defendants' conduct was unlawful under any theory, as demonstrated by this Court's analysis of Plaintiff's Title VI claim.[20]  Instead, the record is full of extraordinary patience, forbearance, and willingness on Defendants' part to assist a student committed to his personal (and groundless) interpretations of the School's policy.

---

[18] *Stoldt v. City of Toronto*, 234 Kan. 957, 678 P.2d 153, 161 (1984).

[19] *Id.*

[20] While the Court did not reach the merits of Plaintiff's constitutional claims, common sense balks at the idea that a plaintiff could maneuver around qualified immunity simply by bringing a civil conspiracy claim based on a constitutional violation when the defendant is entitled to qualified immunity on that independent claim.  *Cf. Reams v. City of Frontenac*, 587 F. Supp. 3d 1082, 1105 (D. Kan. 2022) (allowing common law conspiracy claim to go forward based on independent constitutional claim to which defendants were *not* entitled to qualified immunity).

Regardless, by failing to respond to Defendants' Motion, Plaintiff has waived this claim and any arguments he might have made in support of it.[21]  Accordingly, Defendants are entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 118) is **GRANTED.**

**IT IS SO ORDERED.**

Dated this 13th day of January, 2023.

This case is closed.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[21] *See Palmer v. Unified Gov't of Wyandotte Cnty./Kan. City*, 72 F. Supp. 2d 1237, 1250–51 (D. Kan. 1999) ("[T]he court deems plaintiff's failure to respond to an argument raised in defendants' papers tantamount to an express abandonment of any such claim.").